GIBSON, DUNN & CRUTCHER LLP
CHRISTOPHER CHORBA, SBN 216692
  cchorba@gibsondunn.com
TIMOTHY LOOSE, SBN 241037
  tloose@gibsondunn.com
ADRIENNE LIU, SBN 331262
  aliu@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

PAUL HASTINGS LLP
BEHNAM DAYANIM *(pro hac vice)*
  bdayanim@paulhastings.com
2050 M Street, NW
Washington, DC 20036
Telephone:  202.551.1700
Facsimile:  202.551.1705

SEAN D. UNGER, SBN 231694
ANDY LEGOLVAN, SBN 292520
  seanunger@paulhastings.com
101 California Street
San Francisco, CA 94111
Telephone:  415.856.7000
Facsimile:  415.856.7100

Attorneys for Defendant META PLATFORMS, INC.,
(f/k/a Facebook, Inc.), a Delaware corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KATHLEEN WILKINSON, *et al.*,<br><br>          *Plaintiffs*,<br><br>     v.<br><br>META PLATFORMS, INC. (f/k/a Facebook, Inc.), a Delaware corporation,<br><br>          *Defendant.*<br><br>HANNELORE BOORN,<br><br>          *Plaintiff*,<br><br>     v.<br><br>META PLATFORMS, INC. (f/k/a Facebook, Inc.), a Delaware corporation,<br><br>          *Defendant.* | Case No. 5:21-cv-02777-EJD<br>Case No. 5:21-cv-02818-EJD<br><br>**MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS COMPLAINT UNDER SECTION 230 OF THE COMMUNICATIONS DECENCY ACT**<br><br>**Hearing:**<br>Date:      August 4, 2022<br>Time:      9:00 AM<br>Place:     Courtroom 4 – 5th Floor<br>Judge:     Hon. Edward J. Davila |

## <u>NOTICE OF MOTION AND MOTION</u>

PLEASE TAKE NOTICE THAT, on August 4, 2022, at 9:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Edward J. Davila, in Courtroom 4, 5th Floor, of the United States District Court, Northern District of California, located at 280 South 1st Street, San Jose, California, 95113, Defendant Meta Platforms, Inc. will and hereby does move this Court, under Federal Rule of Civil Procedure 12(b)(6), for an order dismissing all of the claims in Plaintiffs' Master Complaint with prejudice because they are barred under Section 230 of the Communications Decency Act.

Meta brings this Motion in accordance with the Court's Order dated March 15, 2022 (*Wilkinson* Dkt. 98), without prejudice to the other grounds for dismissal, which grounds are expressly preserved and which will be raised in a subsequent Motion to Dismiss, should Plaintiffs' claims survive this Motion.  Meta also brings this Motion without prejudice to its right to enforce any arbitration clauses between the Plaintiffs and/or putative class members and the third parties that have developed the games at issue.

This Motion is based on the Memorandum of Points and Authorities submitted herewith, any Reply Memorandum or other papers submitted in connection with the motion, the Master Complaint filed in this action, the Declaration of Christopher Chorba and accompanying exhibits, any matter of which this Court may properly take judicial notice, and any information presented at argument.

Dated: April 8, 2022

GIBSON, DUNN & CRUTCHER LLP

By:    /s/ *Christopher Chorba*
Christopher Chorba

Attorneys for Defendant META PLATFORMS, INC.
(f/k/a Facebook, Inc.), a Delaware corporation

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.     SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY ..................................... 2

III.    LEGAL STANDARD..................................................................... 5

IV.     ARGUMENT ....................................................................... 6

        A.      Facebook Is an "Interactive Computer Service" ........................................ 7

        B.      The Complaint Impermissibly Treats Meta as the "Publisher" of Casino-Themed  Video Games................................................................ 7

        C.      Meta Was Not Responsible for the "Creation" or "Development" of the Video Games................................................................ 12

V.      CONCLUSION ...................................................................... 15

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................5

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ..................................................................................1, 7, 8, 10

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ........................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................5

*Brown v. Entm't Merchants Ass'n*,
    564 U.S. 786 (2011) ........................................................................................................9

*Caraccioli v. Facebook, Inc.*,
    167 F. Supp. 3d 1056 (N.D. Cal. 2016) ........................................................................6, 7

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ................................................................................6, 9, 14, 15

*Coffee v. Google, LLC*,
    No. 20-cv-03901-BLF, 2021 WL 493387 (N.D. Cal. Feb. 10, 2021) ........................9, 13

*Coffee v. Google, LLC*,
    No. 20-cv-03901-BLF, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022) ....................2, 8, 10, 11, 12, 15

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ................................................................1, 5, 6, 7, 10, 12, 14

*Evans v. Hewlett-Packard Co.*,
    No. 13-02477-WHA, 2013 WL 4426359 (N.D. Cal. Aug. 15, 2013) ..........................11

*Evans v. Hewlett-Packard Co.*,
    No. 13-02477-WHA, 2013 WL 5594717 (N.D. Cal. Oct. 10, 2013) ............................15

