Rafey S. Balabanian (SBN 315962)
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300 / Fax: 415.373.9435

*Interim Lead Counsel*

**[Additional Counsel Listed on Signature Page]**

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| IN RE: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-cv-02777-EJD |
|---|---|
| | **PLAINTIFFS' AMENDED MASTER COMPLAINT** |
| | **CLASS ACTION** |
| | **JURY DEMAND** |

Plaintiffs Kathleen Wilkinson, Nancy Urbanczyk, Laura Perkinson, Maria Valencia-Torres, Mary Austin, Patricia McCullough, Alison Koda, Glenna Wiegard, Clotera Rogers, Carol Smith, Hannelore Boorn, Janice Williams, Jennifer Andrews, Dawn Mehsikomer, Denice Wax, Frances Long, Sandra Meyers, Steve Simons, Vanessa Sowell Skeeter, Donna Whiting, Sheri Miller, Paul Lombard, Ben Kramer, Rick Larsen, Eleanor Mizrahi, and Janice Wilson, individually and on behalf of the proposed classes, bring this Class Action Complaint against Defendant Facebook, Inc. ("Defendant" or "Facebook"), seeking restitution, damages, injunctive relief, and other appropriate relief from Facebook's ongoing participation in an illegal internet gambling enterprise. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and on information and belief derived from investigation of counsel, and review of public documents as to all other matters.

**INTRODUCTION**

1.      Over the last decade, the world's leading slot machine makers—companies like International Game Technology, Scientific Games Corporation, and Aristocrat Leisure—have teamed up with American technology companies to develop a new product line: social casinos.

2.      Social casinos are apps—playable from smartphones, tablets, and internet browsers—that make the "authentic Vegas-style[1]" experience of slot machine gambling available to consumers anywhere and anytime. *See* Figure 1 (Screenshot of DoubleDown Casino Gameplay). By moving their casino games directly onto the phones, tablets, and computers of players, and by leveraging an innocuous-sounding "free-to-play" model,[2] social casino companies, along with Facebook, Google, and Apple (the "Platforms"), have found a way to smuggle slot machines into the homes of consumers nationwide, twenty-four hours a day and three-hundred-sixty-five days a year.

3.      Just like Las Vegas slot machines, social casinos allow users to purchase virtual "chips" in exchange for real money and then gamble those chips at slot machine games in hopes of winning still more chips to keep gambling. In DoubleDown Casino, for example, players purchase "chip packages" costing up to $499.99. *See* Figure 2 (Screenshot of "Popular" Chip Packages in DoubleDown Casino). But unlike Las Vegas slots, social casinos do not allow players to cash out their chips. Instead, purchased chips and won chips alike can be used only for more slot machine "spinning."

---

[1]      Form F-1/A DoubleDown Interactive Co., Ltd. at 87, https://sec.report/Document/0001193125-20-183157/.

[2]      This term is a misnomer. It refers to a business model by which the initial download of the game is free, but companies reap huge profits by selling "in-game" items (known generally as "in-app purchases").

**Figure 1**

**Figure 2**





4.      Like Las Vegas slots, social casinos are extraordinarily profitable and highly addictive. Social casinos are so lucrative because they mix the addictive aspects of traditional slot machines with the power of the Platforms, including Defendant Facebook, to leverage big data and social network pressures to identify, target, and exploit consumers prone to addictive behaviors.[3]

5.      Simply put, the social casino apps do not, and cannot, operate and profit at such a high level from these illegal games on their own. Their business of targeting, retaining, and collecting losses from addicted gamblers is inextricably entwined with the Platforms. Not only do the Platforms retain full control over allowing social casinos into their stores, and their distribution and promotion therein, but they also share directly in a substantial portion of the gamblers' losses, which are collected and controlled by the Platforms themselves.

6.      Because the Platforms are the centers for distribution and payment, social casinos gain a critical partner to retain high-spending users and collect player data, a trustworthy marketplace to conduct payment transactions, and the technological means to update their apps with targeted new content designed to keep addicted players spending money.

---

[3]      *See, e.g.*, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NEWS HOUR, youtube.com/watch?v=FFtkFLNJZfM.

7.      For example, in 2019, PBS NewsHour reported:

[w]e obtained leaked company documents that show how [a social casino's] VIP system tracks players by their Facebook IDs, closely monitors their game play, and then prods people to keep them spending. They refer to their VIPs as whales, a term taken from the casino industry to describe big spenders.

Social casinos now use behavioral analysis software to quickly identify people who are likely to become big spenders. Behaviors like increasing your bet, or playing frequently, are signals to the companies, and they target these players with heavy marketing, and label them, proto-whales . . .

Facebook's website shows how it tracks people online, and can predict who is likely to spend big by analyzing user data. **Facebook helps social casinos find those potential whales. It charges a premium to nudge players to spend more, to target people whose online behavior might be a sign of addiction**.[4]

8.      Last year alone, consumers purchased and gambled away an estimated *$6 billion* in social casino virtual chips.[5] Indeed, of the top twelve grossing apps available on Defendant Facebook, *nine are social casinos. See* Figure 3 (Screenshot of "Top Grossing" Facebook Apps).

**Figure 3**



----

[4]      *Id.*

[5]      *SciPlay Net Income Skyrockets 127 Percent, as Social Gaming Embraced by Americans Sheltered at Home*, CASINO.ORG (May 13, 2020), https://www.casino.org/news/sciplay-net-income-skyrockets-127-percent-as-social-gaming-embraced/.

9.      By utilizing Facebook for promotion, distribution and payment processing, the social casinos entered into a mutually beneficial business partnership. In exchange for promoting and distributing the casino games, providing them valuable data and insight about their players, and collecting money from consumers, Facebook (and the other Platforms) take a *30 percent* commission off of every wager, earning them billions in revenue. By comparison, the "house" at a traditional casino only takes 1 to 15 percent, while also taking on significant risk of loss in its operation. Facebook's 30 percent commission, on the other hand, is guaranteed for its ability to act as a casino "host" and bankroll.

10.     The result (and intent) of this dangerous partnership is that consumers become addicted to social casino apps, maxing out their credit cards with purchases amounting to tens or even hundreds of thousands of dollars. Consumers addicted to social casinos suffer a variety of non-financial damages ranging from depression to divorce to attempted suicide.

11.     These devastating consequences are not hypothetical or hyperbole: below are excerpts of sworn testimony from individuals describing their experiences with social casinos:

- "There is no way to escape. . . . I actually was able to stop playing DoubleDown once, but I relapsed. DoubleDown has affected my life in so many ways. . . . Overall, I believe that I have spent well over $220,000 playing DoubleDown. . . . My husband and I dreamed of paying off our house and retiring at age 60. My addiction to DoubleDown likely ruined that plan. *The financial consequences have caused a lot of strain in our relationship. When I got hooked on DoubleDown again, I lied to my husband about the total amount I had spent because I was afraid he would divorce me if he were to find out the real amount.* He found out anyway, and when he did, he contacted a divorce attorney to start the process of separation. Luckily for me, he decided to give me another chance. I am so thankful for his patience with me, but I feel terrible that I have put him through all this." Exhibit 1, Declaration of Ben Kramer ¶¶ 3-4, 7 (emphasis added).

- "Overall, I believe that I have spent between $10,000-$20,000 playing social casinos. . . . This kind of loss *put a huge strain on my ability to even buy food* since I had spent money on a stupid game. I believe social casinos were taking advantage of my addiction. … This game hurt me and the worst part was that when my husband was alive, he would say, 'You're not spending money on there are you?' and *I lied. I hate that I have to live with that now*." Exhibit 2, Declaration of Laura Perkinson ¶¶ 3-6 (emphasis added).

12.     Unsurprisingly, social casinos are illegal under many states' gambling laws.

13.     As the Ninth Circuit held in *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785

(9th Cir. 2018):

> In this appeal, we consider whether the virtual game platform "Big Fish Casino" constitutes illegal gambling under Washington law. Defendant–Appellee Churchill Downs, the game's owner and operator, has made millions of dollars off of Big Fish Casino. However, despite collecting millions in revenue, Churchill Downs, like Captain Renault in *Casablanca*, purports to be shocked—shocked!—to find that Big Fish Casino could constitute illegal gambling. We are not. We therefore reverse the district court and hold that because Big Fish Casino's virtual chips are a "thing of value," Big Fish Casino constitutes illegal gambling under Washington law.

14.     As an instructive example, DoubleDown Casino is illegal both in Washington and here in California (where the Platforms, including Defendant Facebook, host it and collect their 30% commission). This year, consumers will purchase approximately $400 million worth of virtual casino chips in DoubleDown Casino. That $400 million will be divided up approximately as follows: $240 million to DoubleDown; $40 million to International Game Technology ("IGT") (a multinational slot machine manufacturer that licenses slot machine game intellectual property to DoubleDown); and—as particularly relevant here—the remaining $120 million to Facebook and the other Platforms (for hosting the app, driving vulnerable consumers to it, and processing the payments for those consumers' virtual chip purchases).

15.     In other words, despite knowing that DoubleDown Casino is illegal, Facebook and the other Platforms continue to maintain a major (30%) financial interest by hosting the game, driving customers to it, and acting as the bank.

16.     As such, DoubleDown, Facebook, and the other Platforms are all liable as co-conspirators to an illegal gambling enterprise. Moreover, DoubleDown Casino is just one of more than fifty social casino apps (the "Illegal Slots") that the Platforms illegally host, promote, and profit from.

17.     Consequently, Facebook and the other Platforms—alongside the Illegal Slot companies—are liable as co-conspirators to an illegal gambling conspiracy.

18.     Defendant Facebook, for its part, is a direct participant in an informal association and enterprise of individuals and entities with the explicit purpose of knowingly devising and operating an online gambling scheme to exploit consumers and reap billions in profits (the "Social Casino Enterprise").

19.     This ongoing Enterprise necessarily promotes the success of each of its members: Social casino operators need Platforms like Facebook, Apple, and Google, to access consumers, host their games, and process payments. The Platforms, for their part, need developers like DoubleDown to publish profit-driven and addictive applications on their platforms to generate massive revenue streams.

20.     Through this case, Plaintiffs seek to force Facebook to stop participating in, and to return to consumers the money it has illegally profited from, the Social Casino Enterprise.

21.     Plaintiffs, on behalf of the putative Classes, bring claims for damages and for injunctive relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"); California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.* ("UCL"); state gambling laws; state consumer protection statutes; and unjust enrichment.

## **PARTIES**

22.     Plaintiff Kathleen Wilkinson is a natural person and a citizen of the State of Montana.

23.     Plaintiff Nancy Urbanczyk is a natural person and a citizen of the State of Illinois.

24.     Plaintiff Laura Perkinson is a natural person and a citizen of the State of Washington.

25.     Plaintiff Maria Valencia-Torres is a natural person and a citizen of the State of Alabama.

26.     Plaintiff Mary Austin is a natural person and a citizen of the State of Arkansas.

27.     Plaintiff Patricia McCullough is a natural person and a citizen of the State of Georgia.

28.     Plaintiff Alison Koda is a natural person and a citizen of the State of Illinois.

29.     Plaintiff Glenna Wiegard is a natural person and a citizen of the State of Illinois.

30.     Plaintiff Clotera Rogers is a natural person and a citizen of the State of Illinois.

31.     Plaintiff Carol Smith is a natural person and a citizen of the State of Illinois.

32.     Plaintiff Hannelore Boorn is a natural person and a citizen of the State of

1    Kentucky.

2        33.    Plaintiff Janice Williams is a natural person and a citizen of the State of

3    Kentucky.

4        34.    Plaintiff Jennifer Andrews is a natural person and a citizen of the State of

5    Minnesota.

6        35.    Plaintiff Dawn Mehsikomer is a natural person and a citizen of the State of

7    Minnesota.

8        36.    Plaintiff Denice Wax is a natural person and a citizen of the State of Minnesota.

9        37.    Plaintiff Frances Long is a natural person and a citizen of the State of Missouri.

10       38.    Plaintiff Sandra Meyers is a natural person and a citizen of the State of Montana.

11       39.    Plaintiff Steve Simons is a natural person and a citizen of the State of New Jersey.

12       40.    Plaintiff Vanessa Sowell Skeeter is a natural person and a citizen of the State of

13   New York.

14       41.    Plaintiff Donna Whiting is a natural person and a citizen of the State of South

15   Carolina.

16       42.    Plaintiff Sheri Miller is a natural person and a citizen of the State of Tennessee.

17       43.    Plaintiff Paul Lombard is a natural person and a citizen of the Commonwealth of

18   Virginia.

19       44.    Plaintiff Ben Kramer is a natural person and a citizen of the State of Washington.

20       45.    Plaintiff Rick Larsen is a natural person and a citizen of the State of Washington.

21       46.    Plaintiff Eleanor Mizrahi is a natural person and a citizen of the State of

22   California.

23       47.    Plaintiff Janice Wilson is a natural person and a citizen of the State of California.

24       48.    Defendant Facebook, Inc. is a corporation existing under the laws of the State of

25   Delaware with its principal place of business located at 1 Hacker Way, Menlo Park, California

26   94025. Facebook regularly conducts and transacts business in this District and throughout the

27   United States. Facebook owns and operates the Facebook App Center.

28

1

## JURISDICTION AND VENUE

2      49.    Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because

3  (a) at least one member of the proposed classes is a citizen of a state different from Defendant,

4  (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none

5  of the exceptions under that subsection apply to this action.

6      50.    Federal subject-matter jurisdiction also exists under 28 U.S.C. § 1331 because

7  Plaintiffs allege violations of 18 U.S.C. § 1962(c)-(d).

8      51.    The Court has personal jurisdiction over Defendant because Defendant is

9  headquartered in this District and Defendant's alleged wrongful conduct occurred in and

10  emanated from this District.

11      52.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

12  part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

13

## GENERAL ALLEGATIONS

14  **I.    Facebook Promotes, Offers, Supports, and Profits From Illegal Slot Machines**

15      53.    Players can access Illegal Slots through Facebook—either on a computer or a

16  mobile device—and play at any time of day or night. The doors to these mobile casinos never

17  close.

