1

2

3                  UNITED STATES DISTRICT COURT

4                NORTHERN DISTRICT OF CALIFORNIA

5                       SAN JOSE DIVISION

6

7    IN RE: APPLE INC. APP STORE          Case No.   5:21-md-02985-EJD
     SIMULATED CASINO-STYLE GAMES
8    LITIGATION                           **ORDER GRANTING IN PART AND
                                          DENYING IN PART MOTIONS TO
9                                         DISMISS; CERTIFYING
                                          INTERLOCUTORY APPEAL**
10
                                          Re: ECF No. 145
11

12   IN RE: GOOGLE PLAY STORE             Case No.   5:21-md-03001-EJD
     SIMULATED CASINO-STYLE GAMES
13   LITIGATION                           Re: ECF No. 125

14

15

16

17   IN RE: FACEBOOK SIMULATED            Case No.   5:21-cv-02777-EJD
     CASINO-STYLE GAMES LITIGATION
18                                        Re: ECF No. 158

19

20

21

22        In these three putative class actions, plaintiffs from around the country seek to hold

23   Defendants Apple Inc., Google LLC, and Meta Platforms, Inc.[1] liable for supporting social casino

24   apps.  Plaintiffs argue that these apps constitute illegal gambling.  As such, Plaintiffs claim that

25   Defendants are violating several states' laws, as well as the federal Racketeer Influenced and

26   _____

27   [1] Plaintiffs name Facebook, Inc. as the defendant in their complaint even though Facebook has
     changed its name to Meta Platforms, Inc., and the parties refer to the company as Meta throughout
28   their briefs.  The Court therefore refers to the company as Meta.

United States District Court
Northern District of California

1    Corrupt Organizations Act (RICO), by offering payment processing services to the social casino

2    apps' developers.  Each Defendant moved to dismiss for failure to state a claim.  After careful

3    consideration of the parties' written submissions and oral arguments, the Court **GRANTS IN**

4    **PART** and **DENIES IN PART** the motions to dismiss.

5    **I.        BACKGROUND**

6    **A.        Factual Allegations[2]**

7        Over the past two decades, smartphones have grown to become a ubiquitous feature of

8    modern society.  So too have mobile apps, which now generate billions of dollars in revenue each

9    year.  These matters concern one category of mobile apps: social casinos.

10        Social casinos are apps that mimic the experience of playing slot machines at physical

11    casinos.  Apple Compl. ¶¶ 2, 58, ECF No. 144.  To play, users wager virtual chips on simulated

12    slot machine spins.  *Id.* ¶¶ 3, 59.  If a user wins, she receives more virtual chips.  If she loses, she

13    forfeits all the virtual chips she wagered.  *Id.* ¶¶ 3, 60.  When users first access a social casino,

14    they receive an initial allowance of virtual chips.  They can also receive more free chips by

15    waiting for a period of time set by the social casino.  *Id.* ¶¶ 60, 62.  However, these free virtual

16    chips run out quickly.  *Id.* ¶ 66.  At that point, users who wish to continue playing immediately

17    must purchase more chips with actual currency.  *Id.* ¶¶ 3, 62.  Once users purchase those chips,

18    there is no way to get their money back; social casinos offer no method for cashing out virtual

19    chips, and chips can only be used to spin simulated slots within the casino apps.  *Id.* ¶ 3.

20        According to Plaintiffs, these social casinos have had devastating impacts on many users.

21    Users who become addicted to these casino apps may face depression, strained relationships, or

22    other emotional distress.  *Id.* ¶¶ 106–08.  For some, their relentless spending on virtual chips

23    forces them to skip medical treatments or even meals due to lack of money.  *Id.*  One Plaintiff

24

25    ─────────────

26    [2] Because the material factual allegations in each case are not substantially different with respect to the issues discussed in this Order, the Court generally cites to the Apple (Case No. 5:21-md-02985) docket for ease of reference, rather than the Google (Case No. 5:21-md-3001) or Meta (Case no. 5:21-cv-2777) dockets.  To identify which docket it is citing to, the Court either includes "Apple," "Google," or "Meta" in the name of the cited document or appends it parenthetically to the end of the record citation.

27

28

United States District Court
Northern District of California

estimates spending $220,000 on social casinos, which has forced him to twice leverage his home equity to pay off credit card debt. *Id.* ¶ 109. Another Plaintiff estimates spending $30,000 on social casinos, causing her to miss deadlines for rent, car payments, and other household bills. *Id.* ¶ 111. And several have reported spending thirty or more hours per week on social casinos. *Id.* ¶¶ 109, 113, 117, 124, 126–27.

This is purportedly no accident. Plaintiffs allege that developers design social casinos specifically to create and exploit addicted users. *Id.* ¶¶ 4, 9. For example, social casino developers have patented "dynamic paytables" that vary the payout of simulated slot machines based on the time a user has spent on a casino app. *Id.* ¶ 68. Such developers use these dynamic paytables in their apps because, in one developer's own words, "players are more apt to play gaming machines for longer periods of time if the payout is increased as the player continues to play the game." *Id.* ¶ 69. That is, developers seek to maximize both the time and money that users spend on casino apps. *Id.* ¶ 71.

Plaintiffs believe it is not just social casino app developers who are responsible for this situation. Plaintiffs assert that Defendants, too, share blame. As Plaintiffs explain, each Defendant operates an app store through which social casinos are available for download. *Id.* ¶¶ 50, 55; Google Compl. ¶¶ 47, 53, ECF No. 124; Meta Compl. ¶¶ 48, 53, ECF No. 157. Each Defendant also requires apps downloaded from their respective stores to use their respective payment processing system for in-app purchases. Each Defendant then takes a thirty percent cut of every in-app transaction. Apple Compl. ¶ 95; Google Compl. ¶ 92; Meta Compl. ¶ 89. Whenever Defendants process a virtual chip purchase in a social casino, say Plaintiffs, they are contributing to the problem by unlawfully facilitating illegal gambling transactions.

**B.    Procedural History**

This is the second time Defendants have sought to dismiss the claims in these actions. Defendants first moved to dismiss all claims back in 2022, arguing that they were immune from Plaintiffs' claims under Section 230 of the Communications Decency Act, 47 U.S.C. § 230. *See* ECF No. 92 (Apple). In addressing Defendants' first set of motions to dismiss, the parties and the Court focused on three theories of liability based on three different aspects of Defendants'

conduct: (1) promotion of social casino apps in their app stores (the promotion theory); (2) processing of in-app transactions for virtual chips (the payment processing theory); and (3) providing support to casino app developers for driving increased user engagement and revenue (the business support theory). Prior Order 31–32, ECF No. 106 (Apple). The Court ultimately ruled that Section 230 barred the promotion and business support theories but not the payment processing theory. *Id.* at 32–35.

The Court also certified its order on those motions for interlocutory appeal under 28 U.S.C. § 1292(b). *Id.* at 35–36. A motions panel of the Ninth Circuit initially granted permission to appeal. *See* Appeal Order, Case No. 22-80099 (9th Cir.), ECF No. 11. But upon further consideration by the merits panel, the Ninth Circuit dismissed the appeal. USCA Mem., ECF No. 119 (Apple). The merits panel held that, for the Circuit to have interlocutory jurisdiction under § 1292(b), the Court would have needed to dismiss (or deny dismissal of) specific claims. Because the Court's order addressed theories, not claims, the Circuit lacked jurisdiction. *Id.*

After the Court certified its order for interlocutory appeal, the Court stayed these matters pending the Ninth Circuit's decision on whether to grant permission to appeal. Prior Order 36. The Court did not officially extend the stay after the motions panel granted permission to appeal, but a de facto stay continued to hold while the appeal was pending—no substantive activity occurred on the docket during that period. *See* ECF Nos. 106–19 (Apple); ECF Nos. 80–98 (Google); ECF Nos. 119–31 (Meta). It was not until the merits panel dismissed the appeal that the litigation before this Court became active again.

Each Defendant separately moved to dismiss a second time, although they incorporated and joined in each other's arguments. Apple MTD, ECF No. 145; Google MTD, ECF No. 125; Meta MTD, ECF No. 158. In their motions, Defendants again sought to invoke Section 230 immunity as to the surviving payment processing theory, arguing that intervening circuit precedent should change the Court's earlier analysis. Defendants also sought to dismiss most of Plaintiffs' state law claims, which they grouped into three categories: gambling loss recovery statutes, consumer protection laws, and unjust enrichment. Finally, Defendants sought to dismiss the RICO claim as well. Plaintiffs filed a single omnibus opposition to all three motions. Opp'n, ECF

United States District Court
Northern District of California

No. 151 (Apple).  Defendants filed separate replies.  Apple Reply, ECF No. 153; Google Reply, ECF No. 133; Meta Reply, ECF No. 164.

## II.    REQUESTS FOR JUDICIAL NOTICE

Before turning to Defendants' motions to dismiss, the Court begins by addressing their requests for the Court to consider materials outside the complaints.  Courts usually may not consider such materials at the pleading stage.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  The only exceptions to this rule are judicial notice and incorporation by reference.  *Id.*  Judicial notice permits courts to consider facts that are not subject to reasonable dispute.  *Id.* at 999 (quoting Fed. R. Evid. 201).  Courts may judicially notice the existence of public records but not disputed facts in those records.  *Id.*  Incorporation by reference allows courts to "treat[] certain documents as though they are part of the complaint itself."  *Id.* at 1002. This doctrine applies when a document forms the basis of a plaintiff's claim, or that document is cited extensively in the complaint.  *Id.*

Apple and Google ask the Court to consider five documents under these exceptions.  Apple RJN, ECF No. 146; Google RJN, ECF No. 125-4.  Apple requests judicial notice of its licensing agreement, two of its policy documents for app developers, and a copy of one app's page from the Apple App Store.  Apple RJN at 1–2.  Google seeks judicial notice of one social casino app developer's terms of use.  Google RJN.  As these documents are all publicly available and Plaintiffs do not contest their authenticity or their existence, the Court takes judicial notice of each of these documents.  *Khoja*, 899 F.3d at 999; Fed. R. Evid. 201(b)(2); RJN Resp., ECF No. 150 (Apple).  The Court takes notice of these documents for their existence, not for the truth of any facts contained in them.  *Khoja*, 899 F.3d at 999.

Apple asks for more with respect to its licensing agreement and one of its policy documents.  For those, Apple requests incorporation by reference in addition to judicial notice. Apple RJN at 2–4.  That way, the Court may go beyond acknowledging those documents' existence and also assume that the contents of those documents are true.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  *But see Khoja*, 899 F.3d at 1003 ("[I]t is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a

1    well-pleaded complaint.").  In these circumstances, the Court need not decide whether it may

2    properly assume the truth of these two documents because they are not subject to incorporation by

3    reference.