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ................................................................6, 7, 13, 14, 15

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) ........................................................................7, 15

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) ............................................................................................7, 14

Gibson, Dunn &
Crutcher LLP

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Gentry v. eBay, Inc.*,
    99 Cal. App. 4th 816 (2002).................................................................................9

*Goddard v. Google, Inc.*,
    No. 08-cv-02738-JF, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008).............................15

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021)..........................................5, 6, 7, 8, 10, 11, 12, 13, 14, 15

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019)...........................................................................11, 12

*Jones v. Bock*,
    549 U.S. 199 (2007) .......................................................................................5

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016)...............................................................2, 6, 7, 10, 13

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ........................................................................7

*La Park La Brea A LLC v. Airbnb, Inc.*,
    285 F. Supp. 3d 1097 (C.D. Cal. 2017)...........................................................9, 10, 15

*Mai v. Supercell Oy*,
    No. 20-cv-05573-EJD, 2021 WL 4267487 (N.D. Cal. Sept. 20, 2021).........................2

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007)........................................................................2, 6

*Sams v. Yahoo! Inc.*,
    713 F.3d 1175 (9th Cir. 2013)..........................................................................5

*Taylor v. Apple Inc.*,
    No. 20-cv-03906-RS (N.D. Cal. Jan. 4, 2022) ......................................................2

*Taylor v. Apple Inc.*,
    No. 20-cv-3906-RS (N.D. Cal. Mar. 19, 2021) ....................................................12

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003).............................................................................3

**STATUTES**

47 U.S.C. § 230 ...........................................................................6, 7, 8, 9, 12, 13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**OTHER AUTHORITIES**

*Developer Products*, Meta for Developers,
   https://developers.facebook.com/products ........................................................................................4

*Payments Terms*, Meta for Developers,
   https://developers.facebook.com/policy/payments_terms ........................................................4, 10

*Meta Platform Terms*, Meta for Developers,
   https://developers.facebook.com/policy ........................................................................................3, 14

Gibson, Dunn &
Crutcher LLP

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Through this lawsuit, Plaintiffs seek to hold Meta liable for hosting certain third-party applications on the Facebook social media platform.  Although people can play many different games on Facebook—including trivia games, puzzles, sports, and fantasy games—Plaintiffs' claims focus on so-called "social casino" games that allegedly simulate slot machines in some respects, but with a fundamental difference:  players cannot win any actual money.

Plaintiffs allege that Meta (and Apple and Google) violated state anti-gambling statutes by hosting these games—games that Meta did not create, as Plaintiffs readily admit.  Yet Plaintiffs still contend that Meta has engaged in an "illegal gambling" venture, despite the inability of players to win any real money from these third-party games.  Meta disputes Plaintiffs' view of the law, and Plaintiffs have not stated and cannot state a viable claim for relief.  But this Court can and should dispose of all of Plaintiffs' claims without reaching their dubious merits because Section 230 of the Communications Decency Act precludes claims that treat an internet intermediary like Meta as the publisher or speaker of content created by third parties.

The Ninth Circuit repeatedly has held that Section 230 protects providers of interactive computer services from liability for content posted by third parties.  *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019).  Plaintiffs not only seek to hold Meta liable for allowing third parties to publish casino-themed video games alongside other types of video games on the Facebook platform, but also request an injunction requiring Meta to remove such games from its platform.  (Compl. ¶ 21, *Wilkinson* Dkt. 80; *id.* at 81.)  These claims and requested remedies represent a textbook example of a publisher theory of liability that is barred by Section 230.  *See, e.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

Plaintiffs try to plead around Section 230 by alleging that Meta (1) processed in-app purchases of virtual coins for use in the casino-themed video games, (2) allowed third parties to display advertisements for the games, and (3) provided data analytics tools to third-party developers.  But this alleged conduct is all part and parcel of Meta's hosting of any type of video game, and the underlying services and tools are available to all developers.  Nothing about Plaintiffs' allegations provides any basis to hold Meta independently liable for the supposed illegality of video games created by third

parties.  Nor do these activities turn Meta into a "developer" or "creator" of the underlying casino-themed video games.  Plaintiffs' attempts at "creative pleading in an effort to work around" Section 230 therefore fail as a matter of law, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016), as a judge in this District recently held when confronting an attempt to hold internet intermediaries liable for games that purportedly constituted illegal gambling, *see Coffee v. Google, LLC*, No. 20-cv-03901-BLF, 2022 WL 94986, at *6 (N.D. Cal. Jan. 10, 2022).