18      54.    The Illegal Slot apps each contain multiple games. For example, the DoubleDown

19  Casino app contains over 200 total titles: 186 slot titles, 21 card game titles, and 1 bingo title.[6]

20  The Illegal Slots derive substantially all of their revenue from their slot titles.

21      55.    Many of the Illegal Slots feature the same games—sporting the same graphics and

22  music—as can be found on a slot machine in a brick-and-mortar casino. For instance,

23  International Game Technology's well-known slot game "Cleopatra" can be found both in

24  physical casinos and through Facebook's DoubleDown Casino app.[7]

25      56.    The Illegal Slots are designed to mimic the electronic slot machines found in

26  _____
[6]    Form F-1/A DoubleDown Interactive Co., Ltd. at 82,
27  https://sec.report/Document/0001193125-20-183157/.

[7]    *Id.* at 4 ("We have exclusive access to hundreds of highly recognizable, branded land-
28  based slot titles through our partnership with IGT which enables us to deliver an authentic casino
floor experience to our players.").

brick-and-mortar casinos, including many of the features designed to maximize time-on-device and money spent. For example, the Illegal Slots offer multiline betting—allowing players to wager and win on multiple pay lines—which tends to keep people playing and spending for longer.[8]

57.     There is no skill involved in the slot machine games offered at the Illegal Slots. Players can only place wagers (using virtual chips), and then press a button to "spin" the slot machine. It is impossible for players to affect the outcome of any spins.

58.     Within the Illegal Slots, players are typically given an initial allotment of virtual chips for free. Players use those chips to play the animated slot machines, choosing the amount they wager on each spin. Virtual chips are won and lost based on the outcome of those spins.

59.     Once a player loses their initial allotment of free chips, the Illegal Slots typically alert the player that he or she has insufficient funds to continue playing that slot game. Many of the Illegal Slot games have minimum bet requirements, such that a player cannot continue playing that game if their chip balance falls too low.

60.     At this point, players have three options: (i) stop playing, (ii) wait for some period of time before receiving more free chips from the Illegal Slot; or (iii) purchase more chips to keep playing—often with just a single click. To keep playing the same game immediately, players navigate to an electronic store and purchase chip packages.

61.     Facebook operates as the payment processor for all in-app purchases of virtual chips in the Illegal Slots. Facebook collects the money players spend on virtual chips, takes a cut for itself, and remits the rest to the Illegal Slots.[9]

62.     Purchased chips extend gameplay in the Illegal Slots because they allow players to place wagers on more spins of the slot machines.

63.     Virtual chips cannot be used outside of any individual Illegal Slots app. The chips can only be used to (1) place wagers on slot machine spins, (2) place wagers on the few card

---

[8]     *See* Natasha Dow Schüll, *Addiction By Design: Machine Gambling in Las Vegas* (Princeton Univ. Press 2012).

[9]     *Payments Terms*, Facebook for Developers, https://developers.facebook.com/policy/payments_terms.

game or bingo titles in the Illegal Slots app, or (3) give a "gift" of virtual chips to another account in the app. Substantially all virtual chips are used on slot machine spins.

64.    Players typically run out of virtual chips quickly—within a day or two.[10]

65.    Notably, while any legitimately operated slot machine must randomize its results, social casinos do not fully randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues). As the CEO of DoubleDown Casino once explained, "[o]ur games aren't built to be bulletproof like you'd need to be if you're a real gambling company. We can do things to make our games more [fun] that if you were an operator in Vegas you'd go to jail for, because *we change the odds just for fun*."[11]

66.    Developers of social casino games, such as Scientific Games, hold patents for "dynamic paytables" in interactive games. Paytables—coded into the Illegal Slot apps—set the payout for each possible game event. In other words, they determine how many chips players receive for various spin outcomes. Use of a dynamic paytable means that the payout for any given game event can change over the course of a game or over the course of a player's use of the app.

67.    As Scientific Games explained in their patent application, "[t]he slot machine's dynamic paytable is designed to take advantage of the observation that players are more apt to play gaming machines for longer periods of time if the payout is increased as the player continues to play the game. Other slot machines change the paytable based on the amount wagered by the player."[12]

68.    On information and belief, many Illegal Slots utilize dynamic paytables. In these games, players are cheated out of a legitimately randomized slot machine experience. Rather, the games adjust the potential payouts in order to maximize revenue—changing the gameplay and

---

[10]    Form F-1/A DoubleDown Interactive Co., Ltd. at 72, https://sec.report/Document/0001193125-20-183157/ ("Th[e] timing difference [between virtual currency purchase and consumption] is relatively short.").

[11]    *Gambling giant IGT buying Double Down for $500M, moving into Facebook games*, GEEK WIRE (Jan. 12, 2012), https://www.geekwire.com/2012/gambling-giant-igt-buying-doubledown-500m-moving-facebook-games/ [emphasis added].

[12]    United States Patent, *Dynamic Paytable for Interactive Games*, No. US 7,628,691 B2 (Dec. 8, 2009).

the odds in order to manipulate players into playing longer and spending more.

**II.    Facebook Promotes, Hosts and Facilitates At Least Fifty Illegal Social Casinos**

69.    The Platforms, including Defendant Facebook, have directly assisted in creating and operating the unregulated market of virtual casino games from the outset of the industry.

70.    Before gaining access to these social media platforms, the Illegal Slots used methods like loyalty cards to track data on how much gamblers spent, how frequently they played, or how often they bet. The Platform partnerships upgraded their business model to an in-app payment system and provided additional user data which skyrocketed revenue by providing them with access to a whole new market of consumers.

71.    The Illegal Slots rely on Platforms, like Defendant Facebook, to make their games available to players and to collect revenue.[13] The Illegal Slots are *only* available to play via third-party Platforms, including on Facebook (online or mobile app), on an app downloaded from the Apple App Store, or on an app downloaded from Google Play.

72.    The core marketing for the Illegal Slots is accomplished in concert with the Platforms, and their systems are inextricably linked. Here, for example, is how one social casino maker described their partnership with the Platforms in a public securities filing:

> Our games are distributed through several main platform providers, including Apple, Facebook, Google, and Amazon, which also provide us valuable information and data, such as the rankings of our games. **Substantially all of our revenue is generated by players using those platforms.** Consequently, our expansion and prospects depend on our continued relationships with these providers[.]
> ….
>
> We focus our marketing efforts on acquiring new players and retaining existing players. We acquire players both organically and through paid channels. Our paid marketing includes performance marketing and dynamic media buying on Facebook, Google, and other channels such as mobile ad networks. Underlying our paid marketing efforts are our data analytics that allow us to estimate the expected value of a player and adjust our user acquisition spend to a targeted payback period. Our broad capabilities in promotions allow us to tailor promotional activity around new releases, execute differentiated multi-channel campaigns, and reach players with preferred creative content.
> ….

---

[13]    Form F-1/A DoubleDown Interactive Co., Ltd. at 16, https://sec.report/Document/0001193125-20-183157/.

> Our player retention marketing includes advertising on Facebook as well as outreach through email, push notifications, and social media posts on channels such as Facebook, Instagram, and Pinterest. Our data and analytics also inform our retention marketing efforts. Campaigns are specially designed for each channel based upon player preferences for dimensions such as time of day and creative content. We consistently monitor marketing results and return on investment, replacing ineffective marketing tactics to optimize and improve channel performance.
>
> ….
>
> We employ a rigorous, data-driven approach to player lifecycle management from user acquisition to ongoing engagement and monetization. We use internally-developed analytic tools to segment and target players and to optimize user acquisition spend across multiple channels.
>
> ….
>
> We continuously gather and analyze detailed customer play behavior and assess this data in relation to our judgments used for revenue recognition.[14]

73.     By partnering with the Illegal Slots in marketing, distribution, and payment processing, Defendant Facebook entered into a mutually beneficial business partnership with the Illegal Slots. In exchange for pushing and distributing the social casino apps and collecting money from consumers, Facebook and the other Platforms take a 30 percent commission off of every in-app purchase, earning them billions in revenue.[15]

A.     **The Illegal Slots**

74.     Each of the following fifty Illegal Slots offered by Facebook allows players to gamble on online slot machines, even in states where such gambling is unlawful.[16]

**Figure 4 – The Illegal Slots**

| # | Game Title | Facebook URL |
|---|---|---|
| 1 | DoubleDown Casino | https://apps.facebook.com/doubledowncasino/ |
| 2 | Slotomania Slot Machines | https://apps.facebook.com/slotomania/ |
| 3 | Jackpot Party Casino Slots | https://apps.facebook.com/jackpotpartycasino/ |
| 4 | House of Fun – Slots | https://apps.facebook.com/houseoffun/ |
| 5 | DoubleU Casino | https://apps.facebook.com/doubleucasino/ |

---

[14]     *Id.* at 16, 72, 85, 91.

[15]     *Payments Terms*, Facebook for Developers, https://developers.facebook.com/policy/payments_terms.

[16]     For the Court's convenience, an iPad containing Apple-based versions of the Illegal Slots will be lodged with the Court as Exhibit 3. Upon request from Facebook's appearing counsel, a copy of the iPad will be produced to Facebook. For the purposes of the claims alleged here, the Apple-based versions of the Illegal Slot games are materially indistinguishable from the Facebook-based versions.

| 6 | High 5 Casino Real Slots | https://apps.facebook.com/highfivecasino |
| 7 | Heart of Vegas | https://apps.facebook.com/heart_of_vegas |
| 8 | Caesars Slots | https://apps.facebook.com/caesars/ |
| 9 | Hit It Rich! Casino Slots | https://apps.facebook.com/hititrich/ |
| 10 | myVEGAS Slots | https://apps.facebook.com/playmyvegas |
| 11 | GSN Casino | https://apps.facebook.com/mesmogames/ |
| 12 | Rock N' Cash Casino Slots | https://apps.facebook.com/rockncash/ |
| 13 | Huuuge Casino | https://apps.facebook.com/1672695549623058/ |
| 14 | Old Vegas Slots | https://apps.facebook.com/oldvegasslots/ |
| 15 | Take5 Free Slots | https://apps.facebook.com/takefiveslots/ |
| 16 | Quick Hit Slots | https://apps.facebook.com/quickhitslots/ |
| 17 | Vegas Downtown Slots & Words | https://apps.facebook.com/vegas_downtown_slots |
| 18 | Diamond Sky Casino | https://apps.facebook.com/diamondskycasino |
| 19 | Gold Fish Casino Slots | https://apps.facebook.com/goldfishcasinoslots/ |
| 20 | Billionaire Casino | https://apps.facebook.com/657457464407450/ |
| 21 | Slots - Wizard of Oz | https://apps.facebook.com/wizardofozslots/ |
| 22 | Hot Shot Casino Slots | https://apps.facebook.com/hotshotcasino/ |
| 23 | Scatter Slots | https://apps.facebook.com/scatterslots/ |
| 24 | Jackpotjoy Slots | https://apps.facebook.com/jackpotjoyslots/ |
| 25 | Real Casino - Free Slots | https://apps.facebook.com/realtexasholdem/ |
| 26 | Infinity Slots | https://apps.facebook.com/infinityslots/ |
| 27 | Let's Vegas Casino-Slot Roulette | https://apps.facebook.com/letsvegas/ |
| 28 | OMG! Fortune FREE Slots | https://apps.facebook.com/omgfortune/ |
| 29 | Gold Party Casino - Free Slots | https://apps.facebook.com/goldpartycasino/ |
| 30 | Vegas Live Slots | https://apps.facebook.com/vegasliveslots/ |
| 31 | my KONAMI Slots | https://apps.facebook.com/mykonamislots/ |
| 32 | Spin Vegas Slots | https://apps.facebook.com/spinvegasslots |
| 33 | Cashman Casino | https://apps.facebook.com/cashman_casino |
| 34 | Baba WILD Slots & Casino | https://apps.facebook.com/babacasino/ |
| 35 | MONOPOLY Slots! | https://apps.facebook.com/monopoly-slots/ |
| 36 | Slotica Casino - Free Slots | https://apps.facebook.com/slotica_slots/ |
| 37 | Mirrorball Slots | https://apps.facebook.com/mirrorballslots/ |
| 38 | Slots Era | https://apps.facebook.com/slotsera/ |
| 39 | CasinoStar - Free Slots | https://apps.facebook.com/casinostar |
| 40 | Slots - Classic Vegas Casino | https://apps.facebook.com/classic-vegas/ |

| 41 | Lucky Time Slots | https://apps.facebook.com/luckytimeslots/ |
|----|------------------|-------------------------------------------|
| 42 | Vegas Star Casino - Free Slots | https://apps.facebook.com/vegasstarcasino |
| 43 | Willy Wonka Slots Free Casino | https://apps.facebook.com/wonkaslots/ |
| 44 | DoubleHit Casino - Free Slots | https://apps.facebook.com/doublehitcasino/ |
| 45 | Winning Slots | https://apps.facebook.com/winningslots/ |
| 46 | Our Slots | https://apps.facebook.com/our-slots/ |
| 47 | Gambino Slots | https://apps.facebook.com/gambino-slots/ |
| 48 | Slots Farm | https://apps.facebook.com/slots_farm/ |
| 49 | Blazing 7s Slots | https://apps.facebook.com/blazingsevensslots/ |
| 50 | VegasTower Casino - Free Slots | https://apps.facebook.com/vegastowercasino/ |

75.    Most or all of the Illegal Slots are also hosted and promoted by the other Platform members of the Social Casino Enterprise: Apple and Google.

**B.    Facebook's Facilitation, Promotion, and Control Over the Illegal Slots**

76.    Facebook, for its part, routinely facilitates the success of social casinos by counseling the app developers through the app launch process and providing them with resources and business tools necessary to maximize the platform's powerful social features.[17]

77.    Prior to being published in the Facebook App Center, developers must submit their app for review. In this process, Facebook examines whether the app violates any company policies and demands that apps comply with all relevant laws within the jurisdiction where the app is available.[18] Apps may be, and often are, removed at Facebook's discretion for violating its policies and can be audited at any time.