4         First, they do not form the basis of Plaintiffs' claims.  Plaintiffs do not allege that Apple

5    violated its own policies or licensing agreements.  Although the documents touch on topics related

6    to Plaintiffs' claims, that shows only that the documents may be relevant evidence, not that they

7    are the basis of Plaintiffs' claims.  If relevance were enough, incorporation by reference would not

8    be a narrow exception to the rule that courts are limited to the pleadings.  It would become a

9    gaping hole through which defendants could freely introduce evidence at the pleading stage.

10        Second, the documents that Apple seeks to incorporate are not cited extensively in the

11   complaint.  To qualify under this test, "the complaint must cite the document at least more than

12   once or quote from it at length; merely mentioning the existence of a document is insufficient."

13   *Callen v. Resonant Inc.*, 709 F. Supp. 3d 1021, 1025 (C.D. Cal. 2023) (citing *Khoja*, 899 F.3d at

14   1002–04).  Here, Plaintiffs did no more than mention the two documents in their complaint.  The

15   complaint twice cites to the licensing agreement without quoting from it.  Apple Compl. ¶¶ 63 n.8,

16   76 n.14.  And it cites just once to the policy document sought to be incorporated, again without

17   quotation.  *Id.* ¶ 82 n.16.  Those scarce references do not support incorporation by reference.

18   **III.    MOTIONS TO DISMISS**

19        **A.    Legal Standard**

20        To survive a motion to dismiss for failure to state a claim, "a complaint must contain

21   sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

22   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

23   570 (2007)).  For a claim to be plausible, the complaint must establish "more than a sheer

24   possibility that a defendant has acted unlawfully."  *Id.*  A claim clears the plausibility bar when its

25   factual allegations support a "reasonable inference that the defendant is liable for the misconduct

26   alleged."  *Id.*  Merely reciting the elements of a claim through conclusory allegations is not

27   sufficient.  *Id.*

28

United States District Court
Northern District of California

In assessing whether a complaint satisfies this standard, courts accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). That said, courts do not credit "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

## B.   Section 230

The Court starts with Defendants' Section 230 arguments. When Congress enacted the Communications Decency Act in 1996, one of its goals was "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003). In service of this goal, Congress wrote Section 230 into the Act, directing that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). In doing so, Congress "immunize[d] providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) (footnote omitted).

In the years since, courts have interpreted Section 230 to offer "sweeping," albeit "not limitless," immunity. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024) (citation omitted). Even though *Roommates* seemingly speaks of immunity for all liability arising from third-party content, the Ninth Circuit has clarified that Section 230 immunity does not attach whenever third-party content is a "but for" cause of liability. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (citing *Doe v. Internet Brands*, 824 F.3d 846, 853 (9th Cir. 2016)); *see also Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 642 (9th Cir. 2025). Rather, courts use a three-prong test to determine if Section 230 immunity applies. A defendant is immune if it is "(1) a provider or user of an interactive computer service, (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker, (3) of information provided by another information content provider." *Id.* at 738 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009)). Plaintiffs do not dispute that the first and third prongs of this test are met, so

United States District Court
Northern District of California

1    only the second prong is at issue.  Opp'n at 6; *see also* Google Mot. at 5 & n.2 (arguing that only

2    prong two is at issue and that prongs one and three are satisfied).

3          This is now the second time that the Court is addressing the issue even though the material

4    allegations have not changed.  *See* ECF No. 144-3 (Apple).  However, Defendants represented that

5    the landscape of Section 230 precedent shifted while these matters were up on appeal.  ECF No.

6    129 (Apple).  Based largely on this representation, the Court allowed Defendants to re-raise

7    Section 230 arguments in this round of motion briefing.  Defendants primarily assert that the

8    Ninth Circuit's most recent foray into the second prong, *Calise v. Meta Platforms, Inc.*, 103 F.4th

9    732 (9th Cir. 2024), shows that the payment processing theory fails under Section 230.  In

10   addition, Defendants raise a litany of other arguments that they spend significantly less time on.

11   The Court first tacklers *Calise* before briefly discussing Defendants' remaining arguments on

12   Section 230.

13         **1.    *Calise v. Meta Platforms, Inc.***

14         In the leadup to *Calise*, it was already well established that courts looked to the legal duties

15   implicated by a claim when assessing whether a defendant was being treated as a publisher or

16   speaker under prong two.  *Barnes*, 570 F.3d at 1102.  *Calise* aimed to refine that approach,

17   explaining that the duty analysis requires courts to examine both the source and the substance of

18   the duties involved.  *Calise*, 103 F.4th at 742.  Specifically, *Calise* held that courts must ask two

19   questions when assessing duty:

20               First, what is the "right" from which the duty springs? If it springs
                from something separate from the defendant's status as a publisher,
21               such as from an agreement, or from obligations the defendant has in
                a different capacity, then § 230(c)(1) does not apply. Second, we ask
22               what is this duty requiring the defendant to do? If it obliges the
                defendant to "monitor third-party content"—or else face liability—
23               then that too is barred by § 230(c)(1).

24   *Id.* (citations omitted).

25          As the Ninth Circuit has interpreted *Calise*'s holding, the source and substance portions

26   of this analysis appear to operate disjunctively.  *But see infra* Section IV.  Put differently, the

27   second prong is satisfied *either* when a duty springs from status or conduct as a publisher *or* that

28   duty compels monitoring.  *Twitter*, 148 F.4th at 642; *see also id.* at 640 ("A claim that obliges the

United States District Court
Northern District of California

1    defendant to monitor third-party content . . . *also* treats the defendant as a publisher.") (citation

2    modified); *Calise*, 103 F.4th at 746 (R. Nelson, J., concurring) (interpreting the *Calise* panel

3    opinion—authored by Judge R. Nelson himself—to hold that the second prong is satisfied

4    whenever a duty compels monitoring regardless of where the duty originated).

### a.    Source of Duties

6        When assessing the source of a duty, courts analyze whether that duty "derives from the

7    defendant's status or conduct as a 'publisher or speaker.'"  *Barnes*, 570 F.3d at 1102.  Like in

8    virtually all Section 230 cases, the "publisher" aspect of this inquiry is at the heart of Defendants'

9    asserted immunity.  Although Section 230 does not define "publisher," the Ninth Circuit has held

10   that a party acts as a publisher when it "reviews material submitted for publication, perhaps edits it

11   for style or technical fluency, and then decides whether to publish it."  *Id.*; *see also HomeAway*,

12   918 F.3d at 681; *Twitter*, 148 F.4th at 640.  A party also acts as a publisher when it facilitates

13   communication between third parties.  *Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025)

14   (citing *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019)).

15       Both status as a publisher and conduct as a publisher matter when it comes to Section 230.

16   Status turns on the "capacity" in which a defendant is sued.  *Calise*, 103 F.4th at 743 (citing

17   *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021)).  This most often arises in the context

18   of claims for products liability and negligent design.  Such claims seek to hold a defendant liable

19   in "its distinct capacity as a product designer," not as a publisher, at least when the product feature

20   being challenged is not a publishing feature.  *Lemmon*, 995 F.3d at 992 (challenge to a product

21   feature that allegedly incentivized users to travel at dangerously high speeds was not barred).  *But

22   see Grindr*, 128 F.4th at 1153 (products liability challenge to a publishing feature treats the

23   defendant as a publisher); *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1180

24   (9th Cir. 2024) (same), *cert. denied*, 145 S. Ct. 1435 (2025).  Status also arises in cases that sound

25   in contract; Section 230 does not apply there because defendants are sued in their capacity as a

26   contractual counterparty or promisor.  *Calise*, 103 F.4th at 742 (citing *Barnes*, 570 F.3d at 1107).

27       Conduct is more complicated, at least when it comes to common law causes of action.  For

28   statutory claims, the test is simple.  Statutes treat defendants as publishers whenever they prohibit

United States District Court
Northern District of California

publishing conduct.  Following this logic, the Ninth Circuit held that Section 230 barred a California Unfair Competition Law claim because the duty that it created "to not engage in unfair competition by advertising illegal conduct" was one that "touche[d] on quintessential publishing conduct."  *Calise*, 103 F.4th at 744. Common law claims are trickier because Section 230 immunity does not apply every time publishing conduct is involved.  *See HomeAway*, 918 F.3d at 682.  For Section 230 immunity to attach to a claim, the publishing conduct at issue must *create* the duty underlying that claim.  It is easiest to understand this rule by way of example.

Consider negligent undertaking.  *Barnes*, 570 F.3d at 1102–03.  A negligent undertaking claim imposes a duty to "exercise reasonable care to perform [the] undertaking."  *Id.* at 1102 (quoting Restatement (Second) of Torts § 323).  That duty does not exist unless the defendant first "undertakes *to do* something."  *Id.* at 1103.  In other words, the undertaking itself creates and is the source of the relevant duty.  Thus, when the undertaking is an act of publishing, like efforts "to de-publish [] offensive profiles," the duty derives from publishing conduct and Section 230 bars liability.  *Id.* Unjust enrichment claims are similar.  The duty involved in such claims is to return an unjust benefit, so the act of receiving an unjust benefit is the source of the duty.  *Calise*, 103 F.4th at 743.  When an act of publishing, like the decision to "permit[] third parties to advertise on [a defendant's] website," is the source of that unjust benefit, that act of publishing is also the source of the duty.  *Id.*  As a result, Section 230 bars those claims, too.  *Id.* at 744.

Courts have reached the opposite conclusion when it comes to claims that are contractual or promissory in nature.  For instance, a defendant could face a promissory estoppel claim for promising but failing to "de-publish [] offensive profiles."  *Barnes*, 570 F.3d at 1103.  While Section 230 bars a negligent undertaking claim based on the failure to perform that action, it does not bar a promissory estoppel claim based on the same.  *Id.* at 1103, 1107.  In a promissory estoppel claim, the defendant's legal duty is to carry out a promise.  *Id.* at 1107.  The promise, not the publishing activity, is the source of duty in such claims.  *Id.*  Thus, even when a defendant promises to perform "quintessential publisher conduct," Section 230 does not bar claims to enforce that promise.  *Id.*; *see also Calise*, 103 F.4th at 102–03 (same for contract claims where a defendant allegedly contracts to perform a publishing function).  Likewise, claims for fraud and

United States District Court
Northern District of California

1    misrepresentation stem from a defendant's allegedly false statement, not from any publishing

2    activity that the defendant did or did not perform.  *Est. of Bride*, 112 F.4th at 1178–79.  So those

3    claims are not barred by Section 230 either.