Section 230 "establish[es] broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user."  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (cleaned up).  Because Plaintiffs' claims necessarily treat Meta as the publisher and speaker of casino-themed video games that it did not create or develop, no amendment could remove these claims from Section 230's scope.  The Master Complaint should be dismissed with prejudice.[1]

## II.      SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY

Meta's Facebook social media platform allows people to connect, share information, and engage socially (and virtually).  This case is about casino-themed video games that are "playable from smartphones, tablets, and internet browsers" on a variety of gaming platforms including, but not limited to, Facebook.  (Compl. ¶ 2.)  Nearly 50 competing casino-themed video games appear as apps accessible on the Facebook App Center, the Google Play Store, and the Apple App Store.  (*Id.* ¶¶ 73–74.)  Within these games, players can bet virtual coins on "animated slot machines," where the outcome of the spin decides whether the player wins or loses coins.  (*Id.* ¶ 57.)  The games provide players "an initial allotment of virtual chips for free."  (*Id.*)  A player who runs out of free coins can wait a set

---

[1] The Complaint should be dismissed on several additional grounds, and Meta has reserved its right to assert those additional arguments if necessary.  (*See, e.g.*, *Wilkinson* Dkts. 86, 93, 97.)  In particular, this Court and other judges in this District have dismissed similar claims because the named plaintiffs lacked statutory standing and did not plead any violation of California law.  *See Coffee*, 2022 WL 94986, at *13–23; *Taylor v. Apple Inc.*, No. 20-cv-03906-RS (N.D. Cal. Jan. 4, 2022); *Mai v. Supercell Oy*, No. 20-cv-05573-EJD, 2021 WL 4267487 (N.D. Cal. Sept. 20, 2021).

Gibson, Dunn &
Crutcher LLP

amount of time before receiving more free coins.  (*Id.* ¶ 59.)  Or a player who wants to keep playing immediately may purchase more virtual coins using real money.  (*Id.* ¶¶ 59, 61.)

Unlike with a real-world slot machine, the players of casino-themed video games are not playing for keeps.  A player who hits the jackpot with a good spin wins only virtual coins that cannot be redeemed for anything of real-world value and cannot be used in any way outside the casino-themed video game. (Compl. ¶¶ 57, 61–62.)  Because virtual coins can never be "cash[ed] out," players know that these games and their virtual coins are purely for entertainment purposes.  (*Id.* ¶ 3.)

Plaintiffs are former and current players of casino-themed video games on the Facebook App Center.  (Compl. ¶¶ 101–125.)  They seek to represent a nationwide putative class and 15 state-specific putative classes.  (*Id.* ¶ 126(a)–(p).)  And they raise a panoply of claims against Meta under laws of California, Alabama, Arkansas, Georgia, Illinois, Kentucky, Minnesota, Missouri, Montana, New Jersey, New York, South Carolina, Tennessee, Virginia, and Washington, as well as the federal Racketeer Influenced and Corrupt Organizations Act.  (*Id.* ¶¶ 135–499.)

At bottom, all of the claims turn on the proposition that the content of casino-themed video games constitutes "illegal gambling."  The Complaint does not allege that Meta created any of the 50-plus casino-themed video games challenged by Plaintiffs.  To the contrary, Plaintiffs allege that all of these games were created and developed by third-party game developers even "[b]efore gaining access to . . . social media platforms."  (Compl. ¶ 69.)  Facebook is merely a platform for developers to make these games available to others.  (*Id.*  ¶ 70.)

When game developers wish to "publish[]" their casino-themed video games "in the Facebook App Center," the "developers must submit their app for review" and agree to follow applicable laws. (Compl. ¶ 76.)  This app-review process applies to all apps made available on the Facebook platform. (*See* Chorba Decl., Ex. A, *Meta Platform Terms*, Meta for Developers § 7(a), https:// developers.facebook.com/policy (cited in Compl. ¶ 76 n.18).)[2]

---

[2]  In resolving a motion to dismiss, courts may consider "documents incorporated by reference in the complaint . . . without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  For the convenience of the Court, Meta

*(Cont'd on next page)*

1    In an apparent effort to avoid Section 230, Plaintiffs strain to allege that Meta (as well as Apple

2 and Google) "directly assisted" the developers of casino-themed video games.  (Compl. ¶ 68.)  But by

3 "directly assist[]," the Complaint apparently means that third-party game developers have made use of

4 general resources available to *all* game developers of *any* sort, such as:

- Underline: In-App Payment System:  The Complaint alleges that Meta processes in-app purchases for a
  30% service fee.  (*See* Compl. ¶¶ 60, 72, 88.)  Meta also uses the same terms to process all in-
  app payments for all video games available on the Facebook platform.  (*See* Chorba Decl., Ex.
  B, *Payments Terms*, Meta for Developers § 2.1, https://developers.facebook.com/policy/
  payments_terms ("Facebook will earn a 30% service fee, plus any applicable sales tax or VAT,
  in connection with each Facebook Payments transaction on our platform.") (cited in Compl.
  ¶¶ 60 n.9, 72 n.15, 88 n.30).)

- Advertising:  Meta offers App Ads to allow any app developer to try to reach "lookalike
  audiences to increase engagement" with their games and App Invite as a way to send all types
  of games to potentially interested new players.  (Compl. ¶ 78.)  Meta makes these neutral
  developer tools generally available to *all* app developers, not just those who create video game
  apps much less "social casino apps."  (Compl. ¶ 5; *see* Chorba Decl., Ex. C, *Developer Products*,
  Meta for Developers, https://developers.facebook.com/products (cited in Compl. ¶ 75 n.17).)