78.    The Platforms, through their app review process, are keenly aware of the illegal and deceptive nature of the Illegal Slots. Facebook categorizes the Illegal Slots as "Casino" games (distinct from "Arcade" games and "Card" games).

79.    Facebook also helps the Illegal Slots with marketing and analytics. Facebook

---

[17]    *Developer Products*, Facebook for Developers, https://developers.facebook.com/products.

[18]    *Facebook Platform Terms*, Facebook for Developers, https://developers.facebook.com/policy.

Products, such as App Ads (targets lookalike audiences to increase engagement), App Invite (solicits new players via Game Requests), Facebook Analytics for Apps (tracks the time spent between installation and purchase and devises strategies to turn out higher profits), Facebook login (facilitates easy, familiar sign-up), and Sharing (creates viral social distribution), all enable the Illegal Slots to acquire new users and retain high-spenders. Social features keep players engaged longer, which in turn drives higher and more stable monetization.[19]

80.    By way of example, International Game Technology cited the success of Facebook's distribution channel as one of its main reasons for acquiring DoubleDown Interactive, of "DoubleDown Casino" fame, for $500 million in 2012.[20]

81.    Millions of social casino players access their preferred Illegal Slot through their Facebook login.[21] Upon login, Facebook sends targeted ads offering in-game rewards to users who invite their Facebook friends to also play the Illegal Slots. In many Illegal Slots, the more players a user brings to the game, the more virtual chips they can earn. Users can then compete in "tournaments" online with friends, driving increased chip sales.

82.    Meanwhile, the Illegal Slot companies and Facebook monitor the game activity and use the collected data to increase user spending.[22] This access to data is critical for the developers: Since all payment processing occurs through third-party platforms, the Illegal Slot companies have limited access to personal user data unless players login through Facebook or otherwise sign up for loyalty programs.[23]

---

[19]    Form F-1/A DoubleDown Interactive Co., Ltd. at 80, https://sec.report/Document/0001193125-20-183157/.

[20]    *International Game Technology to Acquire Social Gaming Company Double Down Interactive*, PRNEWSWIRE (Jan 12, 2012), https://www.prnewswire.com/news-releases/international-game-technology-to-acquire-social-gaming-company-double-down-interactive-137209833.html.

[21]    *See, e.g.*, *Success Stories: DoubleU Games*, Facebook for Developers, https://developers.facebook.com/success-stories/doubleu-games/.

[22]    *DoubleDown Casino Launches the World's First Social Slot Tournaments on Facebook*, PRNewswire (July 19, 2011), https://www.prnewswire.com/news-releases/doubledown-casino-launches-the-worlds-first-social-slot-tournaments-on-facebook-125830673.html (last visited Nov. 22, 2021).

[23]    Form F-1/A Doubledown Interactive Co., Ltd. at 21, https://sec.report/Document/0001193125-20-183157/.

83.     Because the Illegal Slots depend on the spending of a small, targeted audience, the Illegal Slot companies and Platforms work together to target and exploit high-spending users, or "whales," as Illegal Slot companies like DoubleDown refer to their top-spenders.[24]

84.     The data that the Illegal Slot companies and the Platforms collect on monetization necessarily contributes to the structure and success of the Social Casino Enterprise.[25]

85.     Facebook App Ads allow Illegal Slot companies to target high spending users and activate non-spending users.[26]

86.     A 2019 *PBS NewsHour* report quotes Facebook executive Julien Codorniou (in 2014) regarding social casinos' financial potential and acknowledging Facebook's intentional role in sharing in the gambling profits:[27]

> It's the number one category on Facebook. It's a category that, you know, never stops growing. Every year, we see new companies out of nowhere coming up with amazing games, amazing IP, launching on Facebook, launching on mobile, making significant money.
>
> It's very good for gaming companies because they can decide to target on Facebook, or on mobile, you know, specific users, or just the whales.

87.     That same article also features former top Facebook executive Sam Lessin admitting to Facebook's knowledge of social casinos' exploitation of vulnerable consumers. In 2012, Lessin emailed Facebook CEO Mark Zuckerberg with his concerns about the predatory and unethical nature of the in-app purchase business model for casino gaming apps.[28] The warning fell on deaf ears:

> I mean, it sounds disgusting, right? You know, we're going to have to live in a world where both very, very good people, and very, very bad people have better

---

[24]     *The Journey From a Single-App to a Multi-App Company*, https://youtu.be/PY8gh8M6T20?t=1260 (Joe Sigrist, DoubleDown General Manager: "We track our whales").

[25]     *Success Stories: DoubleU Games*, Facebook for Developers, https://developers.facebook.com/success-stories/doubleu-games/.

[26]     *Id.*

[27]     Nate Halverson, *How social casinos leverage Facebook user data to target vulnerable gamblers*, PBS NewsHour (Aug. 13, 2019), https://www.pbs.org/newshour/show/how-social-casinos-leverage-facebook-user-data-to-target-vulnerable-gamblers.

[28]     *Id.*

tools.[29]

88.    At all relevant times, Facebook and the Platforms have known of the unlawful nature of the Illegal Slots and nonetheless have subjected the general public to the unlawful, predatory, and addictive games in order to maximize profits at the expense of the public's health and welfare.

89.    Apps, including the Illegal Slots, are required to use Facebook Payments to process all in-game purchases, and Facebook collects a 30 percent service fee off of every transaction.[30]

90.    Because they act as the "bank" for the Illegal Slots, the Platforms are entirely aware that some consumers spend *hundreds of thousands of dollars* on the Illegal Slots.

91.    Furthermore, on information and belief, in the wake of the *Kater* decision, the Platforms did not remove social casinos from their offerings but instead conferred with each other and decided to each continue to offer illegal social casino games. This decision was consistent with the Platforms' long history of entering into highly illegal agreements with each other as long as it is highly lucrative to do so.[31]

92.    Despite having the ability to do so, Facebook has not taken any steps to limit access to the Illegal Slots, such as by excluding minors or excluding players from states where the Illegal Slots violate state gambling laws.

93.    If Facebook ever discovers an illegal or fraudulent transaction in breach of its Facebook terms or policies, it can deny developers from redeeming the proceeds in its Developer Balance.[32]

94.    Unfortunately, Facebook used its developer tools to take advantage of users with

---

[29]    *Id.*

[30]    *Payment Terms*, Facebook for Developers, https://developers.facebook.com/policy/payments_terms.

[31]    S*ee, e.g.*, *Exclusive: Apple, Google to pay $324 million to settle conspiracy lawsuit*, available at https://www.reuters.com/article/us-apple-google-lawsuit-exclusive/exclusive-apple-google-to-pay-324-million-to-settle-conspiracy-lawsuit-idUSBREA3N28Z20140425; *Behind a Secret Deal Between Google and Facebo*ok, available at https://www.nytimes.com/2021/01/17/technology/google-facebook-ad-deal-antitrust.html.

[32]    *Id.*

1    severe gambling problems.

2        95.    As a result, Facebook has unlawfully made billions of dollars on the backs of

3    consumers.

4    **III.    Players Are Harmed By the Illegal Slots Hosted by Defendant**

5        96.    Millions of consumers access Illegal Slots through Facebook, and at least

6    thousands have paid money to Facebook to purchase virtual chips for gambling on the Illegal

7    Slots.

8        97.    These players have been injured by Facebook's conduct because they have lost

9    money as a result of Facebook's hosting, promoting, and facilitating of illegal gambling and

10   Facebook's participation in unfair and unscrupulous business practices.

11       98.    Many players have lost substantial sums of money to Facebook and the Social

12   Casino Enterprise. Players have maxed out credit cards, spent money they could not afford, and

13   fallen behind on bills because they cannot stop spending money on Illegal Slots. Some players'

14   injuries amount to tens or even hundreds of thousands of dollars.

15       99.    Many players feel addicted to the Illegal Slots—they try to stop, knowing that

16   they are losing money and that they are playing too much, but they can't. As long as Facebook

17   continues to offer and promote Illegal Slots and continues to facilitate the sale of virtual chips,

18   the victimization of these players (and the accompanying harms) will persist.

19       100.   Players addicted to Illegal Slots also suffer serious non-economic damages,

20   ranging from depression to divorce to attempted suicide.

21       101.   Many of these harms are irreparable. After-the-fact money damages cannot fix

22   injuries like strained marriages, unsought medical treatments, skipped meals, and anxiety and

23   self-loathing caused by Facebook's and the Social Casino Enterprise's continued unlawful

24   activity.

25                    **FACTS SPECIFIC TO NAMED PLAINTIFFS**

26   **I.    Nancy Urbanczyk**

27       102.   Plaintiff Nancy Urbanczyk, 71, is a resident and citizen of Shorewood, Illinois.

28   Ms. Urbanczyk plays and makes purchases in DoubleDown Casino through Facebook. She

started playing DoubleDown Casino in approximately 2013. Ms. Urbanczyk is addicted to DoubleDown. She estimates that she plays the game 2 to 3 hours per day, and believes she has spent approximately $240,000 in the game to date, sometimes spending as much as $1,000 on chips in a single evening. As a result of her addiction, Ms. Urbanczyk lost her retirement savings, had to take out a mortgage on her home, and had to find a job at the age of 70. Her addiction has put significant strain on her personal relationships and her mental well-being.

## II.    Laura Perkinson

103.    Plaintiff Laura Perkinson, 78, is a resident and citizen of Centralia, Washington. Ms. Perkinson was disabled in an accident several decades ago and has often turned to the Internet for social interaction. This eventually led her to social casinos, which she began playing more than a decade ago. She believes that, over time, she has played and made purchases in more than a dozen social casino games, including 88 Fortunes Casino, Big Fish Casino, Caesars Slots, Casino Jackpot Slots - Infinity Slots, DoubleDown Casino, House of Fun, Jackpot Mania, Jackpot Party, Willy Wonka Slots, and Wizard of Oz Slots through Facebook. Eventually, and especially after she lost her husband, Ms. Perkinson estimates that she began to play social casinos for approximately four to five hours a day. Playing social casinos through Facebook has had a devastating impact on Ms. Perkinson's life. In total, she estimates that she has lost between $10,000 and $20,000 in social casinos. Ms. Perkinson's addiction has also put significant strain on her personal relationships and her mental well-being and has even impacted her ability to buy food.

## III.    Ben Kramer

104.    Plaintiff Ben Kramer, 53, is a resident and citizen of Redmond, Washington. Mr. Kramer started playing DoubleDown Casino in approximately 2013 after discovering the game in the Apple App Store. He plays and makes purchases in DoubleDown Casino through Facebook. Mr. Kramer believes that he has spent approximately $220,000 in DoubleDown Casino, and estimates that he plays the game approximately 48 hours each week. Mr. Kramer's addiction to social casinos has taken a significant toll on his life. He has twice used the equity in his home to pay off massive, high-interest credit card debt amassed from his spending in the

games, which increased his mortgage payment and set back his schedule for paying off his house by years. This spending and debt caused enormous strain in his marriage and he believes the financial stresses caused by DoubleDown Casino have likely made his and his husband's plan to retire by age 60 impossible.

## IV.    Maria Valencia-Torres

105.    Plaintiff Maria Valencia-Torres, 51, is a resident and citizen of Pelham, Alabama. Ms. Valencia-Torres plays and has made purchases in MyVegas Slots and Slotomania through Facebook. She started playing social casinos in approximately 2014. Ms. Valencia-Torres believes she plays social casinos for approximately 15 to 20 hours per week on average, and she estimates that she has spent approximately $1,500 to date playing social casinos.

## V.    Mary Austin

106.    Plaintiff Mary Austin, 62, is a resident and citizen of Springdale, Arkansas. Ms. Austin currently plays and has made purchases in Slotomania through Facebook. She started playing Slotomania in approximately 2015 after seeing advertisements on Facebook. Ms. Austin plays Slotomania every day and believes her playing time adds up to many hours each week, and she estimates that she has lost more than $60,000 playing social casinos to date.

## VI.    Patricia McCullough

107.    Plaintiff Patricia McCullough, 73, is a resident and citizen of Harlem, Georgia. Ms. McCullough plays and makes purchases in DoubleDown Casino through Facebook. She started playing DoubleDown Casino in approximately 2016 after seeing advertisements on Facebook. Ms. McCullough believes she plays social casinos approximately 15 hours per week, and estimates that she has spent more than $4,000 to date playing social casinos.

## VII.    Alison Koda

108.    Plaintiff Alison Koda, 57, is a resident and citizen of Winthrop Harbor, Illinois. Ms. Koda believes that, over time, she has played and made purchases in DoubleDown Casino, Goldfish Casino Slots, Jackpot Party, Baba Wild Slots, and High Five Casino through Facebook. She started playing social casinos in approximately 2011 after seeing advertisements on Facebook. Ms. Koda believes she plays social casinos approximately 4 hours per week, and

estimates that she has spent approximately $1,000 playing social casinos to date.

**VIII.    Glenna Wiegard**

109.    Plaintiff Glenna Wiegard, 58, is a resident and citizen of Ellis Grove, Illinois. Ms. Wiegard plays and has made purchases in Goldfish Casino Slots and Jackpot Party through Facebook. She started playing social casinos in approximately 2017. Ms. Wiegard believes she plays social casinos many hours each week, and estimates that she has spent approximately $400 playing social casinos to date.

**IX.    Clotera Rogers**

110.    Plaintiff Clotera Rogers, 82, is a resident and citizen of Homewood, Illinois. Ms. Rogers has played and made purchases in Hit it Rich! Lucky Vegas Casino Slots, and she currently plays and makes purchases in Jackpot Party through Facebook. She started playing social casinos in approximately 2014. Ms. Rogers plays social casinos many hours each week, and estimates she has spent approximately $1,000 to $2,000 to date playing social casinos.