4           To be clear, even though the above discussion suggests that status and conduct are two

5    different issues, they are simply two perspectives on the same question.  As the treatment of

6    contract claims demonstrates, both perspectives lead to the same result.  The justification for not

7    subjecting contract claims to Section 230 immunity can be thought of in terms of status (such

8    claims treat defendants as contractual counterparties rather than publishers) or conduct (the duty

9    arises from the making of a promise rather than an act of publishing).  *Barnes*, 570 F.3d at 1107.

10   What matters in the end is where the relevant legal duty comes from.

11          With that understanding, the Court concludes that none of the Plaintiffs' claims invoke

12   duties that derive from Defendants' status or conduct as a publisher.  The crux of the statutory

13   claims in these cases is that Defendants were prohibited from processing in-app payments for

14   social casino apps.  *E.g.*, Apple Compl. ¶¶ 188, 200, 540.  Payment processing is not an act of

15   publishing.  It is a transaction, one that is "distinct, internal, and nonpublic."  *HomeAway*, 918

16   F.3d at 682.  Of course, payment processing activities may be an important part of publishing

17   activity.  But that does not make payment processing a publishing activity.  Instead, it is better

18   viewed as a generic business activity common to virtually all companies, publishers or not, just

19   like hiring workers or paying taxes.  None of those activities, including payment processing, are

20   acts of "reviewing, editing, [or] deciding whether to publish or withdraw from publication third-

21   party content."  *Barnes*, 570 F.3d at 1102.  Limits on Defendants' ability to process certain

22   payments does not interfere with Defendants' ability to publish third-party apps by offering them

23   in their app stores or by making in-app content available.  One can understand this point by

24   recognizing that the duties imposed by these statutes apply equally to dedicated payment

25   processors such as PayPal, Square, and Stripe even though those companies are plainly not

26   publishers.  A duty that applies equally to non-publishers does not treat a defendant as a publisher.

27          The discussion of Plaintiffs' statutory claims also resolves the source-of-duty issue as to

28   their unjust enrichment claims.  Plaintiffs allege that Defendants unjustly benefited by taking a

United States District Court
Northern District of California

1    thirty percent commission when processing in-app transactions for social casino apps.  *E.g.*, Apple

2    Compl. ¶¶ 95, 207.  Since payment processing is not a publishing activity, the source of the duties

3    in these unjust enrichment claims is not publishing conduct, and the duty implicated by such

4    claims does not derive from publishing.  *See Calise*, 103 F.4th at 743–44.

5         Consequently, the source of the duties implicated by Plaintiffs' claims is not status or

6    conduct as a publisher.

7                    **b.    Substance of Duties**

8         Since the source of Defendants' duties does not derive from their status or conduct as

9    publisher, the last remaining way for Defendants to satisfy *Calise*'s test is to show that those

10   duties require monitoring of third-party content.  *Calise*, 103 F.4th at 742.  Section 230 does not

11   apply every time that a company "might" respond to a legal duty with monitoring.  *HomeAway*,

12   918 F.3d at 682.  The duty must "necessarily" require monitoring to trigger Section 230.  *Id.*

13   Defendants insist that monitoring is necessary because there is no independently maintained list of

14   social casino apps.  The only way they can determine if they may or may not process a payment

15   transaction is to cross-reference that transaction against the app it originated in.

16        That may be correct so far as Defendants intend to continue offering their own payment

17   processing services.  But as Plaintiffs point out, Defendants need not do so.  Defendants can

18   choose to stop offering their own payment processing and allow app developers to use the services

19   of dedicated third-party processors.  In this way, Defendants can avoid all the issues raised by

20   Plaintiffs' claims without so much as glancing at any app's content.  Put differently, Plaintiffs'

21   claims are "not directed to [] third-party content" because any "alleged violation . . . could be

22   remedied without [referencing] any of the content posted by [third-parties]."  *Gonzalez v. Google*

23   *LLC*, 2 F.4th 871 (9th Cir. 2021) *vacated on other grounds*, 598 U.S. 617 (2023).[3]

24        Taking such a course of action would no doubt cause dramatic upheaval in Defendants'

25   businesses.  Each Defendant takes a thirty percent commission on all in-app transactions that they

26

27   [3] Vacated opinions remain persuasive even though they are no longer binding.  *Doe I v. Cisco Sys.,
     Inc.*, 73 F.4th 700, 717 n.10 (9th Cir. 2023) (quoting *Spears v. Stewart*, 283 F.3d 992, 1017 n.16

28   (9th Cir. 2002)).  The Court therefore cites to *Gonzalez* solely as persuasive authority.

1    process.  Apple Compl. ¶ 95; Google Compl. ¶ 92; Meta Compl. ¶ 89.  Given how big the app

2    industry has grown, relinquishing this commission by halting app processing services could cost

3    each Defendant millions if not billions in revenue.  But monitoring does not become necessary just

4    because it "would be the best option from a business standpoint" or would be the "most practical

5    compliance option."  *HomeAway*, 918 F.3d at 683.  Monitoring is not necessary unless it is "the

6    *only* option."  *Est. of Bride*, 112 F.4th at 1177 n.3 (emphasis added).  Perhaps if the termination of

7    their payment processing services would pose an existential threat to Defendants, or if it would

8    prevent Defendants from engaging in their publishing activities, then such termination would not

9    be an acceptable alternative to monitoring.  At this stage, though, the Court need not determine if

10   monitoring would be necessary under those circumstances since the pleadings do not contain facts

11   supporting those circumstances.  *See Forrest v. Meta Platforms, Inc.*, 737 F. Supp. 3d 808, 815

12   (N.D. Cal. 2024) (Section 230 is an affirmative defense that does not compel dismissal at the

13   pleading stage unless "the plaintiff pleads itself out of court") (quoting *Durnford v. MuschlPharm*

14   *Corp.*, 907 F.3d 595, 604 (9th Cir. 2018)).

15           For these reasons, monitoring is not necessary based on the facts alleged in the pleadings,

16   and Section 230 does not apply under *Calise*.

17                     **2.    Other Arguments**

18           None of Defendants' remaining arguments justify dismissal on Section 230 grounds.

19           ***First***, Defendants suggest that Section 230 protects them because they provide "neutral

20   tools" to social casino apps.  True, but irrelevant.  While the Ninth Circuit has recognized a neutral

21   tools analysis for Section 230, it has consistently situated that analysis under the third prong of the

22   immunity test—whether content is provided by a third party.  *Calise*, 103 F.4th at 745–46; *Dryoff*,

23   934 F.3d at 1098–99.  This is because the neutral tools analysis informs whether the defendant is a

24   "creator or developer" of content, *i.e.*, whether the content is the defendant's or another's.

25   *Lemmon*, 995 F.3d at 1094; *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1270 (9th Cir. 2016)

26   (tying neutral tools analysis to the issue of "content development or creation").

27           In trying to argue otherwise, Defendants point to *Grindr*, 128 F.4th at 1153, which in their

28   reading treated neutral tools analysis as a part of the second prong of Section 230.  But *Grindr* did

United States District Court
Northern District of California

1    not attempt to separate its analysis by Section 230 prongs.  And when it discussed neutral tools

2    analysis, *Grindr* cited those portions of *Dryoff* addressing the third prong.  *Id.* (citing *Dryoff*, 934

3    F.3d at 1098).  In any case, *Grindr* held that Section 230 applied because "the challenged features

4    of [Grindr's] App are not independent of Grindr's role as a facilitator and publisher of third-party

5    content."  *Id.* at 1153.  Here, by contrast, payment processing is independent of Defendants' ability

6    to publish third-party apps; Defendants can publish apps without offering payment processing

7    services themselves.  So, the fact that Defendants' payment processing services are neutral tools

8    does not satisfy the second prong of Section 230 immunity.

9        ***Second***, Defendants fault Plaintiffs for failing to plead their operative theory of liability in

10    their complaints because Plaintiffs supposedly failed to plead that Defendants are "bookies" or

11    "brokers."  Maybe so, but the crux of Plaintiffs' theory is that Defendants improperly processed

12    payments for social casino apps.  As long as Plaintiffs have alleged that Defendants process

13    payments for social casino apps, it is beside the point whether that activity turns Defendants into

14    bookies or brokers.  Plaintiffs have alleged that much.  Apple Compl. ¶ 95; Google Compl. ¶ 92;

15    Meta Compl. ¶ 89.

16        ***Third***, Defendants claim that Plaintiffs conceded the game on interlocutory appeal when

17    they admitted that Defendants engaged in publishing activity by offering apps on their app stores.

18    This argument appears to invoke the doctrine of judicial estoppel, which prevents a party from

19    changing positions after a "court relied on, or accepted, the party's previous inconsistent position."

20    *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782–83 (9th Cir. 2001) (citation and

21    internal quotation marks omitted).  The Ninth Circuit never relied on Plaintiffs' purported

22    admission because it dismissed the appeal for lack of jurisdiction without addressing the merits.

23    *See* USCA Mem.  Regardless, as the Court has repeatedly discussed throughout this Section,

24    payment processing is separate from the publication of apps on app stores.

25        ***Fourth***, Defendants emphasize that Plaintiffs' claims must be barred because Plaintiffs

26    have failed to allege Defendants' "own bad acts."  Apple Reply at 4–6.  These are merits

27    arguments and do not bear on the Section 230 analysis.  *See also* Google Mot. At 11–19 (making

28    merits arguments under the heading of Section 230).  Plaintiffs may well have failed to plead that

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants have violated any asserted duty, but that does not mean Section 230 prevents Plaintiffs

2    from asserting these duties against Defendants in the first place.

3        *Finally*, Defendants argue that the Court must construe Section 230 to provide immunity

4    in these circumstances as a matter of constitutional avoidance.  They have not done much to

5    develop this point, but presumably they believe that Plaintiffs' claims raise free speech concerns

6    under the First Amendment.  That much is far from obvious as there are many questions that

7    Defendants do not even attempt to address, including basic questions about whether Plaintiffs'

8    claims implicate speech in the first place, or if the claims are better viewed as being directed to

9    conduct.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[R]estrictions on protected

10   expression are distinct from restrictions on economic activity or, more generally, on nonexpressive

11   conduct.").  More fundamentally, the constitutionality of Plaintiffs' claims has no bearing on the

12   application of constitutional avoidance to Section 230.  Constitutional avoidance instructs courts

13   to avoid interpreting an ambiguous statute in ways that would render it unconstitutional or

14   questionably constitutional.  *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014) (quoting

15   *Almendarez-Torres v. United States*, 523 U.S. 224, 237–38 (1998)).  The statute that Defendants

16   ask the Court to construe is Section 230, not the statutes underlying Plaintiffs' claims.  And the

17   Court knows of no authority, nor have Defendants provided any authority, holding that a federal

18   statute is unconstitutional because it does not immunize defendants from state laws or claims of

19   questionable constitutionality.