- Data Analytics:  Game developers had access to Facebook Analytics for Apps, which allegedly
  "track[ed] the time spent between installation and purchase."  (Compl. ¶ 78.)  This tool also
  allegedly allowed game developers to "monitor the game activity."  (*Id.* ¶ 81.)  The Complaint
  does not allege that Facebook Analytics for Apps was offered only to casino-themed video game
  developers or was specially designed for casino-themed video games.  Again, these are neutral
  tools offered to all developers whose games are published on Facebook's platform.

- User Functions:  Meta also allegedly assisted the third-party game developers by creating a
  general application login system (which "facilitates easy, familiar sign-up") and a sharing

is concurrently submitting copies of each webpage incorporated by reference into Plaintiffs'
Complaint and cited in this Motion.  (*See* Declaration of Christopher Chorba, Exs. A–C.)

function (which "creates viral social distribution") that are made available to Facebook users who choose to use them.  (Compl. ¶ 78.)  Here, too, the Complaint does not allege that Meta designed either the Facebook login process or the sharing function specifically to facilitate casino-themed video games.

Plaintiffs say that Meta should be held liable because the game developers used the Facebook platform to publish the games, because Meta allegedly processed users' in-app purchases of virtual coins to play the game, and because Meta allegedly provided neutral advertising and analytic tools to game developers.  (*E.g.*, Compl. ¶¶ 248, 257, 263 (basis for all three types of claims under Illinois law).)  Plaintiffs do not allege that processing transactions or providing analytical tools or advertising services are acts that are unlawful in and of themselves.  Rather, Plaintiffs claim that Meta can be held liable for these content-neutral functions because certain third-party developers used them in conjunction with their casino-themed video games.

In addition to the claims against Meta in two consolidated actions (*Wilkinson* and *Boorn*), multidistrict litigation raising materially identical claims against Apple and Google is also pending before this Court.  *See In re Apple Inc. Store Simulated Casino-Style Games Litig.*, No. 5:21-md-02985-EJD; *In re Google Play Store Simulated Casino-Style Games Litig.*, No. 5:21-md-03001-EJD.  As to all of these matters, the Court set a briefing schedule under which the parties will brief the applicability of Section 230 before other potential grounds for dismissal.  (*Wilkinson* Dkt. 98.)

### III.     LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Courts are "not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555.  A motion to dismiss is proper when an affirmative defense is plain on the face of the complaint—that is, when "the allegations, taken as true, show the plaintiff is not entitled to relief."  *Jones v. Bock*, 549 U.S. 199, 215 (2007); *see, e.g.*, *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013).  The Ninth Circuit has repeatedly held that courts can determine whether Section 230 precludes a claim at the pleadings stage.  *See, e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 890 n.8 (9th Cir. 2021); *Dyroff*, 934 F.3d at 1097

("When a plaintiff cannot allege enough facts to overcome Section 230 immunity, a plaintiff's claims should be dismissed."); *see also, e.g.*, *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065–67 (N.D. Cal. 2016) (Davila, J.) (dismissing complaint under Section 230(c)(1) without leave to amend).

## IV.    ARGUMENT

In enacting Section 230, Congress determined that Americans were turning to interactive computer services—frequently, websites—for (among other things) "entertainment services," and that "Federal or State regulation" could dampen the innovation that characterized the digital marketplace. 47 U.S.C. § 230(a)(5), (b)(2).  This concern about the potential chilling effect of overregulation led Congress to enact the limitation on claims against interactive computer services that forecloses Plaintiffs' claims here:  "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  *Id.* § 230(c)(1).  This provision, along with the corresponding preemption provision, *id.* § 230(e)(3), bars Plaintiffs' attempt to hold Meta liable for the casino-themed video games created and developed by third-party developers and published on Facebook.

Section 230(c)(1) protects "providers of interactive computer services against liability arising from content created by third parties."  *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc).  This provision is "robust" by design.  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).  Its protections apply to *any* cause of action that "inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another," not only to paradigmatic publisher claims like defamation and libel.  *Gonzalez*, 2 F.4th at 891 & n.9; *see, e.g.*, *Kimzey*, 836 F.3d at 1267, 1270 (applying Section 230 to civil RICO claims).  Section 230 thus shields providers of interactive computer services from liability whenever a claim "would make [them] liable for information originating with a third-party user" of their services.  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007).  This protection extends to claims premised on "'traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content,'" *Roommates.com*, 521 F.3d at 1184—as well as any "content-neutral tools" that service providers offer "to facilitate communications," *Dyroff*, 934 F.3d at 1096.