**X.    Carol Smith**

111.    Plaintiff Carol Smith, 71, is a resident and citizen of Chicago, Illinois. Ms. Smith believes that, over time, she has played and made purchases in Monopoly Slots, Quick Hit Casino Games, DoubleDown Casino, Hit it Rich! Lucky Vegas Casino Slots, Jackpot Slot Machines – Slots Era Vegas Casino, Rock and Cash Slots, Diamond Sky Casino, Best Casino Slots, and Spin Vegas through Facebook. She started playing social casinos in approximately 2014. Ms. Smith believes she plays social casinos more than 35 hours per week, and estimates that she has spent more than $4,000 to date in social casinos.

**XI.    Hannelore Boorn**

112.    Plaintiff Hannelore Boorn, 71, is a resident and citizen of Lexington, Kentucky. Ms. Boorn has played and made purchases in Quick Hit Casino Games and currently plays and makes purchases in DoubleDown Casino through Facebook. She started playing social casinos more than a decade ago. Ms. Boorn estimates that she plays social casinos more than 35 hours each week, and estimates she has lost more than $90,000 in social casinos to date.

**XII.    Janice Williams**

113.    Plaintiff Janice Williams, 63, is a resident and citizen of Lexington, Kentucky. Ms. Williams has played Slotomania and currently plays DoubleDown Casino, and has made purchases in both games through Facebook. She started playing social casinos more than a decade ago. Ms. Williams believes she plays social casinos approximately 20 hours per week, and estimates that she has spent approximately $10,000 playing social casinos to date.

**XIII.    Jennifer Andrews**

114.    Plaintiff Jennifer Andrews, 54, is a resident and citizen of Sauk Rapids, Minnesota. Ms. Andrews started playing social casinos around 2011 after seeing an advertisement on Facebook. She believes that, over time, she has played more than a dozen social casino games, including Caesars Slots, Cash Frenzy, Cashman Casino, Casino Jackpot Slots - Infinity Slots, Double U Casino, Willy Wonka Slots, Wizard of Oz Slots, and Quick Hit Casino Games. She currently plays and makes purchases in DoubleDown Casino through Facebook. Ms. Andrews estimates that she plays social casinos approximately 20 hours per week on average, and estimates that she has spent approximately $80,000 playing social casinos.

**XIV.    Dawn Mehsikomer**

115.    Plaintiff Dawn Mehsikomer, 64, is a resident and citizen of New Brighton, Minnesota. Ms. Mehsikomer has played and made purchases in Double U Casino, Heart of Vegas, DoubleDown Casino, and Jackpot Party through Facebook. She started playing social casinos in approximately 2011. Ms. Mehsikomer estimates that she plays social casinos for approximately 20 to 25 hours per week on average, and estimates that she has lost approximately $100,000 playing social casinos.

**XV.    Denice Wax**

116.    Plaintiff Denice Wax, 60, is a resident and citizen of Fridley, Minnesota. Ms. Wax has played and made purchases in Double U Casino, and she currently plays and makes purchases in DoubleDown Casino through Facebook. She believes she started playing social casinos around 2010. Ms. Wax has spent many hours playing social casinos, and estimates that she has spent more than $19,000 in social casinos to date.

1

## XVI.    Frances Long

2

    117.    Plaintiff Frances Long, 70, is a resident and citizen of Ferguson, Missouri. Ms.

3

Long believes she has, over time, played more than a dozen social casino games, including

4

Double U Casino, House of Fun, Caesars Slots, Slotomania, Real Casino, Real Vegas Casino,

5

and Old Vegas through Facebook. Ms. Long believes she plays social casinos between

6

approximately 35 and 70 hours each week, and estimates that she has spent more than $15,000

7

on the games to date.

8

## XVII.    Sandra Meyers

9

    118.    Plaintiff Sandra Meyers, 71, is a resident and citizen of Helena, Montana. Ms.

10

Meyers currently plays and has made purchases in DoubleDown Casino and My-KONAMI Real

11

Vegas Slots through Facebook. She started playing social casinos in approximately 2017 after

12

seeing an advertisement on Facebook. Ms. Meyers believes she plays social casinos dozens of

13

hours per week, and estimates that she has spent approximately $9,000 playing social casinos to

14

date.

15

## XVIII.    Kathleen Wilkinson

16

    119.    Plaintiff Kathleen Wilkinson, 52, is a resident and citizen of Kalispell, Montana.

17

Ms. Wilkinson believes she has played and made purchases in more than a dozen social casinos,

18

including DoubleDown Casino, Jackpot Party, Scatter Slots, Heart of Vegas, House of Fun,

19

Willy Wonka Slots, Wizard of Oz Slots, and Cashman Casino. She started playing social casinos

20

in approximately July 2016. Ms. Wilkinson believes she plays social casinos for approximately

21

40 to 50 hours per week on average, and estimates that she has spent approximately $50,000 to

22

date playing social casinos.

23

## XIX.    Steven Simons

24

    120.    Plaintiff Steven Simons, 55, is a resident and citizen of Westwood, New Jersey.

25

Mr. Simons has played and made purchases in Jackpot Party and GSN Casino and currently

26

plays and makes purchases in DoubleDown Casino through Facebook. He started playing social

27

casinos in approximately 2014 after seeing an ad on Facebook. Mr. Simons estimates that he

28

plays social casinos for approximately 20 hours per week on average, and estimates that he has

spent approximately $15,000 playing social casinos.

## XX.   Vanessa Sowell Skeeter

121.   Plaintiff Vanessa Sowell Skeeter, 65, is a resident and citizen of Bronx, New York. Ms. Skeeter has played and made purchases in Quick Hit Casino Games, and DoubleDown Casino through Facebook. She started playing social casinos in approximately 2016 after seeing an ad on Facebook. Ms. Skeeter believes she plays social casinos 6 to 10 hours each week, and estimates that she has spent approximately $5,000 to date in social casinos.

## XXI.  Donna Whiting

122.   Plaintiff Donna Whiting, 68, is a resident and citizen of Little River, South Carolina. Ms. Whiting started playing social casinos in approximately 2010 after seeing ads on Facebook. She plays and has made purchases in DoubleDown Casino and Jackpot Party through Facebook. To date, she estimates she has spent between approximately $30,000 to $60,000 in social casinos, and she estimates that she plays approximately 28 hours per week.

## XXII. Sheri Miller

123.   Plaintiff Sheri Miller, 72, is a resident and citizen of Jefferson City, Tennessee. Ms. Miller started playing DoubleDown Casino more than a decade ago after seeing an ad while browsing Facebook. She plays and makes purchases in DoubleDown Casino through Facebook. She estimates that she has spent between approximately $50,000 and $75,000 to date, and estimates that she plays DoubleDown Casino approximately 25 hours per week.

## XXIII. Paul Lombard

124.   Plaintiff Paul Lombard, 71, is a resident and citizen of Virginia Beach, Virginia. Mr. Lombard began playing social casinos in approximately 2013 after seeing ads on Facebook. He plays and makes purchases in DoubleDown Casino, Double U Casino, and Slotomania through Facebook. He estimates that has spent more than $10,000. He believes that many of his purchases were made after he saw ads outside the social casinos when he logged into the "Games" section of Facebook or received email ads with special offers for virtual coins. Social casinos have substantially impacted Mr. Lombard's life. In addition to the financial impact, he believes he plays social casinos at least 15 hours each week, and has not made upgrades to his

1  home, put money into his grandson's savings fund, or made planned contributions to his

2  retirement funds so that he can spend more money on the social casinos.

3  **XXIV. Eleanor Mizrahi**

4          125.    Plaintiff Eleanor Mizrahi, 76, is a resident and citizen of Sherwood Forest,

5  California. Ms. Mizrahi started playing DoubleDown Casino in approximately 2013 after

6  discovering it on Facebook. She plays and makes purchases in DoubleDown Casino through

7  Facebook. Ms. Mizrahi estimates she has spent approximately $108,000 to date in DoubleDown

8  and believes that she plays DoubleDown Casino approximately 20 hours each week.

9  **XXV.  Janice Wilson**

10         126.    Plaintiff Janice Wilson, 63, is a resident and citizen of Modesto, California. Ms.

11  Wilson plays Game of Thrones Slots, Hit it Rich! Lucky Vegas Casino Slots, myVEGAS Slots,

12  Willy Wonka Slots, and Wizard of Oz Slots through Facebook. Ms. Wilson estimates that she

13  plays social casinos approximately 40 hours per week, and she estimates that she has spent more

14  than $25,000 to date playing the social casinos. She regularly makes purchases in the social

15  casinos after seeing promotional ads on Facebook offering discounted coins.

16  **XXIV. Rick Larsen**

17         127.    Plaintiff Rick Larsen is a resident and citizen of Washington. Mr. Larsen has

18  played and made purchases of virtual chips in High 5 Casino and/or High 5 Vegas through

19  Facebook.

20                                  **CLASS ALLEGATIONS**

21         128.    **Class Definitions**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2)

22  and (b)(3) on behalf of themselves and Classes of similarly situated individuals, defined and

23  represented by Class Representatives as follows:

24              a.   California Class: All persons in California who have lost money to any Illegal

25                   Slots through the Facebook platform. The California Class is represented by Class

26                   Representatives Eleanor Mizrahi and Janice Wilson.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b.   <u>Washington Class</u>: All persons in Washington who have lost money to any Illegal Slots through the Facebook platform. The Washington Class is represented by Class Representatives Ben Kramer and Rick Larsen.

c.   <u>Alabama Class</u>: All persons in Alabama who have lost money to any Illegal Slots through the Facebook platform. The Alabama Class is represented by Class Representative Maria Valencia-Torres.

d.   <u>Arkansas Class</u>: All persons in Arkansas who have lost money to any Illegal Slots through the Facebook platform. The Arkansas Class is represented by Class Representative Mary Austin.

e.   <u>Georgia Class</u>: All persons in Georgia who have lost money to any Illegal Slots through the Facebook platform. The Georgia Class is represented by Class Representative Patricia McCullough.

f.   <u>Illinois Class</u>: All persons in Illinois who have lost money to any Illegal Slots through the Facebook platform. The Illinois Class is represented by Class Representatives Alison Koda, Glenna Wiegard, Clotera Rogers, and Carol Smith.

g.   <u>Kentucky Class</u>: All persons in Kentucky who have lost money to any Illegal Slots through the Facebook platform. The Kentucky Class is represented by Class Representatives Hannelore Boorn and Janice Williams.

h.   <u>Minnesota Class</u>: All persons in Minnesota who have lost money to any Illegal Slots through the Facebook platform. The Minnesota Class is represented by Class Representatives Jennifer Andrews, Dawn Mehsikomer, and Denice Wax.

i.   <u>Missouri Class</u>: All persons in Missouri who have lost money to any Illegal Slots through the Facebook platform. The Missouri Class is represented by Class Representative Frances Long.

j.   <u>Montana Class</u>: All persons in Montana who have lost money to any Illegal Slots through the Facebook platform. The Montana Class is represented by Class Representatives Sandra Meyers and Kathleen Wilkinson.

k.  New Jersey Class: All persons in New Jersey who have lost money to any Illegal Slots through the Facebook platform. The New Jersey Class is represented by Class Representative Steven Simons.

l.  New York Class: All persons in New York who have lost money to any Illegal Slots through the Facebook platform. The New York Class is represented by Class Representative Vanessa Sowell Skeeter.

m.  South Carolina Class: All persons in South Carolina who have lost money to any Illegal Slots through the Facebook platform. The South Carolina Class is represented by Class Representative Donna Whiting.

n.  Tennessee Class: All persons in Tennessee who have lost money to any Illegal Slots through the Facebook platform. The Tennessee Class is represented by Class Representative Sheri Miller.

o.  Virginia Class: All persons in Virginia who have lost money to any Illegal Slots through the Facebook platform. The Virginia Class is represented by Class Representative Paul Lombard.

p.  Nationwide Class: All persons in the United States who have lost money to any Illegal Slots through the Facebook platform. The Nationwide Class is represented by Class Representatives Kathleen Wilkinson, Nancy Urbanczyk, Laura Perkinson, Maria Valencia-Torres, Mary Austin, Patricia McCullough, Alison Koda, Glenna Wiegard, Clotera Rogers, Carol Smith, Hannelore Boorn, Janice Williams, Jennifer Andrews, Dawn Mehsikomer, Denice Wax, Frances Long, Sandra Meyers, Steve Simons, Vanessa Sowell Skeeter, Donna Whiting, Sheri Miller, Paul Lombard, Ben Kramer, Rick Larsen, Eleanor Mizrahi, and Janice Wilson.

129.  The following people are excluded from any of the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors;

(3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

130.    **Numerosity**: On information and belief, thousands of consumers fall into the definition of each Class. Members of the Classes can be identified through Defendant's records, discovery, and other third-party sources.

131.    **Commonality and Predominance**: There are many questions of law and fact common to Plaintiffs' and the Classes' claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Classes include, but are not necessarily limited to the following:

      A.    Whether the Illegal Slots are illegal under the relevant state gambling laws;

      B.    Whether Facebook, under relevant state gambling laws, is liable for managing, possessing, controlling, and/or profiting from the Illegal Slots;

      C.    Whether Facebook's participation in operating the Illegal Slots constitutes an unfair and/or unlawful business practice under relevant state consumer protection statutes;

      D.    Whether Facebook should be enjoined from further participation in the Social Casino Enterprise;

      E.    Whether Facebook is a participant in the Social Casino Enterprise; and

      F.    Whether Facebook has committed illegal predicate acts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

132.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes in that Plaintiffs and the members of the Classes sustained damages arising out of Defendant's wrongful conduct.

133.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the

other members of the Classes, as Plaintiffs and each member of the Classes lost money playing

the Illegal Slots. Plaintiffs also have no interests antagonistic to those of the Classes, and

Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to

vigorously prosecuting this action on behalf of the Classes and have the financial resources to do

so. Neither Plaintiffs nor their counsel have any interest adverse to the Classes.

134.    **Policies Generally Applicable to the Classes**: This class action is appropriate for

certification because Defendant has acted or refused to act on grounds generally applicable to the

Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure

compatible standards of conduct toward the members of the Classes and making final injunctive

relief appropriate with respect to the Classes as a whole. Defendant's policies that Plaintiffs

challenge apply and affect members of the Classes uniformly, and Plaintiffs' challenge of these

policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or

law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs

and to the other members of the Classes are the same.