20       Section 230 therefore does not render Defendants immune from Plaintiffs' claims.

21   **C.    California Claims**

22       The Court now turns to the merits of Plaintiffs' claims, starting with their claims under

23   California law for unjust enrichment and violation of the Unfair Competition Law (UCL).  Both

24   claims are premised on the theory that Defendants processed illegal gambling transactions for

25   social casinos, so both are barred by California's public policy against judicial resolution of

26   gambling-related claims.  *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 477 (1999).

27       California's policy against gambling-related claims has a long pedigree.  It "can be traced

28   back virtually to the inception of statehood."  *Id.*  In one sense, it stretches even further back

1    because California adopted the policy from English common law. *Tak Chun Gaming Promotion*

2    *Co. Ltd. v. Long*, 96 Cal. App. 5th 1027, 1032–33. California courts have consistently and

3    repeatedly affirmed this policy. Since the policy's creation, the California Supreme Court "has

4    issued a long line of unbroken decisions" reaffirming the policy, and "[w]ith one exception,

5    [California's] intermediate appellate courts have all uniformly toed that line" too. *Id.* (collecting

6    cases); *see also Kelly*, 72 Cal. App. 4th at 477–88 (tracing the judicial history of the policy

7    through California courts). In fact, the California Court of Appeal has reaffirmed this policy as

8    recently as 2023. *Tak Chun*, 96 Cal. App. 5th at 1032–33. In light of this extensive history, it is

9    no surprise that California courts have characterized this policy as "strong, broad, and long-

10   standing." *Kelly*, 72 Cal. App. 4th at 477.

11          Plaintiffs try to dismiss this policy as obsolete. In their view, the California legislature

12   displaced the policy against gambling-related claims and authorized such claims when it passed

13   the UCL. This argument is only half right. Plaintiffs are correct that the California legislature has

14   the authority to modify common law policies. *Tak Chun*, 96 Cal. App. 5th at 1036. But to

15   exercise that authority, the legislature needed to either expressly repeal the common law policy or

16   provide a clear statement of intent "that necessarily (but implicitly) repeals the common law." *Id.*

17   Silence on the common law policy is insufficient to support repeal. *Id.* at 1037. Yet silence is all

18   the UCL offers. The UCL does not expressly mention gambling at all. *See* Cal. Bus. & Prof.

19   Code § 17200, et seq. Nor is there any clear statement of intent to modify the public policy on

20   gambling-related claims. Plaintiffs suggest that the California legislature intended to protect

21   consumers through the UCL, but that kind of intent is too generic to demonstrate that the

22   legislature "necessarily" meant to abrogate the specific policy against gambling-related claims.

23          In the alternative, Plaintiffs argue that the policy does not apply because social casinos can

24   be characterized as lotteries under California Penal Code § 319. So, say Plaintiffs, it was not

25   unlawful for them to play social casinos even if it was unlawful for app developers to operate

26   social casinos. Opp'n at 46 (citation omitted). The problem with this argument is that lotteries are

27   still a form of gambling. *W. Telcon, Inc. v. Cal. State Lottery*, 13 Cal. 4th 475, 484 (1996); *see*

28   *also Kelly*, 72 Cal. App. 4th at 472 (discussing *W. Telcon*). While the exact ways in which

United States District Court
Northern District of California

California regulates different types of gambling may differ, the policy against gambling-related claims "applies to all forms of gambling, whether legal or illegal." *See Kelly*, 72 Cal. App. 4th at 490. It is of no consequence whether social casinos are lotteries.

Since gambling is at the heart of Plaintiffs' claims, the Court sees no path for Plaintiffs to plead around this policy. The Court therefore dismisses the California claims with prejudice.

### D.    Gambling Loss Recovery Statutes

Next, the Court addresses Plaintiffs' claims under various states' gambling loss recovery statutes. These laws create specialized causes of action that allow a plaintiff to recover money lost in gambling. Plaintiffs bring claims under such laws in twenty-one different states: Alabama, Arkansas, Connecticut, Georgia, Illinois, Indiana, Kentucky, Minnesota, Mississippi, Missouri, Montana, New Jersey, New Mexico, New York, Ohio, Oregon, South Carolina, Tennessee, Virginia, Washington, and West Virginia.[4] The Arkansas claim is alleged solely against Meta, who does not seek dismissal of that claim. *See* Meta MTD. Similarly, the Montana claim is alleged against solely Google and Meta, and neither seek dismissal of that claim. *See* Google MTD at 23–24; Google Reply at 13–15; Meta MTD. The Court therefore excludes the Arkansas and Montana loss recovery claims from consideration in this Order.

As to the rest of the loss recovery statutes, Defendants seek dismissal at this stage on just two issues: who may be sued and what may be recovered. First, Defendants contend that they do not fall within the categories of parties who may be sued under many of these statutes. Second, Defendants contend that the purchase of virtual chips is not the kind of "loss" recoverable under these statutes. Defendants do not, however, address whether the games offered in social casino apps constitute illegal gambling. Thus, for purposes of this Order, the Court assumes that the games in social casinos are illegal gambling subject to the loss recovery statutes.

---

[4] Ala. Code § 8-1-150; Ark. Code § 16-118-103; Conn. Gen. Stat. § 52-554; Ga. Code § 13-8-3; 720 Ill. Comp. Stat. 5/28-8; Ind. Code § 34-16-1-2; Ky. Rev. Stat. § 372.020; Minn. Stat. § 541.20; Miss. Code § 87-1-5; Mo. Rev. Stat. § 434.030; Mont. Code § 23-5-131; N.J. Stat. § 2A:40-5; N.M. Stat. § 44-5-1; N.Y. Gen. Oblig. Law § 5-419; Ohio Rev. Code § 3763.02; Or. Rev. Stat. § 30.740; S.C. Code § 32-1-10; Tenn. Code § 29-19-104; Va. Code § 11-15; Wash. Rev. Code § 4.24.070; W. Va. Code § 55-9-2.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.    Who May Be Sued

Many of the loss recovery statutes identified above permit plaintiffs to recover their losses from specific types of parties.  Most commonly, these statutes limit plaintiffs to recovering their losses from a "winner."  Other loss recovery statutes extend their reach further by allowing recovery against both winners and other types of parties.  In addressing Defendants' arguments about who may be sued, the Court starts with the statutes limited solely to winners.  Only after that does the Court address the statutes that restrict whom a plaintiff may recover from but also allow recoveries from parties other than winners.

### a.    Winners

Connecticut, Georgia, Illinois, Minnesota, Ohio, South Carolina, Virginia, and West Virginia expressly limit claims under their loss recovery statutes to those raised against "winners."[5]  Claims under New Mexico law are limited to winners as well, even though the statutory provision authorizing loss recovery claims does not so specify.  *See* N.M. Stat. § 44-5-1. That is because a related provision, authorizing suit by the relatives of someone who suffered a gambling loss, restricts relatives to "remed[ies] against the winner."  N.M. Stat. § 44-5-3.  Reading these two provisions together, the New Mexico Supreme Court held that "[i]t is apparent . . . that the right of action is given against the winner of the bet."  *Armstrong v. Aragon*, 79 P. 291, 292 (N.M. 1905).

Although many of these statutes are similarly structured, state courts have put slightly different glosses on each.  The Court therefore analyzes their commonalities together before turning to arguments based in state-specific precedents.

### i.    Common Interpretation

As a general matter, one cannot be a winner unless she risks losing money to the plaintiff. The Illinois statute demonstrates why this is so.  It allows someone "who by gambling shall lose

---

[5] Conn. Gen. Stat. § 52-554 ("recover from the winner"); Ga. Code § 13-8-3(b) ("may be recovered from the winner"); 720 Ill. Comp. Stat. 5/28-8(a) ("in a civil action against the winner thereof"); Minn. Stat. § 541.20 ("to the winner"); Ohio Rev. Code § 3763.02 ("from the winner thereof"); S.C. Code § 32-1-10 ("from the respective winner or winners thereof"); Va. Code § 11-15 ("recover from the winner"); W. Va. Code § 55-9-2 ("recover back from the winner").

. . . any sum of money or thing of value . . . [to] recover the money or other thing of value . . . [from] the winner thereof." 720 Ill. Comp. Stat. Ann. 5/28-8(a). "Winner" under this statute, then, refers to someone who won money that another lost "by gambling." In other words, a winner is someone "whom a player has played with and lost to." *Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509, 510 (7th Cir. 2016). This in turn suggests that a winner must have "a direct stake in the outcome of the gambling." *Fahrner v. Tiltware LLC*, No. 13-cv-0227, 2015 WL 1379347, at *7 (S.D. Ill. Mar. 24, 2015), *aff'd sub nom. Sonnenberg*, 810 F.3d 509. A person who does not risk her "earned money . . . on the outcome of a game" cannot be a winner. *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 740 (N.D. Ill. 2016); *see also Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915, 923, 921 (2010) (holding that a defendant whose earnings were "not affected by the outcome of the gambling" was not a winner); *Anderson v. Naperville Rotary Charities Inc.*, No. 1-18-0312, 2019 WL 1368551, at *5 (Ill. App. Ct. Mar. 22, 2019) [6] ("[A] winner must put its own money at risk."); *Langone v. Kaiser*, No. 12-cv-2073, 2013 WL 5567587, at *7 (N.D. Ill. Oct. 9, 2013) ("Since FanDuel does not risk its own money . . . it cannot be a winner or loser under the Loss Recovery Act.").

The loss recovery statutes in Connecticut, Minnesota, Ohio, South Carolina, and Virginia are structured like the Illinois statute—they make clear that a "winner" is one who won a game or bet—so the Illinois construction of "winner" applies equally to those statutes.[7] The same is true of the New Mexico statute since state courts have limited it to actions against "the winner of the bet." *Armstrong*, 79 P. at 292. To win a bet, a person must have participated in the bet and therefore must have risked losing the bet.