Consistent with the plain terms of the statute, the Ninth Circuit has applied a "three-prong test for Section 230 immunity": "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat as a publisher or speaker (3) of information provided by another information content provider." *Gonzalez*, 2 F.4th at 891 (cleaned up) (quoting *Barnes*, 570 F.3d at 1100–01). Plaintiffs cannot "circumvent" Section 230 "through 'creative' pleading" that purports to challenge actions of an internet intermediary when the essence of the claim rests on alleged harms caused by third-party content. *Kimzey*, 836 F.3d at 1266. Such creative pleading (if permitted) would nullify the protections of Section 230, because a "clever lawyer" will always be able to argue that a website "promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Roommates.com*, 521 F.3d at 1174.

All of the claims in this case seek to hold Meta liable for third-party content (consisting of allegedly unlawful casino-themed video games) developed by third parties and made available on the Facebook platform. Because each element of Section 230 is established here, this Court should dismiss the Complaint for failure to state a claim on which relief can be granted under Rule 12(b)(6).

## A. Facebook Is an "Interactive Computer Service"

An "interactive computer service" includes any "system" that "provides or enable computer access by multiple users to a computer server." 47 U.S.C. § 230(c)(1), (f)(2); *see, e.g.*, *Dyroff*, 934 F.3d at 1096–97. Here, the Complaint alleges that the Facebook platform makes online video games available to players via the internet. (Compl. ¶ 70.) That allegation alone establishes the definition in Section 230(f)(2). And as multiple courts have unanimously held, Meta is indisputably a provider of an "interactive computer service"—here, the Facebook platform. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359–60 (D.C. Cir. 2014); *see, e.g.*, *Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1117 (N.D. Cal. 2020); *Caraccioli*, 167 F. Supp. 3d at 1065.

## B. The Complaint Impermissibly Treats Meta as the "Publisher" of Casino-Themed Video Games

By attempting to hold Meta liable for allegedly illegal content posted through casino-themed video games Plaintiffs' claims seek to treat Meta "as the publisher or speaker" of those games. 47

U.S.C. § 230(c)(1).  The Complaint claims that Meta has joined "an illegal gambling enterprise" by making the Facebook App Center available as a "center[] for distribution and payment" for third-party games.  (Compl. ¶¶ 6, 16.)  But that is just the sort of claim that Section 230 bars.  Plaintiffs cannot circumvent that bar by focusing on the neutral tools made available to all developers (processing in-app purchases, in-app advertising, or data analytics tools), and the claims in this case do not fit the very narrow exceptions the Ninth Circuit has identified in refusing to apply Section 230.

    **1.  *Plaintiffs Expressly Advance a Publisher Theory of Liability.***  The Complaint explicitly treats Meta "as the publisher of speaker of" casino-themed video games.  47 U.S.C. § 230(c)(1).  Plaintiffs allege that the games at issue were developed before they were presented to Meta for publication.  (Compl. ¶ 69.)  Meta then reviewed the apps before they were "*published* [by the game developer] in the Facebook App Center."  (*Id.* ¶ 76 (emphasis added).)  Plaintiffs further allege that Meta "retain[s] full control" over what apps are playable on Facebook, that it "has not taken any steps to limit access" to casino-themed video games (*id.* ¶¶ 5, 91), and that this failure to preclude casino-themed video games from the Facebook platform violates RICO and state laws (*e.g.*, *id.* ¶ 138 ("By hosting and facilitating" casino-themed video games, "Facebook engaged in unfair competition"), ¶ 320 ("Facebook is responsible for making social casinos available to the public in trade and commerce")).

    In addition to this conduct, the Complaint also targets advertisements that third parties displayed on Facebook regarding casino-themed video games.  (*E.g.*, *id.* ¶¶ 71, 82, 84, 490(E).)  But "'reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content'" is what *publishers* do.  *Gonzalez*, 2 F.4th at 892 (quoting *Barnes*, 570 F.3d at 1102).  Section 230 precludes claims that seek to impose liability on Meta for allowing casino-themed video games (and advertisements about such games) onto the Facebook platform.  *See Coffee*, 2022 WL 94986, at *5; *see also Gonzalez*, 2 F.4th at 892, 894–95.

    The analysis does not change because the Complaint alleges Meta published casino-themed video games rather than news articles, movies, or books.  Section 230 broadly covers any "*information* provided by another information content provider," 47 U.S.C. § 230(c)(1) (emphasis added), and video game software is exactly that.  In fact, the Supreme Court has recognized that video games constitute

protected speech. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011). And because video games are "information" within the scope of Section 230, Congress has immunized from liability the decision whether to host video games on an interactive computer service, thereby forgoing "the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Carafano*, 339 F.3d at 1123 (cleaned up); *see also Coffee v. Google, LLC*, No. 20-cv-03901-BLF, 2021 WL 493387, at *6 (N.D. Cal. Feb. 10, 2021). This outcome serves Section 230's purpose of "promot[ing] the development of e-commerce." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (citing 47 U.S.C. § 230(a)), *superseded by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2017); *see also La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1108 (C.D. Cal. 2017).