135.    **Superiority**: This case is also appropriate for certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of

this controversy. The harm suffered by the individual members of the Classes is likely to have

been relatively small compared to the burden and expense of prosecuting individual actions to

redress Defendant's wrongful conduct. Absent a class action, it would be difficult for the

individual members of the Classes to obtain effective relief from Defendant. Even if members of

the Classes themselves could sustain such individual litigation, it would not be preferable to a

class action because individual litigation would increase the delay and expense to all parties and

the Court and require duplicative consideration of the legal and factual issues presented. By

contrast, a class action presents far fewer management difficulties and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single Court.

Economies of time, effort, and expense will be fostered and uniformity of decisions will be

ensured.

136.    Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

## CLAIMS BROUGHT ON BEHALF OF THE STATE CLASSES

### COUNT I
**Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")**
**Unlawful and Unfair Business Practices**
**(Restitution and Injunctive Relief)**
**(Plaintiffs Eleanor Mizrahi and Janice Wilson, On Behalf of the California Class)**

137.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

138.    Plaintiffs are "person[s]" within the meaning of Cal. Bus. & Prof. Code § 17201 because they are natural persons.

139.    Plaintiffs have standing under the UCL because they suffered injury in fact and have lost money or property as a result of Facebook's unlawful and unfair conduct.

140.    By hosting and facilitating the Illegal Slots, Facebook engaged in unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200 by committing unlawful, unfair, and fraudulent business acts and practices.

141.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

142.    Slot machines have long been outlawed in California.

143.    California law recognizes that a device can be an illegal slot machine without offering users the opportunity to win money.

144.    In fact, if a gaming machine has the look and feel of a slot machine, accepts real money for gameplay, and rewards a winning spin with an "additional chance or right to use the slot machine or device," the device is an illegal slot machine.

145.    Consequently, social casinos, as described herein, are illegal slot machines under California law.

146.    California gambling law is, on this point, consistent with the laws of many other states—including Washington. In *Kater*, for example, the Ninth Circuit held that social casinos

are illegal under Washington law because, while users cannot win money, social casino chips are "things of value" because they can be purchased for money, are awarded as prizes in social casino slot machines, and then can be used to allow players to keep spinning social casino slot machines.

147.    California aggressively regulates all forms of gambling. One reason it does so is to prevent consumers from being cheated by professional gambling operations.

148.    Because social casinos have previously operated as if they were not subject to gambling regulations, they do not comply with any of the regulations that govern the operation of slot machines.

149.    Notably, while any legitimately operated slot machine must randomize its results, social casinos do not randomize their results. Instead, social casinos tailor "wins" and "losses" in such a way as to maximize addiction (and, in turn, revenues).

150.    In other words, social casinos cheat players out of a legitimately randomized slot machine experience. Not only can players never actually win money, but their financial losses are maximized by deceptive gameplay tweaks that would never be allowed in a legitimate slot machine.

151.    The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330b(d) because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal Slots. Pursuant to Cal. Penal Code § 330b(a), Defendant Facebook, among other violative conduct, manufactures, repairs, owns, stores, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale or lease, the Illegal Slots. Facebook also offers to repair, sells, rents, leases, lets on shares, lends and gives away, permit the operations, placement, maintenance, and keeping of, in places, rooms, spaces, and buildings owned, leased, or occupied, managed, or controlled by Facebook, the Illegal Slots.

152.    The Illegal Slots are illegal slot machines as defined by Cal. Penal Code § 330.1 because, among other reasons, when a player purchases and wagers virtual casino chips in the Illegal Slots, a winning spin affords the player an "additional chance or right to use" the Illegal

Slots. Pursuant to Cal. Penal Code § 330.1(a), Defendant Facebook, among other violative conduct, manufactures, owns, stores, keeps, possesses, sells, rents, leases, lets on shares, lends and gives away, transports, and exposes for sale and lease, the Illegal Slots. Facebook also offers to sell, rent, lease, let on shares, lends and gives away and permits the operation of and permits to be placed, maintained, used, or kept in rooms, spaces, and building owned, leased, or occupied by Facebook or under Facebook's management and control, the Illegal Slots.

153.    The Illegal Slots are also illegal lotteries as defined by Cal. Penal Code § 319. Section 319 defines a lottery as any "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property." Thus, the elements of an illegal lottery under Section 319 are a prize (or "property"), distribution by chance, and consideration.

154.    The Illegal Slots satisfy all three elements because players pay valuable consideration in the form of real money to purchase virtual casino chips, use those chips to try to win prizes in the form of additional free plays, and are awarded these prizes based on chance outcomes.

155.    California law recognizes that the duty of the operator of a game of chance to permit the winner to play further games for free is an obligation arising from contract, and the right of the winning player to continue to play for free is personal property.

156.    Facebook's hosting and facilitating of the Illegal Slots constitutes an unfair and unscrupulous business practice because—among other reasons—Facebook and the Illegal Slots work together to target and exploit vulnerable and addicted players; to deceptively tweak gameplay in order to maximize time-on-device and revenue; and to operate their online slot machines outside the bounds of licensing, regulation, and tax policy. California's Unfair Competition Law ("UCL"), Cal. Bus. and Prof. Code § 17203, specifically authorizes this Court to issue injunctive relief to enjoin ongoing acts of unfair competition and unlawful conduct.

157.    Under the UCL, unfair competition encompasses any unlawful act, including acts made unlawful under the penal code and acts made unlawful by federal law.

158.    The UCL authorizes this Court to award restitution to the California Class and to enjoin Facebook's ongoing violations of Sections 330b and 330.1 of the California Penal Code, as well as violations of the federal RICO law.

159.    No plain, adequate, and complete remedy for Defendant's conduct exists at law. Consequently, the California Class is entitled to an equitable remedy under the UCL.

160.    Plaintiffs Eleanor Mizrahi and Janice Wilson, on behalf of themselves and the California Class, seek an order from the Court awarding restitution to the California Class in an amount to be determined at trial and enjoining Facebook from further participation in the Social Casino Enterprise.

**COUNT II**
**Unjust Enrichment**
**(Plaintiffs Eleanor Mizrahi and Janice Wilson, On Behalf of the California Class)**

161.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

162.    Plaintiffs bring this claim on behalf of themselves and the California Class under the common law of unjust enrichment.

163.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and California Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

164.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

165.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

166.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

167.    These profits were a benefit conferred upon Facebook by California Class Members when purchasing coins to wager in social casinos.

168.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each California Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

### COUNT III
### Ala. Code § 8-1-150(a)
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)

169.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

170.    Plaintiff brings this claim on behalf of herself and the Alabama Class under Alabama's Civil Remedy Statute for Recovery of Gambling Losses, Ala. Code § 8-1-150(a), which was enacted to effectuate the State's public policy against gambling.

171.     Ala. Code § 8-1-150(a) provides: "Any person who has paid any money or delivered any thing of value lost upon any game or wager may recover such money, thing, or its value by an action commenced within six months from the time of such payment or delivery."

172.    Accordingly, Ala. Code § 8-1-150(a) prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

173.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Alabama Class paid money or gambled and lost money within the meaning of Ala. Code § 8-1-150(a).

174.    Facebook has profited and continues to profit from each payment made by Alabama Class Members to purchase virtual coins, and therefore is in violation of Ala. Code § 8-1-150(a).

175.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

176.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Alabama Class Members to gamble in social casinos.

177.    Plaintiff and Alabama Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

## COUNT IV
### Ala. Code § 8-19-1, *et seq.*
### Alabama Deceptive Trade Practices Act
### (Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)

178.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

179.    Plaintiff brings this action on behalf of herself and the Alabama Class against Facebook.

180.    Facebook, Plaintiff, and Alabama Class members are "persons" within the meaning of Ala. Code § 8-19-3(5).

181.    Plaintiff and Alabama Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

182.    Virtual coins and tokens used to play social casinos are "goods" within the meaning of Ala. Code. § 8-19-3(3).

183.    Facebook is and was engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

184.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") prohibits "deceptive acts or practices in the conduct of any trade or commerce[.]" Ala. Code § 8-19-5.

185.    The Alabama DTPA makes unlawful "engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." *Id.* § 8-19-5(27).

186.    Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Alabama Class members purchased virtual coins and tokens. This constitutes an unconscionable act or practice and thus is in violation of the Alabama DTPA.

187.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

188.    Plaintiff and Alabama Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Facebook's unconscionable acts.

189.     Facebook's violations present a continuing risk to Plaintiff and Alabama Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

190.    Pursuant to Ala. Code § 8-19-10, Plaintiff and Alabama Class members seek an order enjoining Facebook's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Alabama DTPA.

**COUNT V**
**Unjust Enrichment**
**(Plaintiff Maria Valencia-Torres, On Behalf of the Alabama Class)**

191.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

192.    Plaintiff brings this claim on behalf of herself and the Alabama Class under the common law of unjust enrichment.

193.     As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Alabama Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

194.     Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

195.     Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

196.      These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

197.     These profits were a benefit conferred upon Facebook by Alabama Class Members when purchasing coins to wager in social casinos.

198.     Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Alabama Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

### COUNT VI
### Ark. Code. Ann. § 16-118-103
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Mary Austin, On Behalf of the Arkansas Class)

199.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

200.     Plaintiff brings this claim on behalf of herself and the Arkansas Class under Arkansas's Civil Remedy Statute for Recovery of Gambling Losses, Ark. Code. Ann. § 16-118-103, which was enacted to effectuate the State's public policy against gambling.

201.     Ark. Code. Ann. § 16-118-103 provides: "Any person who loses any money or property at any game or gambling device, or any bet or wager whatever, may recover the money

or property by obtaining a judgment ordering the return of the money or property following an action against the person winning the money or property."

202.    Accordingly, Ark. Code. Ann. § 16-118-103 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

203.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Arkansas Class paid money or gambled and lost money within the meaning of Ark. Code. Ann. § 16-118-103.

204.    Facebook has profited and continues to profit from each payment made by Arkansas Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ark. Code. Ann. § 16-118-103.

205.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

206.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Arkansas Class Members to gamble in social casinos.

207.    Plaintiff and Arkansas Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

<u>COUNT VII</u>
**Ark. Code Ann. § 4-88-101, *et seq.***
**Arkansas Deceptive Trade Practice Act**
**(Plaintiff Mary Austin, On Behalf of the Arkansas Class)**

208.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

209.    Plaintiff brings this action on behalf of herself and the Arkansas Class against Facebook.

210.    Facebook, Plaintiff, and Arkansas Class members are "persons" within the meaning of Ark. Code Ann. § 4-88-102(5).

211.    Virtual coins and tokens used to play social casinos are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

212.    The Arkansas Deceptive Trade Practice Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices[.]" Ark. Code Ann. § 4-88-107(a).

213.    The Arkansas DTPA makes unlawful "engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10).

214.    Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Arkansas Class members purchased virtual coins and tokens. Facebook's conduct is thus unconscionable and in violation of the Arkansas DTPA.

215.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

216.    Plaintiff and Arkansas Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable financial loss and actual damages as a direct and proximate result of their reliance on Facebook's unconscionable conduct.

217.    Facebook's violations present a continuing risk to Plaintiff and Arkansas Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

218.    Plaintiff and Arkansas Class members seek an order enjoining Facebook's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Arkansas DTPA.

## COUNT VIII
### Unjust Enrichment
### (Plaintiff Mary Austin, On Behalf of the Arkansas Class)

219.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

220.    Plaintiff brings this claim on behalf of herself and the Arkansas Class under the common law of unjust enrichment.

221.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Arkansas Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

222.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

223.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

224.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

225.    These profits were a benefit conferred upon Facebook by Arkansas Class Members when purchasing coins to wager in social casinos.

226.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Arkansas Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT IX
### Ga. Code Ann. § 13-8-3
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Patricia McCullough, On Behalf of the Georgia Class)

227.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

228.    Plaintiff brings this claim on behalf of herself and the Georgia Class under Georgia's Civil Remedy Statute for Recovery of Gambling Losses, Ga. Code. Ann. § 13-8-3, which was enacted to effectuate the State's public policy against gambling.

229.    Ga. Code. Ann. § 13-8-3 provides: "Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county."

230.    Accordingly, Ga. Code. Ann. § 13-8-3 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

231.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Georgia Class gambled and lost money within the meaning of Ga. Code. Ann. § 13-8-3.

232.    Facebook has profited and continues to profit from each payment made by Georgia Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ga. Code. Ann. § 13-8-3.

233.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

234.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Class Members to gamble in social casinos.

235.    Plaintiff and Georgia Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

## COUNT X
### Ga. Code Ann. § 10-1-390, *et seq.*
### Georgia Fair Business Practices Act
### (Plaintiff Patricia McCullough, On Behalf of the Georgia Class)

236.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

237.    Plaintiff brings this action on behalf of herself and the Georgia Class against Facebook.

238.    Facebook, Plaintiff, and Georgia Class members are "persons" within the meaning of Ga. Code. Ann. § 10-1-392(a)(24).

239.    Plaintiff and Georgia Class members are "consumers" within the meaning of Ga. Code. Ann. § 10-1-392(a)(6).

240.    Facebook is and was engaged in "trade" and "commerce" within the meaning of Ga. Code. Ann. § 10-1-392(a)(28).

241.    The Georgia Fair Business Practices Act ("Georgia FBPA") prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce[.]" Ga. Code Ann. § 10-1-393(a).

242.    Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiff and Georgia Class members purchased virtual coins and tokens. This constitutes an unfair act or practice in violation of the Georgia FBPA.

243.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

244.    Plaintiff and Georgia Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Facebook's conduct.

245.    Facebook's violations present a continuing risk to Plaintiff and Georgia Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

246.    Pursuant to Ga. Code. Ann. § 10-1-399, Plaintiff and the Georgia Class seek an order enjoining Facebook's unfair and/or deceptive acts or practices, and awarding any other just and proper relief available under the Georgia FBPA.