---

[6] To the extent Illinois Supreme Court Rule 23(e)(1) prohibits Illinois state courts from citing unpublished, pre-2021 appellate decisions, that rule does not prevent federal courts from considering such decisions for the persuasiveness of their reasoning. *United States v. Hillcrest Resort, Inc.*, No. 15-cv-04194, 2019 WL 6112840, at *2 (C.D. Ill. Nov. 18, 2019) (collecting cases). The Court therefore cites *Anderson* as persuasive authority.

[7] Conn. Gen. Stat. § 52-554 (winner of money lost "by playing at any game, or betting"); Minn. Stat. § 541.20 (winner of money lost "by playing at cards, dice, or other game, or by betting"); Ohio Rev. Code § 3763.02 (winner of money lost "by playing a game, or by a wager"); S.C. Code § 32-1-10 (winner of money lost "by playing at cards, dice table or any other game); Va. Code § 11-15 (winner of money lost "by playing at any game or betting").

1    The Georgia statute is different in that it ties "winners" to "gambling contracts" and

2  "gambling consideration" rather than a game or a bet.  Ga. Code. § 13-8-3.  Still, the outcome does

3  not change.  Georgia law defines a "gambling contract" as "one in which the parties in effect

4  stipulate that they shall gain or lose upon the happening of an . . . event." *Hardin v. NBC*

5  *Universal, Inc.*, 283 Ga. 477, 479 (2008) (quoting *Martin v. Citizens' Bank of Marshallville*, 177

6  Ga. 871, 874 (1933)).  And it defines "gambling consideration" as the consideration that "fall[s] to

7  the one or the other upon the determination of the specified event." *Id.*  So, by definition, the

8  parties to a gambling contract risk losing gambling consideration.  Given that a winner under the

9  Georgia loss recovery statute must have been party to a gambling contract, a winner necessarily

10  faced the risk of loss.  Thus, the Illinois construction applies to the Georgia statute as well.

11    The West Virginia statute presents a trickier interpretive question because it does not tie

12  recoverable money to a specific game or bet, W. Va. Code § 55-9-2, and there are few cases

13  interpreting the statute.  Nonetheless, the Court finds that the Illinois construction applies to the

14  West Virginia loss recovery statute.  A neighboring provision is expressly tied to games and bets.

15  W. Va. Code § 55-9-1.  Meanwhile, the little case law that does exist suggests that winner must

16  have participated in the game or bet.  *See Berns v. Shaw*, 64 S.E. 930, 932 (W. Va. 1909) (finding

17  that two different parties were winners because both parties operated the roulette wheel at which

18  the plaintiff lost money).

19    In short, a person cannot be a winner under any of these states' laws without risking a loss

20  in a game, wager, or bet.  Defendants do not meet that definitional requirement.  When Defendants

21  receive their commission from purchases of virtual chips, those commissions are not contingent on

22  the outcome of any slot machine spin, game, wager, or other bet.  *See Reuter*, 397 Ill. App. 3d at

23  923 (2010) (reaching the same conclusion for credit card companies that collect a percentage

24  transaction fee).  There is no risk that Defendants will lose those commissions, so they are not

25  winners.

26    Naturally, Plaintiffs disagree.  According to them, each Defendant does have a stake in the

27  outcome of virtual slot spins, likening Defendants to "the house" in a physical casino.  Slot

28  machines put the house's money at risk because the house must pay out to any player who wins a

1   slot machine spin.  That is true as far as it goes, but it does not salvage Plaintiffs' claims.  If a

2   social casino user wins a slot spin, they receive a payout in the form of more virtual chips.  Apple

3   Compl. ¶ 60.  It is the social casino app itself, not Defendants, that provides the additional chips.

4   The newly awarded chips do not come out of Defendants' pockets.

5       But, counter Plaintiffs, that is not the end of the story.  Even if Defendants do not lose

6   money at the exact moment a social casino player wins a spin, Defendants will still lose future

7   profits.  The winning player, armed with a large stack of newly awarded chips, will not buy as

8   many virtual chips later.  That cuts into the social casino app's future chip sales and, by extension,

9   Defendants' cut of those in-app sales.  In essence, Plaintiffs argue that Defendants' future profits

10  are at risk.  Courts have rejected that logic, and for good reason.  *See Phillips*, 173 F. Supp. 3d at

11  740; *Ristic v. Mach. Zone, Inc.*, No. 15-cv-8996, 2016 WL 4987943, at *3 (N.D. Ill. Sept. 19,

12  2016).  The future revenues that Plaintiffs identify are too attenuated from the game at issue, and

13  they are too speculative as well.  Those revenues depend on a player continuing to play social

14  casino apps, losing slot spins, and then deciding to purchase more chips.  None of those steps are

15  guaranteed to occur.

16      It is also most natural to speak of "winning" a particular "prize or a reward."  *See United*

17  *States v. 103 Elec. Gambling Devices*, 223 F.3d 1091, 1098 (9th Cir. 2000) (interpreting the term

18  "won" in the Indian Gaming Regulatory Act).  The possibility that Defendants might gain some

19  future benefit due to a chain of contingent events—namely, that Defendants might be able to

20  collect greater commissions from in-app sales of virtual chips—can hardly be said to be the prize

21  or reward of a game.  Only the immediate object of a game can be won.  Defendants no more

22  "win" future commissions from a player's losing slot spin than a casino "wins" the future profits it

23  might realize by investing the money it receives from losing players.

24      Plaintiffs press one last point.  They assert that Defendants are winners because by the time

25  Defendants process a payment for virtual chips, the gambling has already begun.  From Plaintiffs'

26  perspective, this means that Defendants are gambling participants in addition to the social casinos

27  themselves and the individuals playing social casino games.  This argument does not move the

28  needle because the aspect of "winner" that Plaintiffs have failed to plead is risk of loss.

United States District Court
Northern District of California

1    Defendants' participation or non-participation in the gambling at issue is irrelevant to the Court's

2    conclusion that Defendants are not winners.

3              ii.        **State-Specific Precedents**

4         Plaintiffs' state-specific arguments are not availing either.

5         ***Connecticut and West Virginia.***  Plaintiffs' arguments on Connecticut and West Virginia

6    law can be quickly disposed of.  With respect to Connecticut, Plaintiffs cite *Mendelsohn v.*

7    *BidCactus, LLC*, No. 3:11-cv-1500, 2012 WL 1059702 (D. Conn. Mar. 28, 2012), for the

8    proposition that they can recover from Defendants even if Defendants were not winners.

9    *BidCactus* does not say that.  In fact, it says nothing at all about what it means to be a winner

10   under the Connecticut loss recovery statute.  *BidCactus* focused on questions about the definition

11   of illegal gambling and the existence, or not, of a statute of limitations.  *Id.* at *3–5.  As for West

12   Virginia, Plaintiffs claim that *Berns v. Shaw*, 64 S.E. at 932, permits them to collect from both

13   winners and those acting in concert with winners.  That argument also fails.  While *Berns* did

14   involve partners in a roulette operation, the West Virginia Supreme Court of Appeals did not hold

15   that both could be liable simply because they were working together.  Instead, the key was that

16   both had operated the roulette table and thus both were independently winners.  *Id.*

17        ***Georgia and Ohio.***  For Georgia and Ohio, Plaintiffs assert that case law expands the reach

18   of the states' loss recovery statutes to "stakeholders" and "bookmakers" in addition to winners.

19   Plaintiffs are correct on that front.  The issue for Plaintiffs is that Defendants are neither

20   "stakeholders" nor "bookmakers" as Georgia and Ohio courts use those terms.

21        The Georgia Supreme Court has expressly held that plaintiffs can recover losses "from the

22   stakeholder" in addition to the winner.  *Quillian v. Johnson*, 49 S.E. 801, 805 (Ga. 1905); *see also*

23   *Alford v. Burke*, 21 Ga. 46, 50 (1857) (affirming a plaintiff's right to "recover the money deposited

24   by him with a stakeholder").  In doing so, the Georgia Supreme Court treated "stakeholder" like a

25   term of art in the gambling context, not as a general reference to anyone with an interest.  Quite

26   literally, a stakeholder in the gambling context is one who holds the stakes of a wager and then

27   passes those stakes to the ultimate winner—an escrow agent of sorts.  That was precisely the

28   situation in *Alford*, where the stakes were "five hundred dollars, paid into the hands of the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    defendant, as stakeholder, upon a bet." 21 Ga. at 47. And it was also the case in *Quillian*, where

2    the stakes were a life insurance policy, and the stakeholder was the insurance company responsible

3    for paying out that policy. 49 S.E. at 801, 804. Defendants' roles here are nothing like the

4    stakeholders' roles in *Quillian* and *Alford* since Defendants had no obligation to make any

5    payments to the social casinos or their players based on the result of a virtual slot spin.

6         Ohio case law is similar. In *Yantis v. Murnan*, 20 Ohio Law Abs. 356, 359 (Ohio Ct. App.

7    1935), the Ohio Court of Appeal found that liability could extend to a "bookmaker, that is, a

8    person who takes bets and wagers on horse races." The way that *Yantis* defines "bookmaker" is

9    nearly identical to how Georgia law defines "stakeholder." The reason Defendants are not

10   bookmakers under Ohio law is likewise nearly identical to the reasons they are not stakeholders

11   under Georgia law. Separately, Plaintiffs cite to *Lester v. Buel*, 49 Ohio St. 240, 253–54 (1892),

12   as a case that expands the definition of a "winner" under Ohio law. However, *Lester* does the

13   opposite by restricting the definition to exclude agents of the losing party. *Id.*

14        **Illinois.** Plaintiffs invest most of their time in addressing Illinois law, because the Illinois

15   loss recovery statute is the most developed out of all of them. They refer to a bevy of cases in

16   their opposition in an effort to support their position. Opp'n at 31. The Illinois Appellate Court

17   (the intermediate Illinois appeals court) already considered many of those cases in *Reuter*, and it

18   explained why those cases do not change the result. *Reuter*, 397 Ill. App. 3d at 925–27. The

19   Court agrees and adopts *Reuter*'s reasoning on those cases. In any event, Plaintiffs ultimately

20   concede that "the common thread in the Illinois cases . . . is the rule that to be a winner, a person

21   must have a direct stake in the outcome of the gambling." Opp'n at 31 (citation modified). Given

22   that admission, the Court's analysis of Plaintiffs' universal counterarguments fully resolves

23   Plaintiffs' Illinois-specific counterarguments in favor of dismissal.

24        **Minnesota, South Carolina, and Virginia.** Plaintiffs' remaining state-specific arguments

25   can be taken together. Plaintiffs believe that the view of "winner" adopted by the Court is too

26   narrow as to Minnesota, South Carolina, and Virginia because each of those states instructs courts

27   to liberally construe their loss recovery statutes. Opp'n at 30 (citing *Foley v. Whelan*, 219 Minn.