Plaintiffs nonetheless seek to impose a duty to monitor and remove third-party content—the Complaint explicitly requests an injunction "to force Facebook to stop participating in" the publication of casino-themed video games. (Compl. ¶ 20; *see also id.* at 80.) Such an injunction, if ordered by this Court, would run directly contrary to the policy judgment embodied in Section 230. The many websites that process third-party transactions for a fee would face substantially increased risks of liability if Section 230 vanished whenever the transaction was alleged to be unlawful—for example, because a third party's listing included a misrepresentation. *See Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 831 (2002); *see also La Park La Brea*, 285 F. Supp. 3d at 1106–07 (collecting more examples). If one State bans one type of online video game, and another State bans another, the costs and strain on all platforms to monitor all games (and, if necessary, revise or remove them) would directly undermine Congress's vision of a "vibrant and competitive free market . . . unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). It was for this reason that Congress erred on the side of allowing more speech (not less) after finding that "[i]t would be impossible for service providers to screen each of their millions of postings for possible problems"—as Plaintiffs would have Meta do with respect to the Facebook App Center—without "severely restrict[ing]" the content of postings. *Carafano*, 339 F.3d at 1124 (cleaned up).

The overarching theme in the Complaint is that casino-themed video games (third-party content) made available through the Facebook platform (an interactive computer service) have a wider

reach than games that are not on Facebook, which only further cements the allegations' focus on publisher activities. (*See, e.g.*, Compl. ¶¶ 4, 19, 79, 87.) Plaintiffs contend that game developers gained "access to a whole new market of consumers" for their games by moving to online platforms like the Facebook App Center. (*Id.* ¶ 69.) No doubt, a third party posting its content on a platform with more users will provide increased access to the third party's allegedly illegal content (whether it be defamatory statements, trademark violations, or illegal gambling). *See, e.g.*, *Barnes*, 570 F.3d at 1101–02 & n.8. But Section 230 does not turn on the popularity or lawfulness of the content, so long as the interactive computer service does not create its own content. *See Kimzey*, 836 F.3d at 1270. And here, all of the content at issue originated from third parties who imagined, developed, created, and published their casino-themed video games on the Facebook platform. (Compl. ¶¶ 76–77.) This case, however one slices it, is all about the content of the casino-themed video games.

**2.  *Plaintiffs Cannot Avoid Section 230 by Focusing on Meta's Neutral Tools.*** In an effort to evade Section 230, the Complaint cites various functions of the Facebook platform that are provided to all app developers, not just casino-themed video game developers. Specifically, Plaintiffs emphasize Meta's alleged receipt of a 30% fee for processing in-app purchases, app developers' use of Meta's general advertising platform to display ads for the games, and its provision of data analytics tools to game developers. But all of these activities are "content-neutral tools" that service providers offer "to facilitate communications." *Dyroff*, 934 F.3d at 1096; *see Gonzalez*, 2 F.4th at 895. Such tools are made available to all apps on Facebook, and are used by many app developers, including those who operate entirely outside the video game (or "social casino") space. (*See Payments Terms*, *supra*, § 2.1; *Developer Products*, *supra*.)

Plaintiffs are thus asserting that Meta supposedly became "responsible for offending content merely by providing 'neutral means by which third parties can post information of their own independent choosing online,' or by providing 'neutral tools' to third party developers"—and that is conduct that Section 230 squarely shields from liability. *Coffee*, 2022 WL 94986, at *6 (quoting *Gonzalez*, 2 F.4th at 893); *see also, e.g.*, *La Park La Brea*, 285 F. Supp. 3d at 1106 ("Courts have granted CDA protection to websites that process payments and transactions in connection with third-party listings."). Judge Freeman's ruling in *Coffee* shows why internet intermediaries do not lose the

protections of Section 230 by offering neutral tools.  The plaintiffs there claimed that Google distributed "illegal slot machines" through its Play Store—specifically, in-app purchases of "Loot Boxes" containing unknown-in-advance digital items for use in the game.  2022 WL 94986, at *1, 7. Google, like Meta, set ground rules for (and offered neutral tools to) all developers on an even-handed basis.  *Id.* at *6. And Google took "the same 30% cut" that it takes for all in-app purchases on its Play Store.  *Coffee*, 2022 WL 94986, at *6.

Judge Freeman held that Section 230 barred the claims because they were "grounded entirely in the content of the listings Google displays on its website."  *Id*.  *Coffee* aligned with *Evans v. Hewlett-Packard Co.*, No. 13-02477-WHA, 2013 WL 4426359 (N.D. Cal. Aug. 15, 2013), where Judge Alsup also held that an internet intermediary could not be held liable for hosting a third-party app.  *See id.* at *3.  Here, too, Meta's liability hinges on the specific attributes of the casino-themed video games that Plaintiffs allege transform them from regular games into "illegal gambling."  That means the claims necessarily would require evaluating the content of the third-party video games, and imposing liability on that basis is precluded by Section 230.