## COUNT XI
### Unjust Enrichment
### (Plaintiff Patricia McCullough, On Behalf of the Georgia Class)

247.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

248.    Plaintiff brings this claim on behalf of herself and the Georgia Class under the common law of unjust enrichment.

249.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Georgia Class Members by

virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

250.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

251.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

252.     These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

253.    These profits were a benefit conferred upon Facebook by Georgia Class Members when purchasing coins to wager in social casinos.

254.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Georgia Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XII
### 720 Ill. Comp. Stat. Ann. 5/28-8
### Civil Remedy Statute for Recovery of Gambling Losses
**(Plaintiffs Alison Koda, Glenna Wiegard, Clotera Rogers, and Carol Smith, On Behalf of the Illinois Class)**

255.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

256.    Plaintiffs bring this claim on behalf of themselves and the Illinois Class under Illinois' Civil Remedy Statute for Recovery of Gambling Losses, 720 Ill. Comp. Stat. Ann. 5/28-8, which was enacted to effectuate the State's public policy against gambling.

257.    720 Ill. Comp. Stat. Ann. 5/28-8 provides: "Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court. No person who accepts from another person for transmission, and

transmits, either in his own name or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial, commodity or stock exchange, shall, under any circumstances, be deemed a 'winner' of any moneys lost by such other person in or through any such transactions."

258.    Accordingly, 720 Ill. Comp. Stat. Ann. 5/28-8 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

259.    By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Illinois Class gambled and lost money within the meaning of 720 Ill. Comp. Stat. Ann. 5/28-8.

260.    Facebook has profited and continues to profit from each payment made by Illinois Class Members to purchase virtual coins, and is the "winner" of each transaction, in violation of 720 Ill. Comp. Stat. Ann. 5/28-8.

261.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

262.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Illinois Class Members to gamble in social casinos.

263.    Plaintiffs and Illinois Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

**COUNT XIII**
**815 ILCS 505/1, *et seq.***
**Illinois Consumer Fraud and Deceptive Business Practices Act**
**(Plaintiffs Alison Koda, Glenna Wiegard, Clotera Rogers, and Carol Smith, On Behalf of the Illinois Class)**

264.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

265.    Plaintiffs bring this action on behalf of themselves and the Illinois Class against Facebook.

266.    Facebook, Plaintiffs, and Illinois Class members are "persons" within the meaning of 815 ILCS 505/1(c).

267.    Plaintiffs and Illinois Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

268.    Virtual coins and tokens are "merchandise" within the meaning of 815 ILCS 505/1(b).

269.    Facebook is and was engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f).

270.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA") prohibits "[U]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" [815 ILCS 510/2], approved August 5, 1965, in the conduct of any trade or commerce[.]" 815 ILCS 505/2.

271.     Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiffs and Illinois State Class members purchased virtual coins and tokens. This offends public policy because it violates 720 Ill. Comp. Stat. Ann. 5/28-8.  Facebook intended that Plaintiffs rely on its unfair practices with regard to social casinos as outlined above. This constitutes an unfair or deceptive act or practice, and thus violates the Illinois Consumer Fraud and Deceptive Business Practices Act.

272.     Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

273.     Plaintiffs and Illinois Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Facebook's conduct.

274.     Facebook's violations present a continuing risk to Plaintiffs and Illinois Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

275.     Pursuant to  815 ILCS 505/10a, Plaintiffs and Illinois Class members seek an order enjoining Facebook's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois CFDBPA.

### COUNT XIV
**Unjust Enrichment**
**(Plaintiffs Alison Koda, Glenna Wiegard, Clotera Rogers, and Carol Smith, On Behalf of the Illinois Class)**

276.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

277.    Plaintiffs bring this claim on behalf of themselves and the Illinois Class under the common law of unjust enrichment.

278.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Illinois Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

279.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

280.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

281.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

282.    These profits were a benefit conferred upon Facebook by Illinois Class Members when purchasing coins to wager in social casinos.

283.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Illinois Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XV
### Ky. Rev. Stat. Ann. § 372.020
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Hannelore Boorn and Janice Williams, On Behalf of the Kentucky Class)

284.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

285.    Plaintiffs bring this claim on behalf of themselves and the Kentucky Class under Kentucky's Civil Remedy Statute for Recovery of Gambling Losses, Ky. Rev. Stat. Ann. § 372.020, which was enacted to effectuate the State's public policy against gambling.

286.    Ky. Rev. Stat. Ann. § 372.020 provides: "If any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser or any of his creditors may recover it, or its value, from the winner, or any transferee of the winner, having notice of the consideration, by action brought within five (5) years after the payment, transfer or delivery. Recovery may be had against the winner, although the payment, transfer or delivery was made to the endorsee, assignee, or transferee of the winner."

287.    Accordingly, Ky. Rev. Stat. Ann. § 372.020 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

288.    By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Kentucky Class gambled and lost money within the meaning of Ky. Rev. Stat. Ann. § 372.020.

289.    Facebook has profited and continues to profit from each payment made by Kentucky Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Ky. Rev. Stat. Ann. § 372.020.

290.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

291.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Kentucky Class Members to gamble in social casinos.

292.     Plaintiffs and Kentucky Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

### COUNT XVI
**Ky. Rev. Stat. § 367.110, *et seq.***
**Kentucky Consumer Protection Act**
**(Plaintiffs Hannelore Boorn and Janice Williams, On Behalf of the Kentucky Class)**

293.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

294.     Plaintiffs bring this action on behalf of themselves and the Kentucky State Class against Facebook.

295.     Facebook, Plaintiffs, and Kentucky Class members are "persons" within the meaning of Ky. Rev. Stat. § 367.110(1).

296.     Facebook is and was engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. § 367.110(2).

297.     The Kentucky Consumer Protection Act ("Kentucky CPA") prohibits unfair, unconscionable, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.  Ky. Rev. Stat. §§ 367.170(1) and (2).

298.      Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional coins or tokens). In the course of its business, Facebook profits from illegal gambling in connection with its operation of social casinos, for which Plaintiffs and Kentucky Class members purchased virtual coins and tokens. This constitutes an unconscionable act or practice and thus is in violation of the Kentucky CPA.

299.     Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

300.    Plaintiffs and Kentucky Class members purchased virtual coins or tokens for personal, family, or household purposes and suffered ascertainable loss and actual damages as a direct and proximate result of Facebook's unconscionable acts.

301.    Facebook's violations present a continuing risk to Plaintiffs and Kentucky Class members, as well as to the general public. Facebook's unlawful acts and practices complained of herein affect the public interest.

302.    Plaintiffs and Kentucky Class members seek an order enjoining Facebook's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Kentucky CPA.

### COUNT XVII
### Unjust Enrichment
### (Plaintiffs Hannelore Boorn and Janice Williams, On Behalf of the Kentucky Class)

303.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

304.    Plaintiffs bring this claim on behalf of themselves and the Kentucky Class under the common law of unjust enrichment.

305.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Kentucky Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

306.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

307.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

308.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

309.    These profits were a benefit conferred upon Facebook by Kentucky Class Members when purchasing coins to wager in social casinos.

310.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Kentucky Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

**COUNT XVIII**
**Minn. Stat. Ann. § 541.20**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Jennifer Andrews, Dawn Mehsikomer and Denice Wax, On Behalf of the Minnesota Class)**

311.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

312.    Plaintiffs bring this claim on behalf of themselves and the Minnesota Class under Minnesota's Civil Remedy Statute for Recovery of Gambling Losses, Minn. Stat. Ann. § 541.20 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

313.    The Statute provides: "Every person who, by playing at cards, dice, or other game, or by betting on the hands or sides of such as are gambling, shall lose to any person so playing or betting any sum of money or any goods, and pays or delivers the same, or any part thereof, to the winner, may sue for and recover such money by a civil action, before any court of competent jurisdiction."

314.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

315.    By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Minnesota Class gambled and lost money within the meaning of the Statute.

316.    Facebook has profited and continues to profit from each payment made by Minnesota Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of the statute.

317.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

318.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Minnesota Class Members to gamble in social casinos.

319.    Plaintiffs and Minnesota Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

## COUNT XIX
### Unjust Enrichment
### (Plaintiffs Jennifer Andrews, Dawn Mehsikomer and Denice Wax, On Behalf of the Minnesota Class)

320.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

321.    Plaintiffs bring this claim on behalf of themselves and the Minnesota Class under the common law of unjust enrichment.

322.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Minnesota Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

323.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

324.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

325.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

326.    These profits were a benefit conferred upon Facebook by Minnesota Class Members when purchasing coins to wager in social casinos.

327.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Minnesota Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XX
### Mo. Ann. Stat. § 434.030
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Frances Long, On Behalf of the Missouri Class)

328.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

329.    Plaintiff brings this claim on behalf of herself and the Missouri Class under Missouri's Civil Remedy Statute for Recovery of Gambling Losses, Mo. Ann. Stat. § 434.030 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

330.    The Statute provides: "Any person who shall lose any money or property at any game, gambling device or by any bet or wager whatever, may recover the same by a civil action."

331.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

332. By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Missouri Class gambled and lost money within the meaning of the Statute.

333. Facebook has profited and continues to profit from each payment made by Missouri Class Members to purchase virtual coins, and therefore is subject to "recover[y]" for each transaction, in violation of the Statute.

334. Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

335. Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Missouri Class Members to gamble in social casinos.

336. Plaintiff and Missouri Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

## COUNT XXI
### Mo. Ann. Stat. § 407.020(1)
### Unfair Acts and Practices in the Conduct of Trade or Commerce
### (Plaintiff Frances Long, On Behalf of the Missouri Class)

337. Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

338. Missouri's Consumer Protection Act prohibits that "[a]ny deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or

1    omission of any material fact in connection with the sale or advertisement of any merchandise in

2    trade or commerce." Mo. Ann. Stat. § 407.020(1) (referred to in this count as the "Statute").

3         339.   Under the Statute, an unfair or deceptive practice includes one which is unlawful.

4         340.   Facebook, Plaintiff, and Missouri Class members are "persons" within the

5    meaning of Mo. Ann. Stat. §§ 407.020(1) and 407.025.

6         341.   As set forth herein, Facebook violated Missouri's Civil Remedy Statute for

7    Recovery of Gambling Losses.

8         342.   Facebook's unlawful and otherwise unfair or deceptive acts and practices

9    occurred in the conduct of trade or commerce. Indeed, Facebook is responsible for making social

10   casinos available to the public in trade and commerce.

11        343.   Facebook's acts and practices were and are injurious to the public interest because

12   Facebook continuously advertises, solicits, and enables the general public in Missouri and

13   throughout the United States to play unlawful and otherwise unfair or deceptive social casinos,

14   all while profiting from such conduct.

15        344.    Such acts and practices are part of a pattern or generalized course of conduct on

16   the part of Facebook that contradicts the express public policy of Missouri.

17        345.   As a result of Facebook's conduct, Plaintiff and Missouri Class Members were

18   injured in their business or property—i.e., economic injury—in that they lost money wagering on

19   unlawful and otherwise unfair or deceptive games of chance.

20        346.   Facebook's unlawful and otherwise unfair or deceptive conduct proximately

21   caused Plaintiff's and Missouri Class Members' injuries because, but for the challenged conduct,

22   Plaintiff and Missouri Class Members would not have lost money wagering on illegal games of

23   chance, which was a direct, foreseeable, and planned consequence of Facebook's conduct.

24        347.   Facebook's liability under this Count arises from its own conduct, including

25   processing and profiting from unlawful transactions for virtual chips and providing development

26   assistance to social casino app developers.

27

28

**COUNT XXIII**
**Mont. Code Ann. § 23-5-131**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiffs Sandra Meyers and Kathleen Wilkinson, On Behalf of the Montana Class)**

357.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

358.    Plaintiffs bring this claim on behalf of themselves and the Montana Class under Montana's Civil Remedy Statute for Recovery of Gambling Losses, Mont. Code Ann. § 23-5-131 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

359.    The Statute provides: "A person, or the person's dependent or guardian, who, by playing or betting at an illegal gambling device or illegal gambling enterprise, loses money, property, or any other thing of value and pays and delivers it to another person connected with the operation or conduct of the illegal gambling device or illegal gambling enterprise, within 1 year following the person's loss, may: (1) bring a civil action in a court of competent jurisdiction to recover the loss; (2) recover the costs of the civil action and exemplary damages of no less than $500 and no more than $5,000; and (3) join as a Facebook any person having an interest in the illegal gambling device or illegal gambling enterprise."

360.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

361.    By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Montana Class gambled and lost money within the meaning of the Statute.

362.    Facebook has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is "another person" for each transaction, in violation of the Statute.

363.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

364.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted

promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Montana Class Members to gamble in social casinos.

365.    Plaintiffs and Montana Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

## COUNT XXIV
### Unjust Enrichment
### (Plaintiffs Sandra Meyers and Kathleen Wilkinson, On Behalf of the Montana Class)

366.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

367.    Plaintiffs bring this claim on behalf of themselves and the Montana Class under the common law of unjust enrichment.

368.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Montana Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

369.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

370.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

371.     These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

372.    These profits were a benefit conferred upon Facebook by Montana Class Members when purchasing coins to wager in social casinos.

373.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Montana Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

**COUNT XXV**
**N.J. Stat. Ann. § 2A:40-5**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Steven Simons, On Behalf of the New Jersey Class)**

374.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

375.    Plaintiff brings this claim on behalf of himself and the New Jersey Class under New Jersey's Civil Remedy Statute for Recovery of Gambling Losses, N.J. Stat. Ann. § 2A:40-5 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

376.    The Statute provides: "If any person shall lose any money, goods, chattels or other valuable thing, in violation of section 2A:40-1 of this title, and shall pay or deliver the same or any part thereof to the winner, or to any person to his use, or to a stakeholder, such person may sue for and recover such money, or the value of such goods, chattels, or other valuable thing, from such winner, or from such depositary, or from such stakeholder, whether the same has been delivered or paid over by such stakeholder or not, in a civil action provided such action is brought within 6 calendar months after payment or delivery."

377.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

378.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the New Jersey Class gambled and lost money within the meaning of the statute.

379.    Facebook has profited and continues to profit from each payment made by New Jersey Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of the Statute.