28   209, 213 (1945); *Berkebile v. Outen*, 311 S.C. 50, 55 (1993); *McIntyre v. Smyth*, 108 Va. 736, 745

United States District Court
Northern District of California

1   (1908)).  To be sure, the principle of liberal construction is a helpful tool when it comes to

2   statutory interpretation.  But its role is minimal when the statutory language is clear; in those

3   instances, the Court must apply the plain meaning of the text.  *Brayton v. Pawlenty*, 781 N.W.2d

4   357, 363 (Minn. 2010); *Brown v. S.C. Dep't of Health & Env't Control*, 348 S.C. 507, 515 (2002);

5   *Parker v. Warren*, 273 Va. 20, 23 (2007).  And the plain text of these three states' statutes

6   unambiguously links winning to specific games or wagers.  *See supra* note 7.  To win a game, one

7   must participate and risk losing.

8           Lastly, Plaintiffs argue that Minnesota and South Carolina extend liability to the "keepers"

9   of a slot machine.  Opp'n at 27–28 (citing *Foley*, 219 Minn. at 214–15; *McCurry v. Keith*, 312

10  S.C. 254, 255 (Ct. App. 1994)).  That argument is a variation on Plaintiffs' "house" argument

11  since the keeper of a slot machine is the one responsible for making payments to winning players,

12  just like the house.  The Court rejects this argument just as it rejected the house argument.

13                                  *       *       *

14          The Court grants the motions to dismiss Plaintiffs' loss recovery claims under Connecticut,

15  Georgia, Illinois, Minnesota, New Mexico, Ohio, South Carolina, Virginia, and West Virginia law

16  for failure to plead that Defendants are "winners."

17          **b.      Other Types of Parties**

18          ***Stakeholders and Depositaries.***  The New York and New Jersey loss recovery statutes

19  authorize recovery from "stakeholders" and "depositaries."  N.Y. Gen. Oblig. Law § 5-419

20  (stakeholder); N.J. Stat. § 2A:40-5 (stakeholder or depositary).  Fortunately, and unlike most of

21  these loss recovery statutes, the New York statute offers a ready definition of stakeholder:

22  someone "in whose hands shall be deposited any such wager, bet or stake."  N.Y. Gen. Oblig. Law

23  § 5-419.  This is consistent with legal dictionaries.  *Stakeholder*, Black's Law Dictionary (12th ed.

24  2024) ("Someone who holds the money or valuables bet by others in a wager."); *Stakeholder*,

25  Ballentine's Law Dictionary (3d ed. 1969) ("One with whom money or property is deposited to

26  abide the result of a gambling contract or transaction.").  It is also the same definition that Georgia

27  and Ohio precedents have adopted.  As such, Defendants are not stakeholders under New York

28  law just as they are not under Georgia and Ohio law.  *See supra* Section III.D.1.a.ii.

1    The New Jersey statute does not offer any explicit definitions.  But the definitions from the

2    legal dictionaries cited above are informative, and case law shows that the meanings of

3    "stakeholder" and "depositary" accord with those dictionary definitions.  *See Hartford Accident &*

4    *Indem. Co. v. Benevento*, 133 N.J.L. 315, 317 (1945) (finding a "bookmaker" who "took bets" to

5    be a depositary); *Hensler v. Jennings*, 62 N.J.L. 209, 210 (1898) (indicating that a stakeholder

6    holds the wagers made when others enter a bet).  The Court therefore concludes that "stakeholder"

7    and "depositary" in the New Jersey statute have the same meaning as "stakeholder" in the New

8    York statute.  Defendants are not stakeholders or depositaries under New Jersey law, either.

9        **Proprietors.**  The Oregon and Washington loss recovery statutes allow plaintiffs to recover

10    from the "proprietor for whose benefit such game was played or dealt."  Or. Rev. Stat. § 30.740;

11    Wash. Rev. Code § 4.24.070 (same).  Defendants, though, are not proprietors.

12        Generally speaking, a proprietor is "[a]n owner, esp[ecially] one who runs a business."

13    *Proprietor*, Black's Law Dictionary (12th ed. 2024).  That definition is consistent with how courts

14    have interpreted the Oregon and Washington statutes.  For instance, the Oregon Supreme Court

15    has held that the owner of a café where poker games were being held, and who also operated the

16    poker tables at the café, were proprietors under Oregon law.  *Lairmore v. Drake*, 185 Or. 239,

17    241–42 (1949).  Interpreting Washington law, the Ninth Circuit reached a similar conclusion,

18    finding that a social casino's "owner and operator" was the proprietor of that social casino.  *Kater*

19    *v. Churchill Downs Inc.*, 886 F.3d 784, 785, 789 (9th Cir. 2018).  Based on these decisions, and in

20    the context of loss recovery statutes, the Court interprets "proprietor" to mean "one who owns or

21    operates a gambling venture."  Defendants do neither own nor operate any social casinos, so they

22    are not proprietors.

23        The Court grants the motions to dismiss Plaintiffs' loss recovery claims under New York,

24    New Jersey, Oregon, and Washington law for failure to plead that Defendants are the type of party

25    from whom recovery can be sought.

26            **2.    What May Be Recovered**

27        Defendants' second argument applies to all the loss recovery claims in these matters

28    (except the claims under Arkansas and Montana law, which no Defendant has sought dismissal

United States District Court
Northern District of California

United States District Court
Northern District of California

1   of).  Defendants note that, by nature of being *loss* recovery statutes, these statutes authorize

2   recoveries only of gambling *losses*.  From their vantage point, any gambling happens when

3   Plaintiffs use their virtual chips to spin a slot machine, not when Plaintiffs purchased the virtual

4   chips.  Since Defendants were involved in the first transaction (purchasing of chips) but not the

5   second (spinning of slots), Defendants submit that the commission that they collect in the first

6   transaction is not a gambling loss.

7           To the extent that Defendants believe the purchase of virtual chips is not a gambling

8   transaction at all, the Court disagrees.  Purchasing virtual chips serves a single purpose—to

9   gamble.  A transaction made for the sole purpose of gambling cannot be anything other than a

10  gambling transaction.  Defendants protest that virtual chips can serve other purposes as well, but

11  on a motion to dismiss, the Court must take Plaintiffs' factual allegations as true.  Plaintiffs have

12  pled that virtual chips cannot be used outside of social casino apps.  Apple Compl. ¶ 65.  And

13  within those apps, chips can be used only to spin slot machines, play some card or bingo games, or

14  be gifted to others using the app.  *Id.*  Recall that Defendants make no argument about what games

15  are or are not illegal gambling, so the Court is assuming that all the games in social casino apps

16  constitute illegal gambling.  In view of that assumption, virtual chips can only be used for illegal

17  gambling, and that must be their purpose.  As a consequence, the purchase of those chips is a

18  gambling transaction.

19          In resisting this conclusion, Defendants observe that virtual chips can be gifted, and gifting

20  is not gambling.  That observation does not change the Court's conclusion, though.  After all,

21  nearly any item can be gifted, but gifting does not change an item's underlying nature.  Consider

22  the purchase of a lottery ticket.  It is easy to conclude that the purchase is a lottery transaction.

23  That is true even though the person purchasing the ticket can gift it to someone else.  And it

24  remains true even if that person does eventually gift the lottery ticket.  The purpose of a lottery

25  ticket is to play the lottery regardless of the ticketholder's ability to gift the ticket.

26          That said, characterizing the purchase of virtual chips as a gambling transaction is just half

27  the equation.  Most of the loss recovery statutes—those from Alabama, Connecticut, Georgia,

28  Indiana, Minnesota, Mississippi, Missouri, New Jersey, New Mexico, New York, Ohio, Oregon,

South Carolina, Tennessee, Virginia, and Washington—restrict recovery to losses specifically tied to a game or wager.[8]  The purchase of virtual chips, while a gambling transaction, is not a game or a wager.  That comes afterwards, when Plaintiffs actually spin a slot machine or play another game within the social casinos.  Accordingly, Plaintiffs have failed to plead recoverable losses under these states' loss recovery statutes.

That leaves the Illinois and West Virginia loss recovery statutes.  The Illinois statute limits recoverable losses to those incurred "by gambling."  720 Ill. Comp. Stat. Ann. 5/28-8(a).  That language plausibly extends the reach of Illinois's law to gambling transactions writ large in addition to games and wagers.  As for West Virginia law, the loss recovery statute itself does not identify the types of losses recoverable.  W. Va. Code § 55-9-2.  For a second time, though, a neighboring provision offers some help.  That provision suggests that losses can include "money lent or advanced . . . to be used in being bet."  W. Va. Code § 55-9-1.  So far as this second provision informs interpretation of the first, a purchase of virtual chips might fall within "money lent or advanced."  However, the Court need not and does not decide these interpretive questions with regard to Illinois and West Virginia law because the Court has already held above that claims under those states' laws must be dismissed for failure to plead that Defendants are winners.

---

[8] Ala. Code § 8-1-150(a) ("lost upon any game or wager"); Conn. Gen. Stat. § 52-554 ("by playing at any game"); Ind. Code § 34-16-1-2 ("by betting on a game"); Minn. Stat. § 541.20 ("by playing at cards, dice, or other game"); Miss. Code § 87-1-5 ("by playing at any game whatever"); Mo. Rev. Stat. § 434.030 ("at any game, gambling device or by any bet or wager whatever"); N.M. Stat. § 44-5-1 (at any game at cards, or at any gambling device"); N.Y. Gen. Oblig. Law § 5-419 ("upon the event of any wager or bet"); Ohio Rev. Code § 3763.02 ("by playing a game"); Or. Rev. Stat. § 30.740 ("at or on any unlawful game"); S.C. Code § 32-1-10 ("by playing at cards, dice table or any other game whatsoever"); Tenn. Code § 29-19-104 ("lost upon any game or wager"); Va. Code § 11-15 ("by playing at any game"); Wash. Rev. Code § 4.24.070 ("at or on any illegal gambling games")

The Georgia statute is limited to losses "upon a gambling consideration."  Ga. Code § 13-8-3(b).  "Gambling consideration" is defined as the consideration that "fall[s] to the one or the other upon the determination of the specified event," meaning the stakes of a bet or wager.  *Hardin*, 283 Ga. at 479.  Thus, the losses referred to by the Georgia statute must be money that was lost at a bet or wager.

The New Jersey statute is limited to losses incurred "in violation of section 2A:40-1."  N.J. Stat. § 2A:40-5.  In turn, § 2A:40-5 refers specifically to "wagers, bets or stakes . . . or upon any gaming."  N.J. Stat. § 2A:40-5.  So, losses under New Jersey law must be those incurred in wagers, bets, or games.