**3.  *The Complaint Is Not Based on Any Independent Acts.***  This case does not fit into the narrow category of cases that the Ninth Circuit has recognized where the platform's actions are independent of any third-party content and thus fall outside Section 230.  In *Gonzalez*, for example, Section 230 did not preclude liability "premised on Google [allegedly] providing ISIS with material support by *giving ISIS money*."  2 F.4th at 898 (emphasis in original).  That was because sharing revenue with a terrorist group is itself unlawful, which meant that "the revenue-sharing theory [did] not depend on the particular content ISIS places on YouTube."  *Id*.  In contrast, Section 230 *did* prohibit claims that Google allegedly aided international terrorism by displaying ISIS recruitment videos on YouTube because those claims turned on "the content Google allowed to be posted on its platform." *Id.* at 891.  Likewise, in *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), the challenged ordinance prohibited the processing of financial transactions for rental properties that were unregistered—no liability turned on the platform's posting of illegal third-party listings or advertisements, and the ordinance did "not proscribe, mandate, or even discuss the content of the listings."  *Id.* at 683.  Platforms could comply by refraining from completing transactions for

Gibson, Dunn &
Crutcher LLP

unregistered properties without having to "chang[e]" or "monitor" the content of the listings posted by users. *Id.* at 682–83.

Unlike *Gonzalez* and *HomeAway*, this case does not seek to penalize Meta for any illegal payment or other financial transaction. As is clear from the Complaint, Plaintiffs do not seek to regulate any *real-world* activity. Most critically, players cannot "cash out" their coins from the so-called "social casinos" into real money or its equivalent. (Compl. ¶ 3.) And while the Complaint editorializes that "Facebook, Google, and Apple . . . have found a way to smuggle slot machines into the homes of consumers nationwide" (Compl. ¶ 2), Plaintiffs concede that *all* of those games were simply software applications created by third parties and published on various platforms, including Facebook (*id.* ¶¶ 257, 379, 394). This theory of liability is squarely barred by Section 230, which forecloses any attempt to treat Meta as "the publisher" of "information" (here, the casino-themed video games) "provided by another information content provider" (here, the third-party video game developers). 47 U.S.C. § 230(c)(1); *see Gonzalez*, 2 F.4th at 891; *Dyroff*, 934 F.3d at 1098.[3]

## C. Meta Was Not Responsible for the "Creation" or "Development" of the Video Games

The casino-themed video games at issue also are "information provided by another information

---

[3] A judge in this District recently held that Section 230 did not bar claims against Apple for hosting video games that allegedly functioned like slot machines because those claims sought "to hold Apple liable for selling allegedly illegal gaming devices, not for publishing or speaking information." Order Granting Motion to Dismiss 6, *Taylor v. Apple, Inc.*, No. 20-cv-3906-RS (N.D. Cal. Mar. 19, 2021). Here, by contrast, Plaintiffs expressly target the publication of casino-themed video games in the Facebook App Center and attempt to hold Meta liable for "hosting" the games online. *E.g.*, Compl. ¶¶ 76, 138; *see also Coffee*, 2022 WL 94986, at *6. In any event, Meta respectfully submits that *Taylor* was decided incorrectly. Internet intermediaries are protected when they disseminate "information" (whether defamation or video games) but not when they distribute, for example, narcotics or unlisted rental properties (which of course are not information). 47 U.S.C. § 230(c)(1); *see HomeAway*, 918 F.3d at 682. The *Taylor* decision appeared to overlook this crucial distinction.

content provider." 47 U.S.C. § 230(c)(1).  The Complaint admits that independent third parties—not Meta—created the games and only later offered them through Facebook.  (Compl. ¶ 69.)  This is a classic example of third-party content on an interactive computer service that triggers the protections of Section 230.  *See Coffee*, 2021 WL 493387, at *6.  And absent from the Complaint are any allegations that would make Meta an "information content provider" with the respect to the content, which Section 230 defines as a person that "is responsible, in whole or in part, for the creation or development" of casino-themed video games.  47 U.S.C. § 230(f)(3).  Plaintiffs nonetheless point to various aspects of the Facebook platform—its ability to host games, its provision of functions like user logins and sharing, its advertising platform, and its payment processing functionality—in another apparent effort to circumvent Section 230.  But none of those acts show that Meta was the creator or developer of the casino-themed video games, as they do not constitute any "material[] contribut[ion]" to the games.  *Roommates.com*, 521 F.3d at 1167–68.

**1.  *Hosting Is Not "Creation" or "Development."***  Meta was not transformed into an "information content provider" of casino-themed video games just because it offered a platform that supports video games generally.  No one would say that Sony "create[d]" or "develop[ed]" every video game available for PlayStation, just as no one can say that Meta "create[d]" or "develop[ed]" all apps submitted for publication in the Facebook App Center.  47 U.S.C. § 230(f)(3).  On the contrary, "proliferation and dissemination of content does not equal creation or development of content." *Kimzey*, 836 F.3d at 1271; *see Gonzalez*, 2 F.4th at 893.  Rather, to lose Section 230 protection, Meta would have to take some action involving the content that "materially contribut[ed]" to "*its alleged unlawfulness*." *Roommates.com*, 521 F.3d at 1167–68 (emphasis added).