380.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

381.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and New Jersey Class Members to gamble in social casinos.

382.    Plaintiff and New Jersey Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

<u>**COUNT XXVI**</u>
**N.J. Stat. Ann. § 56:8-2**
**Unfair Acts and Practices in the Conduct of Trade or Commerce**
**(Plaintiff Steven Simons, On Behalf of the New Jersey Class)**

383.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

384.    New Jersey's Consumer Protection Act prohibits "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2 (referred to in this count as the "Statute").

385.    Under the Statute, an unconscionable practice includes one which is unlawful.

386.    Facebook, Plaintiff, and New Jersey Class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-2.

387.    As set forth herein, Facebook violated New Jersey's Civil Remedy Statute for Recovery of Gambling Losses.

388.    Facebook's unlawful and otherwise unconscionable practices occurred in the conduct of trade or commerce. Indeed, Facebook is responsible for making social casinos available to the public in trade and commerce.

389.    Facebook's practices were and are injurious to the public interest because Facebook continuously advertises, solicits, and enables the general public in New Jersey and throughout the United States to play unlawful and otherwise unconscionable social casinos, all while profiting from such conduct.

390.    Such practices are part of a pattern or generalized course of conduct on the part of Facebook that contradicts the express public policy of New Jersey.

391.    As a result of Facebook's conduct, Plaintiff and New Jersey Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful and otherwise unconscionable games of chance.

392.    Facebook's unlawful and otherwise unconscionable conduct proximately caused Plaintiff's and Class Members' injuries because, but for the challenged conduct, Plaintiff and New Jersey Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Facebook's conduct.

393.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

394.    Plaintiff, on his own behalf and on behalf of the New Jersey Class, seeks to recover, as permitted by law, actual damages and multiple damages, together with the costs of suit, including reasonable attorneys' fees.

## COUNT XXVII
### Unjust Enrichment
### (Plaintiff Steven Simons, On Behalf of the New Jersey Class)

395.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

396.    Plaintiff brings this claim on behalf of himself and the New Jersey Class under the common law of unjust enrichment.

397.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and New Jersey Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

398.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

399.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

400.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

401.    These profits were a benefit conferred upon Facebook by New Jersey Class Members when purchasing coins to wager in social casinos.

402.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each New Jersey Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XXVIII
### N.Y. Gen. Oblig. Law §§ 5-419 & 5-421
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Vanessa Sowell Skeeter, On Behalf of the New York Class)

403.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

404.    Plaintiff brings this claim on behalf of herself and the New York Class under New York's Civil Remedy Statute for Recovery of Gambling Losses, N.Y. Gen. Oblig. Law §§ 5-419 & 5-421 (referred to in this Count as the "Statute"), which was enacted to effectuate the State's public policy against gambling.

405.    The Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." The statute further provides: "Every person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof."

406.    Accordingly, the Statute prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

407.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the New York Class gambled and lost money within the meaning of the Statute.

408.    Facebook has profited and continues to profit from each payment made by New York Class Members to purchase virtual coins, and therefore is the "winner" (and/or "person to whom the same shall be paid or delivered") of each transaction, in violation of the Statute.

409.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

410.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant

percentage of the money paid and lost by Plaintiff and New York Class Members to gamble in social casinos.

411.    Plaintiff and New York Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

**COUNT XXIX**
**Unjust Enrichment**
**(Plaintiff Vanessa Sowell Skeeter, On Behalf of the New York Class)**

412.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

413.    Plaintiff brings this claim on behalf of herself and the New York Class under the common law of unjust enrichment.

414.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and New York Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

415.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

416.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

417.     These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

418.    These profits were a benefit conferred upon Facebook by New York Class Members when purchasing coins to wager in social casinos.

419.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each New York Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XXX
### S.C. Code § 32-1-10
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiff Donna Whiting, On Behalf of the South Carolina Class)

420.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

421.    Plaintiff brings this claim on behalf of herself and the South Carolina Class under South Carolina's Civil Remedy Statute for Recovery of Gambling Losses, S.C. Code § 32-1-10, which was enacted to effectuate the State's public policy against gambling.

422.    Section 32-1-10 provides: "Any person who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit …."

423.    Accordingly, Section 32-1-10 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

424.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the South Carolina Class gambled and lost money within the meaning of Section 32-1-10.

425.    Facebook has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 32-1-10.

426.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

427.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted

promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Class Members to gamble in social casinos.

428.    Plaintiff and South Carolina Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

## COUNT XXXI
### Unjust Enrichment
### (Plaintiff Donna Whiting, On Behalf of the South Carolina Class)

429.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

430.    Plaintiff brings this claim on behalf of herself and the South Carolina Class under the common law of unjust enrichment.

431.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and South Carolina Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

432.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

433.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

434.     These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

435.    These profits were a benefit conferred upon Facebook by South Carolina Class Members when purchasing coins to wager in social casinos.

436.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each South Carolina Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

**COUNT XXXII**
**Tenn. Code § 28-3-106**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Sheri Miller, On Behalf of the Tennessee Class)**

437.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

438.    Plaintiff brings this claim on behalf of herself and the Tennessee Class under Tennessee's Civil Remedy Statute for Recovery of Gambling Losses, Tenn. Code § 28-3-106, which was enacted to effectuate the State's public policy against gambling.

439.    Section 28-3-106 provides that "the loser" of "any kind of gambling or betting" may bring an action "to recover money or goods lost" within 90 days after paying or delivering the lost money or goods.

440.    Accordingly, Section 28-3-106 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

441.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Tennessee Class gambled and lost money within the meaning of Section 28-3-106.

442.    Facebook has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is in violation of Section 28-3-106.

443.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

444.     Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Tennessee Class Members to gamble in social casinos.

445.     Plaintiff and Tennessee Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

## COUNT XXXIII
### Unjust Enrichment
### (Plaintiff Sheri Miller, On Behalf of the Tennessee Class)

446.     Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

447.     Plaintiff brings this claim on behalf of herself and the Tennessee Class under the common law of unjust enrichment.

448.     As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Tennessee Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

449.     Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

450.     Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

451.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

452.    These profits were a benefit conferred upon Facebook by Tennessee Class Members when purchasing coins to wager in social casinos.

453.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Tennessee Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

**COUNT XXXIV**
**Va. Code § 11-15**
**Civil Remedy Statute for Recovery of Gambling Losses**
**(Plaintiff Paul Lombard, On Behalf of the Virginia Class)**

454.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

455.    Plaintiff brings this claim on behalf of himself and the Virginia Class under Virginia's Civil Remedy Statute for Recovery of Gambling Losses, Va. Code § 11-15, which was enacted to effectuate the State's public policy against gambling.

456.    Section 11-15 provides: "Any person who shall, by playing at any game or betting on the sides or hands of such as play at any game, lose within twenty-four hours, the sum or value of five dollars, or more, and pay or deliver the same, or any part thereof, may, within three months next following, recover from the winner, the money or the value of the goods so lost and paid or delivered, with costs of suit in civil action, either by suit or warrant, according to the amount or value thereof."

457.    Accordingly, Section 11-15 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

458.    By purchasing coins from Facebook to wager on social casinos, Plaintiff and each member of the Virginia Class gambled and lost money within the meaning of Section 11-15.

459.    Facebook has profited and continues to profit from each payment made by Class Members to purchase virtual coins, and therefore is the "winner" of each transaction, in violation of Section 11-15.

460.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

461.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiff and Virginia Class Members to gamble in social casinos.

462.    Plaintiff and Virginia Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook, in addition to costs of suit.

### COUNT XXXV
#### Unjust Enrichment
#### (Plaintiff Paul Lombard, On Behalf of the Virginia Class)

463.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

464.    Plaintiff brings this claim on behalf of himself and the Virginia Class under the common law of unjust enrichment.

465.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiff and Virginia Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

466.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

467.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

468.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

469.    These profits were a benefit conferred upon Facebook by Virginia Class Members when purchasing coins to wager in social casinos.

470.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiff and each Virginia Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

## COUNT XXXVI
### Wash. Rev. Code § 4.24.070
### Civil Remedy Statute for Recovery of Gambling Losses
### (Plaintiffs Ben Kramer and Rick Larsen, On Behalf of the Washington Class)

471.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

472.    Plaintiffs bring this claim on behalf of themselves and the Washington Class under Washington's Civil Remedy Statute for Recovery of Gambling Losses, Wash. Rev. Code § 4.24.070, which was enacted to effectuate the State's public policy against gambling.

473.    Section 4.24.070 provides: "All persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

474.    Accordingly, Section 4.24.070 prohibits a person or entity from profiting from gambling activity and provides for the recovery of money paid and lost due to such gambling activity.

475.    By purchasing coins from Facebook to wager on social casinos, Plaintiffs and each member of the Washington Class gambled and lost money within the meaning of Section 4.24.070.

476.    "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence.",

477.    Virtual coins and tokens used to play social casinos are "thing[s] of value" under RCW § 9.46.0285.

478.    Social casinos are illegal gambling games because they are online games at which players wager things of value (the chips) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning additional chips).

479.    Facebook has profited and continues to profit from each payment made by Washington Class Members to purchase virtual coins, and therefore is both the "dealer winning" the same and a proprietor for whose benefit social casinos were played, in violation of Section 4.24.070.

480.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

481.    Facebook's active participation in the operation of social casinos increases its winnings from illegal gambling. The Platform (1) provides marketing guidance, tools, targeted promotional offers and more to help drive discovery and increased purchases within social casinos; (2) contributes to the creation and development of social casinos by providing technology, training, and other tools that allow developers of social casinos to operate these casinos on Facebook's gaming platform; and (3) offers and distributes social casinos through Facebook and facilitates all in-app purchases for social casinos in exchange for a significant percentage of the money paid and lost by Plaintiffs and Washington Class Members to gamble in social casinos.

482.    Plaintiffs and Washington Class Members are therefore entitled to recover from Facebook the amounts they lost when gambling in social casinos through Facebook.

**COUNT XXXVII**
**Wash. Rev. Code § 19.86.020**
**Unfair Acts and Practices in the Conduct of Trade or Commerce**
**(Plaintiff Ben Kramer and Rick Larsen, On Behalf of the Washington Class)**

483.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

484.    Washington's Consumer Protection Act ("CPA") prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020.

485.    Under the CPA, an unfair or deceptive act is one which is unlawful and against public policy as declared by the legislature or judiciary.

486.    Plaintiffs and Washington Class Members are "persons" within the meaning of RCW §§ 19.86.020 and 19.86.090.

487.    Facebook violated RCW § 9.46.010, *et seq.*, which declares that it is the policy of the State of Washington to, *inter alia*, "restrain all persons from seeking profit from professional gambling activities in this state," to "restrain all persons from patronizing such professional gambling activities," and to "safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling." RCW § 9.46.010.

488.    Under RCW § 9.46.010, *et seq.*, unlawful "gambling" is defined as "staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence." RCW § 9.46.0237.

489.    Virtual coins and tokens used to play social casinos are "thing[s] of value" under RCW § 9.46.0285.

490.    Social casinos are illegal gambling games because they are online games at which players wager things of value (virtual coins or tokens purchased with real-world money) and by an element of chance (e.g., by spinning an online slot machine) are able to obtain additional entertainment and extend gameplay (by winning virtual coins or tokens).

491.    Facebook operates social casinos in conjunction with the developers of those casinos and has profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from illegal gambling transactions.

492.    Facebook's unlawful acts and practices occurred in the conduct of trade or commerce. Indeed, Facebook is responsible for making social casinos available to the public in trade and commerce.

493.    Facebook's acts and practices were and are injurious to the public interest because Facebook continuously advertises, solicits, and enables the general public in Washington State and throughout the United States to play unlawful social casinos, all while profiting from such conduct.

494.    This is part of a pattern or generalized course of conduct on the part of Facebook that contradicts the express public policy of the State of Washington.

495.    As a result of Facebook's conduct, Plaintiffs and Washington Class Members were injured in their business or property—i.e., economic injury—in that they lost money wagering on unlawful games of chance.

496.    Facebook's unlawful conduct proximately caused Plaintiff's and Washington Class Members' injuries because, but for the challenged conduct, Plaintiff and Washington Class Members would not have lost money wagering on illegal games of chance, which was a direct, foreseeable, and planned consequence of Facebook's conduct.

497.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

498.    Plaintiffs, on their own behalf and on behalf of the Washington Class, seeks to recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT XXXVIII**
**Unjust Enrichment**
**(Plaintiffs Ben Kramer and Rick Larsen, On Behalf of the Washington Class)**

499.    Plaintiffs reallege and incorporate the preceding paragraphs, as if fully set forth herein.

500.    Plaintiffs bring this claim on behalf of themselves and the Washington Class under the common law of unjust enrichment.

501.    As a result of its unlawful conduct described above, Facebook has been and will continue to be unjustly enriched to the detriment of Plaintiffs and Washington Class Members by virtue of their purchase of virtual coins from Facebook to wager in social casinos through Facebook.

502.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

503.    Facebook has profited immensely by providing marketing guidance, tools, and other assistance to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos.

504.    These profits were obtained from illegal gambling in connection with Facebook's operation of social casinos.

505.    These profits were a benefit conferred upon Facebook by Washington Class Members when purchasing coins to wager in social casinos.

506.    Accordingly, because Facebook will be unjustly enriched if it is allowed to retain the illegal profits from social casinos, Plaintiffs and each Washington Class Member are entitled to recover the amount by which Facebook was unjustly enriched at their expense.

1

**CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS**

2

**COUNT XXXIX**
**18 U.S.C. § 1962(c) (RICO)**
**Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**
**(All Plaintiffs, On Behalf of the Nationwide Class)**

3

4

5    507.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth

6    herein.

7    508.    At all relevant times, Facebook is and has been a "person" within the meaning of

8    18 U.S.C. § 1961(3), because it is capable of holding, and does hold, "a legal or beneficial

9    interest in property."