In conclusion, the Court grants the motions to dismiss Plaintiffs' loss recovery claims under Alabama, Connecticut, Georgia, Indiana, Minnesota, Mississippi, Missouri, New Jersey, New Mexico, New York, Ohio, Oregon, South Carolina, Tennessee, Virginia, and Washington law for failure to plead recoverable losses.

### 3.    Kentucky Law

Up to this point, the Court has carefully avoided discussing Kentucky's loss recovery statute. That is because it is somewhat idiosyncratic. For one, Kentucky's statute applies to both "winners" and "transferees of the winner." Ky. Rev. Stat. § 372.020. More importantly, the Kentucky Supreme Court has construed "winner" in an exceptionally broad manner when compared to "winner" in other states' statutes. Under Kentucky law, "winners [] include individuals who take any portion of the amount lost." *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 807 (Ky. 2020). There is no requirement that a winner put anything at risk. Indeed, there was no risk to the winner in *Stars Interactive*, who "took a percentage from the wagers" made in virtual poker games played on the winner's website. *Id.* at 806. Defendants, who take a thirty percent cut of the proceeds from every in-app sale of virtual chips, plausibly satisfy that definition of winner.

The issue remains as to whether that thirty percent commission is a recoverable loss. Defendants say no, pointing to language from *Stars Interactive* that they say limits losses to money from "the wagers in each of the poker games" or a "rake or percentage of the pot." *Id.* at 806–07. According to Defendants, the references to wagers and pots limit losses to those sustained while playing a game. The references in *Stars Interactive* are best understood as simply describing the facts in front of the Kentucky Supreme Court in that particular case. The Kentucky statute itself allows recovery of any money that a "person loses to another at one (1) time, or withing twenty-four (24) hours." Ky. Rev. Stat. § 372.020. The statute does not require the money to be lost at a game or wager. Plaintiffs alleged they lost their money to Defendants in a gambling transaction (the purchase of virtual chips), and that is sufficient to survive the pleading stage. The Court denies Defendants' motions as to claims raised under the Kentucky loss recovery statute.

United States District Court
Northern District of California

1

E.    **Consumer Protection Laws**

Compared to the loss recovery statutes, the parties devote scant attention to the consumer protection claims—understandably so, given the volume of claims in these matters.  With a limited number of pages to work with, the parties needed to prioritize.  Nonetheless, the fact of the matter is that many important issues are underdeveloped.

Here is how the briefs are set up: In their opening argument, Defendants insist that the consumer protection claims must be dismissed for failure to plead statutory standing.  Plaintiffs sought to purchase virtual chips and got those chips, so Plaintiffs received the benefit of the bargain.  For their part, Plaintiffs do not dispute that they received the benefit of the bargain.  Instead, they argue that it does not matter.  Since their consumer protection claims are based on a purportedly illegal transaction—gambling—Plaintiffs say that the benefit of the bargain defense does not apply.  In reply, Defendants try to sidestep around Plaintiffs' argument.  Defendants do not contest that the benefit of the bargain defense is inapplicable when it comes to allegedly illegal conduct.  Rather, they argue that there was no illegal conduct at all because the purchase of virtual chips is not a gambling transaction.  They also suggest that consumer protection law only protects against deceptive or fraudulent conduct, not illegal conduct writ large.

All this leaves significant issues on which the parties have not truly engaged with each other.  For example, when is the benefit of the bargain defense available?  Can alleged illegality even form the basis of a consumer protection claim, or are such claims limited to deceptive or fraudulent conduct?  The parties do not say, and without the aid of robust party presentation, it is prudent for the Court to avoid answering these far-reaching questions for now.  Just two issues are developed enough for decision, and neither supports dismissal.

***First***, have Plaintiffs alleged that the purchase of virtual chips is an illegal transaction?  Yes, they have.  When analyzing Plaintiffs' loss recovery claims, the Court concluded that the purchase of virtual chips is a gambling transaction.  *Supra* Section III.D.2.  As the Court is also assuming that the underlying gambling in social casino apps is illegal, that purchase is also an illegal transaction.  Because Defendants do not dispute that the benefit of the bargain defense is unavailable when it comes to illegal transactions, that defense is not grounds for dismissal.

1     Defendants' citations to other cases involving virtual currency are unpersuasive.  The

2   virtual currencies at issue in these other cited cases were legal, unlike the virtual chips here,

3   because those other virtual currencies could be used to make legal in-game purchases.  *See Taylor*

4   *v. Apple, Inc.*, No. 20-cv-03906, 2022 WL 35601, at *3 (N.D. Cal. Jan. 4, 2022) (finding that the

5   in-game items being purchased with virtual currency were not "plainly prohibit[ed]"); *Coffee v.*

6   *Google, LLC*, No. 20-cv-03901, 2021 WL 493387, at *10 (N.D. Cal. Feb. 10, 2021) (virtual

7   currency could be used to directly purchase in-game items that were undoubtedly legal, such as

8   weapons or characters); *Mai v. Supercell Oy*, 648 F. Supp. 3d 1130, 1135 (N.D. Cal. 2023)

9   ("Plaintiffs have not plausibly alleged that . . . loot boxes constitute[] illegal gambling."), *vacated*

10   *on other grounds*, 2024 WL 2077500 (9th Cir. May 9, 2024).

11     ***Second***, do Plaintiffs state a claim under the Kentucky Consumer Protection Act (KCPA)?

12   Although the parties' primary dispute is over the benefit of the bargain defense, they provide some

13   specific arguments about the KCPA.  To plead a KCPA claim, a plaintiff must allege that she

14   purchased or leased "goods or services."  Ky. Rev. Stat. § 367.220(1).  Defendants cite case law

15   holding that the purchase of virtual chips is not a service because there is no "ongoing contractual

16   relationship" between Defendants and Plaintiffs.  *Collins v. Ky. Lottery Corp.*, 399 S.W.3d 449,

17   453 (Ky. Ct. App. 2012); *see also Jacobs v. KRM Wagering, LLC*, No. 2022-CA-0543, 2023 WL

18   3397511, at *5 (Ky. Ct. App. May 12, 2023) (similar).  The ongoing relationship requirement,

19   however, is the test for services, not for goods.  *Collins*, 399 S.W.3d at 453; *Jacobs*, 2023 WL

20   3397511, at *5.  And while *Collins* held that lottery tickets were not goods because they were

21   "intangible" "chance[s] to win money," Defendants never argue that virtual chips are intangible

22   and therefore fall outside the KCPA's scope.  *Collins*, 399 S.W.3d at 452–53.  Absent further

23   development on the issue of what it means to be a tangible good, the Court sees no ground for

24   dismissal.

25     The Court denies Defendants' motions to dismiss as to all claims brought under consumer

26   protection laws (except for the California claims, which were dismissed above for an independent

27   reason).

28

United States District Court
Northern District of California

1

### F.    Unjust Enrichment

The parties' unjust enrichment arguments are much like those made regarding the consumer protection statutes.  The parties dispute whether the purchase of virtual chips is illegal, this time in the context of whether it is an injustice for Defendants to retain their commissions on those purchases.  For the third time, the Court finds that Plaintiffs have pled that such purchases are illegal.  However, Defendants have also argued that the unjust enrichment claims must be dismissed as duplicative of Plaintiffs' other claims.  Apple MTD at 33–34.  It is not clear to the Court that this is universally true under the law of every state at issue.  But Plaintiffs do not really contest this point.  Opp'n at 40 n.8.  Plaintiffs contend only that the unjust enrichment claims should survive because Plaintiffs' other claims survive.  That argument misses the thrust of Defendants' position—that duplicative unjust enrichment claims must be dismissed whether or not Plaintiffs have successfully stated their other claims.  As such, Plaintiffs concede the issue, and the Court grants the motions to dismiss as to all unjust enrichment claims.  *See Whooley v. Tamalpais Union High Sch. Dist.*, 399 F. Supp. 3d 986, 993 (N.D. Cal. 2019).

### G.    RICO

Finally, the Court reaches Plaintiffs' RICO claims, which include claims for both substantive RICO violations and RICO conspiracy.  The Court takes them in turn.

#### 1.    Substantive RICO Violations

A RICO claim has five elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or property.'"  *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001).  The fifth element is sometimes referred to as "RICO standing."  *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1248 (9th Cir. 2019).  Defendants attack the sufficiency of Plaintiffs as to the first, second, and fifth elements.  In these circumstances, where the first and fifth elements clearly warrant dismissal, the Court declines to address the second element.

#### a.    Conduct

The "conduct" element requires a showing that Defendants "participated" in the relevant RICO enterprise.  *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 194 (9th Cir. 1987).  Here,

that enterprise is a supposed venture between Defendants and social casino app developers to operate "illegal slot machines."  Apple Compl. ¶ 547.

Participation does not require Defendants to take a leadership role in the enterprise, nor even to hold a formal position within the enterprise.  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).  What it does require is that Defendants have "some part in directing [the enterprise's] affairs."  *Id.*  Plaintiffs have not alleged that Defendants play that part in the alleged enterprise.  All that Defendants are responsible for is processing payments.  As alleged, Defendants take no initiative in developing the social casinos themselves or in steering the business of social casinos.  At best, Defendants are passive contributors.

Plaintiffs maintain that this undersells Defendants' role, accusing them of being responsible for "an enormous swath of the financial portion of [the enterprise], including booking the bets, doling out the chips to players, tallying up the proceeds, and dividing up the spoils among the enterprise participants."  Opp'n at 58.  Yet the complaints do not allege any of this.  Processing a payment is not taking a bet or passing out chips; the social casinos themselves are the ones giving out chips and tracking how those chips are used.  Nor do the complaints come anywhere close to alleging that Defendants serve as some sort of account divvying up earnings.  Plaintiffs allege merely that Defendants have the authority to withhold certain payments that have been processed.  Apple Compl. ¶ 100.  Plaintiffs never state that Defendants have leverage that authority into control or influence over the enterprise.

For this reason, the Court finds that Plaintiffs have failed to plead conduct.

### b.    RICO Standing

RICO standing itself has two sub-elements.  To demonstrate standing, Plaintiffs must show that their alleged injuries were (1) those to their "business or property" and (2) proximately caused by Defendants' alleged violations.  *Takeda Pharms.*, 943 F.3d at 1248.  The main point of contention is whether gambling losses are injuries to business or property.  In *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083 (9th Cir. 2002), the Ninth Circuit definitively answered this question in Defendants' favor.