A website that edits a defamatory statement through neutral tools such as spellcheck retains its protection under Section 230, but a website that edits content "in order to transform an innocent message into a libelous one" has materially contributed to the defamatory statement. *Id.* at 1169.  Here, Meta uses the same app-review process for all games and has not designed a platform specifically for the third-party content at issue in the Complaint.  (*See Meta Platform Terms*, *supra*, § 7(a).)  Meta thus played no role in the creation or development of the casino-themed video games—including their casino-like features that, according to the Complaint, make that underlying third-party content illegal.

Meta's alleged provision of an integrated login for users and a sharing function for content (Compl. ¶ 78, 88; *see supra*, at 4–5) does not change the result under Section 230 for similar reasons. First, these sorts of functions "are not content in and of themselves." *Dyroff*, 934 F.3d at 1098. They are "*neutral* tools to carry out what may be unlawful or illicit" video games or what may be perfectly legal video games. *Roommates.com*, 521 F.3d at 1169 (emphasis in original); *see Carafano*, 339 F.3d at 1124. Second, the login and sharing functions did not "materially contribut[e]" to the alleged unlawfulness of casino-themed video games. *Roommates.com*, 521 F.3d at 1167–68. According to Plaintiffs, casino-themed video games were a form of illegal gambling before they ever appeared on Facebook. (Compl. ¶¶ 5, 12–13.) Meta disputes that these videos games violate any laws, but even if Plaintiffs were correct, the casino-themed video games would be allegedly unlawful—full stop— independent of anything that Meta did. Thus, Meta is utterly unlike the website that adds its own defamatory content or engineers its own system to require unlawful conduct. *See Roommates.com*, 521 F.3d at 1169–70.

   **2.  *Providing an Advertising Platform Is Not "Creation" or "Development."*** The allegations about Meta's provision of an advertising platform and data analytics tools likewise provide no basis for piercing the protections of Section 230, as *Gonzalez* demonstrates. There, YouTube offered "sophisticated" advertising tools based on user's analytics—their past viewing history and other activity to the game developers. 2 F.4th at 894–95. The Ninth Circuit held that such personalized advertising is a content-neutral tool, even when the algorithm allegedly promoted ISIS content, because the complaint did not allege that Google "specifically targeted ISIS content, or designed its website to encourage videos that further the terrorist group's mission." *Id.* at 895 (agreeing with *Force v. Facebook, Inc.*, 934 F.3d 53, 66–67, 70 (2d Cir. 2019)).

   The same is true here. The Complaint does not allege that Meta targeted casino-themed video games or specially designed its advertising tools for casino-themed video games. On the contrary, the advertising tools alleged in the Complaint are available to all game developers. Meta's conduct thus does "not amount to *developing* the underlying information." *Gonzalez*, 2 F.4th at 895 (emphasis in original).

**3.** ***Payment Processing Is Not "Creation" or "Development."*** Nor do the allegations about "payment processing" (Compl. ¶¶ 60, 72, 88) allow Plaintiffs to hold Meta liable for casino-themed video games. The neutral processing of in-app transactions does not "'transform'" an interactive computer service "into a 'developer' of the 'underlying [content].'" *Roommates.com*, 521 F.3d at 1172 (quoting *Carafano*, 339 F.3d at 1124); *see also, e.g.*, *La Park La Brea*, 285 F. Supp. 3d at 1106. Under Section 230, internet intermediaries can charge users for publishing or viewing third-party content so long as "the selection of the content [is] left exclusively to the user"—as the video games and virtual coins are here. *Carafano*, 339 F.3d at 1123–24. The fact that Meta collects a fixed 30% fee for clearing certain in-app transactions is "immaterial" because Meta did not create or develop the casino-themed video games. *Goddard v. Google, Inc.*, No. 08-cv-02738-JF, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008). Simply put, there is no "for-profit exception" to the protections of Section 230. *Fed. Agency of News*, 432 F. Supp. 3d at 1119.

*Coffee* is again instructive. There, Judge Freeman held that conduct by Google constituted only the "publication of third-party apps in the Play Store and the provision of neutral tools and services to all developers across the Google Play platform." 2022 WL 94986, at *6. Such neutral tools cannot demonstrate a material contribution to alleged illegality, as the Ninth Circuit has defined that concept in *Roommates.com* and *Gonzalez*. *See Coffee*, 2022 WL 94986, at *7; *see also Evans v. Hewlett-Packard Co.*, No. 13-02477-WHA, 2013 WL 5594717, at *4 (N.D. Cal. Oct. 10, 2013) (holding that commission on app sales did not show that internet intermediary was "jointly engaged in development of the *content*" (emphasis in original)). So too here.

## V.   CONCLUSION

Because the allegations in the Complaint establish that Section 230 bars all of Plaintiffs' claims, and because amendment would be futile, Meta respectfully requests that the Complaint be dismissed with prejudice.

Dated: April 8, 2022

GIBSON, DUNN & CRUTCHER LLP

By: _____/s/ Christopher Chorba_____
Christopher Chorba

Attorneys for Defendant META PLATFORMS, INC. (f/k/a Facebook, Inc.), a Delaware corporation