10    509.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and

11    have standing to sue as they were injured in their business and/or property as a result of the

12    Social Casino Enterprise's wrongful conduct described herein, including but not limited to the

13    Enterprise's (1) taking and receiving money from Plaintiffs and the Nationwide Class; (2) never

14    providing Plaintiffs and members of the Nationwide Class a fair and objective chance to win—

15    they could only lose; and (3) having directly and knowingly profited from, on information and

16    belief, rigged and manipulated slot machines.

17    510.    Section 1962(c) makes it unlawful "for any person employed by or associated

18    with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

19    to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

20    a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

21    511.    18 U.S.C. § 1961(1) defines "racketeering activity" to include (i) " any act …

22    involving … gambling … which is chargeable under State law and punishable by imprisonment

23    for more than one year;" (ii) any act which is indictable under Title 18, Section 1084 of the

24    United States Code (relating to the transmission of gambling information); and (iii) any act

25    which is indictable under Title 18, Section 1955 of the United States Code (relating to the

26    prohibition of illegal gambling businesses).

27    512.    Interstate gambling, including interstate internet gambling, is illegal under federal

28    law if the gambling transaction is illegal in any states in which the transaction occurs. As

relevant here, at least some portion of all alleged gambling transactions occur within California, where the alleged gambling transactions are illegal. Consequently, all alleged gambling transactions are illegal under federal law.

513.    Specifically, illegal gambling is indictable under both Section 1084 and Section 1955 of Title 18 of the United States Code as well as under California law, and is punishable by imprisonment for more than one year.

514.    Therefore, the Social Enterprise is engaged in "racketeering activity."

515.    18 U.S.C. § 1961(6) defines "unlawful debt" as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof," and "(B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof."

516.    Because the Social Casino Enterprise collects debts incurred from a gambling activity in violation of California and other state law, described herein, its profits derived from its ownership and maintenance constitute "unlawful debt" as defined in Section 1961(6).

517.    Facebook violated 18 U.S.C. § 1962(c) and § 1962(d) by participating in, facilitating, or conducting the affairs of the Social Casino Enterprise through a pattern of racketeering activity composed of indictable offenses under 18 U.S.C. § 1084, 18 U.S.C. § 1955, California Penal Code §§ 319, 330b, and 330.1.

518.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

519.    The affiliation between Defendant Facebook, the other Platforms, and the Illegal Slots constitutes a conspiracy to use an enterprise for the collection of unlawful debt in violation of 18 U.S.C. § 1962(d).

### Social Casino Enterprise

520.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

521.    Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

522.    The Social Casino Enterprise is an association-in-fact composed of Facebook, Apple, Google, and the Illegal Slot companies who are engaged in and whose activities affect interstate commerce, and which have affected and damaged interstate commercial activity. This Enterprise exists separately from the otherwise legitimate businesses operations of each individual participant.

523.    The pattern of racketeering activity conducted by the members of the Social Casino Enterprise is distinct from the Social Casino Enterprise itself, as each act of racketeering is a separate offense committed by an entity while the Social Casino Enterprise itself is an association-in-fact of legal entities. The Social Casino Enterprise has an informal structure of app developers and platforms with continuing functions or responsibilities.

524.    For approximately a decade, the Social Casino Enterprise has collaborated together to target and retain high-spending users in their online gambling scheme throughout the country. At the very latest, following the Ninth Circuit's March 28, 2018, holding in *Kater*, Defendant Facebook and the other Platforms, on information and belief, mutually agreed to continue their Enterprise through their ongoing collection of unlawful debts, functioning as a cohesive unit with the purpose of gaining illicit gambling profits.

<u>Structure of the Social Casino Enterprise</u>

525.    The Social Casino Enterprise consists of dozens of Illegal Slot companies and the Platforms (Facebook, Apple and Google). Each participant agreed to conduct and carry out the affairs and goals of the Social Casino Enterprise:

A.    The Illegal Slot companies agreed to conduct the affairs of the Social Casino Enterprise by developing, updating and operating the illegal slot machines: the "gambling devices." The Illegal Slot companies operate as the principals, forming the necessary business partnerships with Facebook, Apple and Google for the successful execution of their unlawful

gambling scheme. The Illegal Slot companies fundamentally rely on the Platforms to host their games, access consumers, and collect revenue. Upon constructive notice of the unlawful nature of the virtual social gambling applications, the Illegal Slot companies agreed with all Enterprise participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

        B.    Facebook, Apple and Google agreed to conduct the affairs of the Social Casino Enterprise by serving as the gambling premises, hosting the virtual social gambling applications, and processing all in-app transactions in exchange for a share in the gamblers' losses. Additionally, upon notice of the unlawful nature of the virtual social gambling applications, Facebook, Apple, and Google agreed with all participants to uphold their roles in the Social Casino Enterprise and to continue functioning as a single unit with the common purpose of collecting unlawful debts from online gambling activity.

526.    At all relevant times, each Social Casino Enterprise participant was aware of the conduct of the Social Casino Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct through in-app sales.

527.    The persons engaged in the Social Casino Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

528.    All members of the Social Casino Enterprise coordinate and maintain their respective roles in order to enrich themselves and to further the common interests of the whole.

529.    Each Social Casino Enterprise participant participated in the operation and management of the Social Casino Enterprise by directing its affairs as described herein.

530.    The wrongful conduct of the Social Casino Enterprise has been and remains part of the Social Casino Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiffs' and the Class's property. Without the repeated illegal acts and intentional coordination between all participants, the Social Casino Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiffs and the Class into the future.

<u>Pattern of Racketeering Activity</u>

531.     The affairs of the Social Casino Enterprise were conducted in such a way to form a pattern of racketeering activity. The Social Casino Enterprise's general pattern of activity consists of designing and operating illegal internet-based slot machines and repeatedly violating public policy against gambling by:

    A.  Developing illegal slot machine games and disguising them as innocuous video game entertainment;

    B.  Distributing and operating illegal slot machine games that are, on information and belief, rigged and manipulated;

    C.  Concealing the scope and deceptive nature of their gambling applications despite knowledge of their predatory design and business model;

    D.  Providing a host platform to house unlicensed gambling activity;

    E.  Injuring the public interest by continuously advertising to and soliciting the general public to play illegal slot machines;

    F.  Conspiring to uphold the Social Casino Enterprise; and

    G.  Unjustly collecting unlawful debts and retaining the profits from their illegal social gambling applications.

532.     The Social Casino Enterprise has operated as a continuous unit since at least 2010.

533.     Pursuant to and in furtherance of their fraudulent scheme, Facebook committed multiple predicate act violations of federal and state law as previously alleged herein.

**COUNT XL**
**RICO § 1962(d)**
**Conspiracy to Engage in Racketeering Activities and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**
**(All Plaintiffs, On Behalf of the Nationwide Class)**

534.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

535.     18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

536.    As described throughout, and in detail in Count II, even if it did not direct or manage the affairs of the Social Casino Enterprise, Facebook conspired to commit predicate acts in violation of § 1962(c), including violations of California Penal Code §§ 330b and 330.1.

537.    Facebook's liability under this Count arises from its own conduct, including processing and profiting from unlawful transactions for virtual chips and providing development assistance to social casino app developers.

538.    Defendant Facebook acted knowingly at all times when agreeing to conduct the activities of the Social Casino Enterprise. Facebook agreed to and indeed did participate in the requisite pattern of racketeering activity which constitutes this RICO claim, collected unlawful debts, engaged in racketeering activities, and intentionally acted in furtherance of the conspiracy by conducting the pattern of racketeering and unlawful debt collection as described above.

539.    At the very latest, Facebook had notice of the illegality of the Social Casino Enterprise as of the Ninth Circuit's 2018 holding in *Kater*. Facebook's post-*Kater* participation in the Social Casino Enterprise demonstrates its commitment to upholding and operating the structure of the Social Casino Enterprise.

540.    As a result of Facebook's conduct, Plaintiffs and Members of the Nationwide Class were deprived of money and property that they would not otherwise have lost.

541.    Under 18 U.S.C. § 1964(c), the Nationwide Class is entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter an Order:

a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Kathleen Wilkinson, Nancy Urbanczyk, Laura Perkinson, Maria Valencia-Torres, Mary Austin, Patricia McCullough, Alison Koda, Glenna Wiegard, Clotera Rogers, Carol Smith, Hannelore Boorn, Janice Williams, Jennifer Andrews, Dawn Mehsikomer, Denice Wax, Frances Long, Sandra Meyers, Steve Simons, Vanessa Sowell Skeeter, Donna Whiting, Sheri Miller,

Paul Lombard, Ben Kramer, Rick Larsen, Eleanor Mizrahi, and Janice Wilson as representatives of the Classes, and appointing their counsel as Class Counsel;

b)    Declaring that Defendant's conduct, as set out above, is unlawful under California's UCL, Ala. Code § 8-1-150(a), Ala. Code § 8-19-1, *et seq.*, Ark. Code. Ann. § 16-118-103, Ark. Code Ann. § 4-88-101, *et seq.*, Ga. Code Ann. § 13-8-3, Ga. Code Ann. § 10-1-390, *et seq.*, 720 Ill. Comp. Stat. Ann. 5/28-8, 815 ILCS 505/1, *et seq.*, Ky. Rev. Stat. Ann. § 372.020, Ky. Rev. Stat. § 367.110, *et seq.*, Minn. Stat. Ann. § 541.20, Mo. Ann. Stat. § 434.030, Mo. Ann. Stat. § 407.020(1), Mont. Code Ann. § 23-5-131, N.J. Stat. Ann. § 2A:40-5, N.J. Stat. Ann. § 56:8-2, N.Y. Gen. Oblig. Law §§ 5-419 & 5-421, S.C. Code § 32-1-10, Tenn. Code § 28-3-106, Va. Code § 11-15, Wash. Rev. Code § 4.24.070, and Wash. Rev. Code § 19.86.020;

c)    Declaring that Defendant's conduct, as set out above, constitutes racketeering activities, collection of unlawful debts, and conspiracy to engage in the same;

d)    Entering judgment against Defendant Facebook, in the amount of the losses suffered by Plaintiffs and each member of the Classes;

e)    Enjoining Defendant from continuing the challenged conduct;

f)    Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate;

g)    Awarding restitution to Plaintiffs and Class members in an amount to be determined at trial;

h)    Requiring disgorgement of all of Defendant Facebook's ill-gotten gains;

i)    Awarding reasonable attorneys' fees and expenses;

j)    Awarding pre- and post-judgment interest, to the extent allowable;

k)    Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Classes; and

l)    Awarding such other and further relief as equity and justice require, including all forms of relief provided for under the Plaintiffs' claims.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

1

2          Respectfully Submitted,

3          **KATHLEEN WILKINSON, NANCY**
           **URBANCZYK, LAURA PERKINSON, MARIA**
4          **VALENCIA-TORRES, MARY AUSTIN,**
           **PATRICIA MCCULLOUGH, ALISON KODA,**
5          **GLENNA WIEGARD, CLOTERA ROGERS,**
           **CAROL SMITH, HANNELORE BOORN,**
6          **JANICE WILLIAMS, JENNIFER ANDREWS,**
7          **DAWN MEHSIKOMER, DENICE WAX,**
           **FRANCES LONG, SANDRA MEYERS, STEVE**
8          **SIMONS, VANESSA SOWELL SKEETER,**
           **DONNA WHITING, SHERI MILLER, PAUL**
9          **LOMBARD, BEN KRAMER, RICK LARSEN,**
           **ELEANOR MIZRAHI, AND JANICE**
10         **WILSON**, individually and on behalf of all others
           similarly situated,
11

12
    Dated: November 1, 2024        **EDELSON PC**
13

14         By: /s/ Rafey S. Balabanian
           RAFEY S. BALABANIAN (Bar No. 315962)
15         rbalabanian@edelson.com
           TODD LOGAN (Bar No. 305912)
16         tlogan@edelson.com
           150 California Street, 18th Floor
17         San Francisco, CA 94111
           Tel: 415.212.9300
18         Fax: 415.373.9435

19
           JAY EDELSON*
20         jedelson@edelson.com
           THEO BENJAMIN*
21         tbenjamin@edelson.com
           350 North LaSalle St., 14th Floor
22         Chicago, IL 60654
           Tel: 312.589.6370
23         Fax: 312.589.6378

24
           **TYCKO & ZAVAREEI LLP**
25

26         ANDREA R. GOLD*
           agold@tzlegal.com
27         GLENN CHAPPELL*
           gchappell@tzlegal.com
28         2000 Pennsylvania Avenue NW, Suite 1010
           Washington, DC 20006

---

Tel:    202.973.0900
Fax:    202.973.0950

HASSAN A. ZAVAREEI (Bar No. 181547)
hzavareei@tzlegal.com
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC 20006
Tel:    202.973.0900
Fax:    202.973.0950

**KOPELOWITZ OSTROW PA**

KRISTEN LAKE CARDOSO*
cardoso@kolawyers.com
1 West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Tel: 954.525.4100
Fax: 954.525.4300

**BURSOR & FISHER. P.A.**

SARAH N. WESTCOT (Bar No. 264916)
swestcot@bursor.com
701 Brickell Avenue, Suite 12100
Miami, FL 33131
Tel: 305.330.5512

**TOUSLEY BRAIN STEPHENS, PLLC**

CECILY C. JORDAN*
cjordan@tousley.com
1200 Fifth Avenue, Suite 1700
Seattle, WA 98101
Tel:    206.682.8600
Fax:    206.682.2992

**DOVEL & LUNER, LLP**

CHRISTIN CHO (Bar No. 238173)
christin@dovel.com
201 Santa Monica Blvd, Suite 600
Santa Monica, CA 90401
Tel:    310.656.7066
Fax:    310.656.7069

**DAVIS & NORRIS, LLP**

JOHN E. NORRIS*
jnorris@davisnorris.com

2154 Highland Avenue South
Birmingham, AL 35205
Tel:    205.930.9900
Fax:    205.930.9989

**PEARSON WARSHAW, LLP**

MELISSA S. WEINER*
mweiner@pwfirm.com
328 Barry Avenue S., Suite 200
Wayzata, MN 55391
Telephone: (612) 389-0600
Facsimile: (612) 389-0610

*pro hac vice* admitted and/or forthcoming