United States District Court
Northern District of California

1    *Chaset* involved the sale of trading card packs, which included a random mix of standard

2    cards and rarer, more valuable "chase" or "insert" cards. *Id.* at 1086.  The *Chaset* plaintiffs sued

3    the makers of those cards, alleging that the sale of trading card packs constituted gambling.  *Id.*

4    The Ninth Circuit affirmed dismissal, explaining that persons are not injured in their business or

5    property when purchasing a card pack because they "receive[] value—eight or ten cards, one of

6    which might be an insert card—for what they paid as a purchase price." *Id.* at 1087.  Or phrased

7    more generally, they received the benefit of the bargain.[9]  To the extent that the *Chaset* plaintiffs

8    argued that they were injured not at the moment of purchase, but when they opened a pack and

9    found that it did not include a chase card, the Ninth Circuit rejected that injury as well.  The injury

10   in that situation is disappointment, which is not an injury to property. *Id.*; *see also Price v.*

11   *Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests . . .

12   is not sufficient to confer RICO standing.").

13       Courts interpreting *Chaset*, from both this circuit and others, have uniformly concluded

14   that "a disappointing gambling loss after receiving what was paid for is not injury to property

15   sufficient for RICO standing." *McLeod v. Valve Corp.*, No. 16-cv-1227, 2016 WL 5792695, at *4

16   (W.D. Wash. Oct. 4, 2016); *see also Romano v. Torch Elecs., LLC*, No. 2:23-cv-04043, 2023 WL

17   9064602, at *3 (W.D. Mo. Aug. 21, 2023); *Adell v. Macon Cnty. Greyhound Park, Inc.*, 785 F.

18   Supp. 2d 1226, 1238 (M.D. Ala. 2011); *Green v. Aztar Corp.*, No. 02-cv-3514, 2003 WL

19   22012205, at *2 (N.D. Ill. Aug. 22, 2003).

20       The Court thus concludes that Plaintiffs have failed to allege injury to business or property.

21   Plaintiffs did not suffer such an injury when purchasing virtual chips because they received what

22

23   ─────────────────────

24   [9] Defendants also raised a benefit of the bargain defense in seeking to dismiss the consumer
     protection claims.  The Court rejected that defense because Defendants failed to dispute that such
     a defense is not applicable when an illegal transaction is involved.  By contrast, when it comes to

25   benefit of the bargain principles in the RICO context, binding precedent makes clear that those
     principles do apply even if the underlying transaction is illegal gambling. *Chaset*, 300 F.3d at

26   1087.  This is because RICO standing depends on whether an injury is to business or property, and
     the fact that certain actions are unlawful does not mean that they must harm business or property

27   as opposed to harming some other interest. *See Rodriguez v. Topps Co.*, 104 F. Supp. 2d 1224,
     1227 (S.D. Cal. 2000) ("State law may proscribe gambling irrespective of whether or not it causes

28   injury to business or property . . . ."), *aff'd sub nom. Chaset*, 300 F.3d 1083.

they paid for—chips that could be exchanged for a chance to win a virtual slot spin.  And they did not suffer such an injury when they lost on a slot machine, because losing is injury to intangible expectations.

Plaintiffs attempt to evade this conclusion by arguing that social casinos are manipulated or rigged.  Apple Compl. ¶ 531.  That way, Plaintiffs would not have received the benefit of their bargain.  While they paid money expecting to receive a fair chance to win at virtual slots, they did not actually receive a fair chance.  That might well be a winning argument had Plaintiffs alleged *how* social casino apps are rigged.  But they did not, making only the conclusory allegation that social casino apps *are* rigged.  *Id.*

Plaintiffs have failed to plead RICO standing.[10]

\*　　　\*　　　\*

The Court dismisses Plaintiffs' substantive RICO claims.

### 2.     RICO Conspiracy

In order to successfully plead a RICO conspiracy, Plaintiffs must first plead a substantive violation of RICO.  *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010).  Since Plaintiffs have failed to plead a substantive violation, the Court dismisses the conspiracy claim as well.

## IV.    INTERLOCUTORY APPEAL

The Court sua sponte certifies this Order, and its prior order on Section 230, for immediate appeal under 28 U.S.C. § 1292(b).  When the Court certified its prior order based on the importance of the Section 230 issues raised, a motions panel of the Ninth Circuit initially granted permission to appeal, indicating that the issues involved were significant enough to warrant the Circuit's immediate consideration.  Although the merits panel eventually dismissed the appeal, it

---

[10] Defendants suggest that the Court could not consider any allegations of manipulation even if Plaintiffs had pled them because the Court's Section 230 holding limits Plaintiffs to their payment processing theory.  The Court is doubtful that Section 230 restricts the universe of allegations or evidence that may be considered.  Section 230 immunity depends on the duty being imposed. *Barnes*, 570 F.3d at 1102.  As long as that duty remains the same, the Court sees no reason why it cannot consider facts that are unrelated to payment processing.

1   did so not because the issues were unimportant, but because the Court had not yet dismissed (or

2   declined to dismiss) any specific claims.  *See* USCA Mem.  The Court has now addressed specific

3   claims, and the importance of the Section 230 issues has not changed.

4         Moreover, new issues have arisen since then.  For example, part of the Court's Section 230

5   analysis required it determine if monitoring of third-party content was necessary to comply with

6   the duties implicated by Plaintiffs' claims, or if monitoring was just one option.  *See HomeAway*,

7   918 F.3d at 682.  The Court found that it was not necessary, but there is no precedent explaining

8   how to determine necessity.  Another court may well have come out differently.

9         *Calise*, which had not yet been decided when the Court first certified interlocutory appeal,

10  also presents serious theoretical concerns.  *Calise* seems to suggest that Section 230 applies when

11  a duty requires monitoring even if that duty does not spring from a defendant's status or conduct

12  as publisher.  *Calise*, 103 F.4th at 742; *see also id.* at 746 (R. Nelson, J., concurring); *Twitter*, 148

13  F.4th at 640, 642.  Yet, that appears to conflict with *Barnes*.  In *Barnes*, the defendant "promised

14  to take down third-party content from its website."  570 F.3d at 1107.  The Circuit held that

15  Section 230 immunity did not attach to claims enforcing that promise because the duty triggered is

16  not one that stems from the defendant's status as publisher.  *Id.* at 1107–09.  However, for the

17  defendant to take down third-party content, it would seem that the defendant must monitor the

18  third-party content on its website.  And if that were so, then Section 230 immunity should apply

19  under *Calise*, creating a seeming contradiction.

20        In fact, *Calise* itself illustrates this apparent contradiction.  There, the Ninth Circuit held

21  that Section 230 does not immunize Meta from contract claims based on its "promise to moderate

22  third-party advertisements."  *Calise*, 103 F.4th at 743.  Moderating advertisements, of course,

23  requires Meta to monitor those advertisements.  And that would seem to mean that immunity

24  should apply.

25        In certifying these orders for interlocutory appeal, the Court declines to issue a stay of

26  these matters.  Given the age of these cases and the relatively little activity that has occurred since

27  their filing, it is best to continue pushing these cases forward even as an appeal may be pending.

28

United States District Court
Northern District of California

1    V.    CONCLUSION

2        The Court **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss.[11]  Except

3    as dismissed below, Plaintiffs' claims may proceed:

4        • Apple (Case No. 5:21-md-2985)

5            o Counts I and II (the California claims) are **DISMISSED WITH PREJUDICE**.

6            o Counts III, VI, IX, XII, XV, XVII, XIX, XXI, XXIV, XXVII, XXIX, XXXI,

7                XXXIII, XXXV, and XXXVII (all loss recovery claims against Apple) are

8                **DISMISSED**.

9            o Counts V, VIII, XI, XIV, XVI, XVIII, XX, XXIII, XXVI, XXVIII, XXX,

10                XXXII, XXXIV, XXXVI, and XXXIX (all unjust enrichment claims against

11                Apple) are **DISMISSED**.

12            o Counts XL and XLI (the RICO claims) are **DISMISSED**.

13        • Google (Case No. 5:21-md-3001)

14            o Counts I and II (the California claims) are **DISMISSED WITH PREJUDICE**.

15            o Counts III, VI, IX, XV, XVII, XIX, XXIV. XXVII, XXIX, XXXI, XXXIII,

16                XXXV, XXXVII, and XL (all loss recovery claims against Google, except for

17                those brought under Kentucky and Montana law) are **DISMISSED**.

18            o Counts V, VIII, XI, XIV, XVI, XVIII, XXI, XXIII, XXVI, XXVIII, XXX,

19                XXXII, XXXIV, XXXVI, XXXIX, and XLII (all unjust enrichment claims

20                against Google) are **DISMISSED**.

21            o Counts XLIII and XLIV (the RICO claims) are **DISMISSED**.

22        • Meta (Case No. 5:21-cv-2777)

23            o Counts I and II (the California claims) are **DISMISSED WITH PREJUDICE**.

24            o Counts III, IX, XII, XVIII, XX, XXV, XXVIII, XXX, XXXII, XXXIV, and

25

26    _____

27    [11] The Court does not address Defendants' argument that *Sonner v. Premier Nutrition Corp.*, 971
        F.3d 834 (9th Cir. 2020) requires dismissal of equitable claims because only loss recovery and
        consumer protection claims remain, but Defendants do not try to identify which of those claims
28        are equitable and which of those claims are legal.

United States District Court
Northern District of California

XXXVI (all loss recovery claims against Meta, except for those brought under Arkansas, Kentucky, and Montana law) are **DISMISSED**.

    o  Counts V, VIII, XI, XIV, XVII, XIX, XXII, XXIV, XXVII, XXIX, XXXI, XXXIII, XXXV, and XXXVIII (all unjust enrichment claims against Meta) are **DISMISSED**.

    o  Counts XXXIX and XL (the RICO claims) are **DISMISSED**.

The Court **CERTIFIES** this Order and its prior order (ECF No. 106 (Apple), ECF No. 80 (Google), ECF No. 119 (Meta)) for immediate appeal.

Within **twenty-one (21) days**, Plaintiffs shall file a notice indicating whether they intend to proceed on the claims surviving after this Order or whether they intend to file an amended complaint. The parties shall then meet and confer and, within **fourteen (14) days** after the filing of the required notice, submit either a stipulated schedule or a status report with competing scheduling proposals. In conferring on a schedule, the parties should not expect that the Court will further stay discovery regardless of whether Plaintiffs intend to amend.

**IT IS SO ORDERED.**

Dated: September 30, 2025

EDWARD J. DAVILA
United States District Judge